AO 241 (Rev. 5/85)

PETITION UNDER 28 USC § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

## United States District Court

| District | Eastern District, Sacramento CA. |
|---|---|

| Name | Carl C. Hancock Jr. | Prisoner No. H-43946 | Case No. |
|---|---|---|---|

Place of Confinement
C.S.P-Solano
P.O.Box 4000, 5-245-L
Vacaville CA. 95696

10 CW 2215 KJM

| Name of Petitioner (include name under which convicted) | Name of Respondent (authorized person having custody of petitioner) |
|---|---|

CARL C. HANCOCK JR.

v. GARY SWARTHOUT; WARDEN (A)
BOARD OF PRISON HEARING

The Attorney General of the State of:

Jerry Brown

### PETITION

1. Name and location of court which entered the judgment of conviction under attack   San Joaquin Superior

Court   222 E. Weber Ave., #303, Stockton  CA.   95202-2777

2. Date of judgment of conviction   11-07-1989

3. Length of sentence   25 yrs. to life

4. Nature of offense involved (all counts)   PC 187, 1st degree murder

5. What was your plea? (Check one)
   (a) Not guilty  ☐
   (b) Guilty  ☒
   (c) Nolo contendere  ☐
   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury  ☐
   (b) Judge only  ☐

7. Did you testify at the trial?
   Yes ☒  No ☐

8. Did you appeal from the judgment of conviction?
   Yes ☐  No ☒

**FILED**

AUG 18 2010

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY CLERK

AO 241 (Rev. 5/85)

---

9. If you did appeal, answer the following:

(a) Name of court   N/A

(b) Result

(c) Date of result and citation, if known

(d) Grounds raised

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

(1) Name of court   N/A

(2) Result

(3) Date of result and citation, if known

(4) Grounds raised

(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

(1) Name of court   N/A

(2) Result

(3) Date of result and citation, if known

(4) Grounds raised

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
Yes ☒ No ☐

11. If your answer to 10 was "yes," give the following information:
(a) (1) Name of court   San Joaquin Superior Court, San Joaquin CA.

(2) Nature of proceeding   Petition for Writ of Habeas Corpus

(3) Grounds raised   The District Attorney Violated the Plea Agreement

(See Attachment, exhibit 1)

---

(3)

AO 241 (Rev. 5/85)

_____

_____

_____

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☒  No ☐

(5) Result   Petition was Granted

(6) Date of result  2-14-2007     (See Attachment, exhibit 1)

(b) As to any second petition, application or motion give the same information:

(1) Name of court  San Joaquin Superior Court

(2) Nature of proceeding  Petition for Writ of Habeas Corpus, Challenging

Board of Prison Hearing (BPH) denial of suitability.

(3) Grounds raised  1) The District Attorney Violated the Plea Agreement.

2)   The Underlying Cirumstance of the Commitment Offense Alone

Did not Provide a Valid Base For Denying Parole.  3)  The

Board's Denial of Parole was not Supported by Evidence that

Petitioner poses Unreasonable Risk to Society.(See Attachment)

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☒  No ☐

(5) Result  DENIED     (See Attachment exhibit 5)

(6) Date of result  7-22-09

(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

(1) First petition, etc.        Yes ☐   No ☒
(2) Second petition,          Yes ☒   No ☐

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

First Petition was granted

_____

_____

12. State *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same. CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

AO 241 (Rev 5/85)

---

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(I) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A. Ground one: The Board violated petitioners State, Federal, due process & statutory rights in finding petitioner unsuitable for parole.

Supporting FACTS (state *briefly* without citing cases or law) The board relied upon the immut-able and unchangeable circumstance of his commitment offense to find him unsuitable for parole. Not with standing the nature of the commitment offense itself, there was no evidence to support the Boards determination petitioner currently posses an unreasonable risk of danger to society if he was released. (See Attachment)

B. Ground two: That some evidence did not support the board's decision to deny him suitable for parole.

Supporting FACTS (state *briefly* without citing cases or law): The petitioner's work chronos gave him a positive reviews, they all indicated that he was a hard worker, reliable self-movitated, earned position of special skills that he has develope marketable skills, that he took full responcibility for his action, great Psy. report, completed self-help programs, displinary free for the past 10 yrs. ect.. The board did not cite to any evidence in the record to show that he would be a risk/danger to society if he was released on parole.

C. Ground three: The Board did not state/show a nexus between the facts in which they used to deny parole and current risk to society.

Supporting FACTS (state *briefly* without citing cases or law): There was uncontradicted evidence of petitioner's rehabilitation and where one or more factors are used to support a denial of parole, the relevant inquiry is whether those factors, when considered in light of the other factors in the record, are predicitive of current dangerousness of inmate. The board has not pointed to any evidence on the record to indicate that the petitioner is predictive of current dangerousness.

D. Ground four: The District Attorney violated the terms of the PLEA AGREEMENT.

Supporting FACTS (state *briefly* without citing cases or law)Mr. Hancock pled guilty to a charge of first degree murder in exchange for dismissal of the special circumstance allegation and promise from the district attorney that he would submit to the parole board a letter that requested his parole at the earlist time permitted by law. The District Attorney refused to read the letter into the record and refused to go on the record recommending parole. They violated the spirit of the plea agreement. (See Attachment)

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them: All issues raised

San Joaquin Superior Court Case. No. SC045624B (exhibit 5)

Court of Appeal, 3rd Dist. Case No. C062770 (exhibit 10)

Supreme Court of California Case No. S177839 (exhibit 12)

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack? Yes ☐ No☒☒

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
(a) At preliminary hearing Ronald Abernathy, Attorney at Law, 3031 West March Lane, suite 210 west, Stockton CA. 95207

(b) At arraignment and plea      Same As Above

(c) At trial    N/A

(d) At sentencing    Same As (a)

(e) On appeal    N/A

(f) In any post-conviction proceeding    Michael Satris, Attorney at Law, P.O.Box 337

Bolinas,   CA.   94924

(g) On appeal from any adverse ruling in a post-conviction proceeding    Same As Above (f)

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
    Yes ☐ No ☒

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
    Yes ☐ No ☒
    (a) If so, give name and location of court which imposed sentence to be served in the future:

    (b) Give date and length of the above sentence:

    (c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
    Yes ☐ No ☒

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

Carl C. Hancock Jr.
Signature of Attorney (if any)
Carl C. Hancock Jr., In pro-per

I declare under penalty of perjury that the foregoing is true and correct. Executed

8-13-10
(date)

Carl C. Hancock Jr.
Signature of Petitioner
Carl C. Hancock Jr., In pro-per

(7)

Carl C. Hancock Jr., H-43946
C.S.P-Solano
P.O.Box  4000, 5-245-L
Vacaville, CA.  95696

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT

In re:

    Carl C. Hancock Jr.

**CASE NO.** _____

PETITION FOR WRIT OF HABEAS
CORPUS UNDER 28 § 2254
CHALLENGING THE BPH DECISION
FINDING PETITIONER UNSUITABLE
FOR PAROLE AND POINTS AND
AUTHORITIES IN SUPPORT THEREOF

San Joaquin Superior Court...............Case No. SCO45624B
Court of Appeal, Third Appellate District Case No. C062770
The Supreme Court Of California...........Case No. S177839

**TABLE OF CONTENTS**

PAGE

I.      Introduction...............................................1

II.     Factual Background.........................................2

III.    Arguments.................................................3

    I.   The Board violated petitioners state,federal
         due process & statutory rights in finding
         petitioner unsuitable for parole by relying
         upon the immutable and unchangeable circum-
         stance of his commitment offense to find him
         unsuitable for parole............................3

             a)   In regards to the denial due to the
                  commitment offense................3,4,5,6

             b)   In regards to little insight into
                  the crime............................5,6

    II.  Board's denial of parole is unsupported by
         evidence that petitioner poses unreasonable
         risk to society..................................6

             a)   In regards to the denial due to the
                  commitment offense................6,7,8,9

             b)   In regards to the denial due to
                  petitioner programed in only a
                  limited manner....................6,7,8,9

    III. The board/court failed to show an explicit
         articulation of a rational nexus between
         those facts for denial of parole and current
         dangerousness to the public......................9

             a)   In regards to the denial due to
                  petitioners parole plans being
                  deficient............................9,10

    IV.  Santobello requires that the plea agreement
         be construed according to state contract
         law and requires that the terms of a valid
         plea agreement be enforced.......................10

             a)   In regards to the District Attorney
                  violating the plea agreement.....10,11,12

IV.     Conclusion...............................................13

i

**TABLE OF AUTHORITIES**

CASE                                                      PAGE

Brown v. Poole
        337 F.3d 1155....................................10

In re Burdan
        168 Cal.App 4th 18...............................9

In re Gaul
        (2009)  DJDAR  5755..............................6

In re Lawerence
        (2008)  supra 44 CAL.App 4th 1181...............4,6,7,13,14

STATUTES

Penal Code
   187............................................................1
   3046..........................................................12

EXHIBITS

   1.    San Joaquin Superior Court Order granting petitioners
         **New Hearing**

   2.    Board of Parole Hearing Transcripts  (HT)

   3.    Letter of recommendation for earliest possible release
         date, from San Joaquin District Attorney, J. Phillips

   4.    (2007)  Psychological Evaluation Report of petitioner

   5.    Superior Court of California,County of San Joaquin
         **ORDER OF DENIAL** letter

   6.    Petitioners Response to San Joaquin Superior Court
         Denial Order of petition

   7.    Copy of cover sheet of Petition for writ of habeas corpus
         filed and endorsed by Court of Appeal 3rd appellant dist.
         and proof of filing, case no. C062770

               (b)   Request to State Attorney General to file a
                     Informal Response to the petitioners writ,
                     from the Court of Appeal, 3rd App. Dist.

   8.    Informal Response from the Attorney Gemeral

   9.    Petitioners Opposition to the AG Informal Response

   10.   Court of Appeal Third Appellant District CA.,**DENIAL ORDER**

   11.   Copy of cover sheet of Petition for writ of habeas corpus
         filed and endorsed by The Supreme Court of The State of
         California., Case No. S177839

   12.   **POST CARD DENIAL ORDER** From the **CALIFORNIA SUPREME COURT**

1.  **INTRODUCTION**

2    Petitioner, Carl C. Hancock Jr., H-43946, is a prisoner of the
3 State of California incarcerated at California State Prison Solano,
4 (C.S.P-Solano), located in Vacaville CA.  Pursuant to a valid judg-
5 ment entered on 11/07/89 in the San Joaquin Superior Court of the
6 State of California, County of San Joaquin, case no. SCO4564B.
7 Petitioner pled guilty to a charge of first degree murder a viola-
8 tion of penal code 187, in exchange for dismissal of the special
9 circumstance allegation and promise from the districet attorney
10 that he would submit to the parole board a letter that recommended/
11 requested his parole at the earliest time permitted by law.

12    Respondents are the State of California, Jerry Brown is the
13 Attorney General for the State.  The Board of Prison who conducted
14 the petitioners parole suitability hearings and Gary Swarthout the
15 warden at C.S.P-Solano who has legal/physical custody of the
16 petitioner.

17    Petitioner is contending that the Board of Prison Hearings, (BPH)
18 violated petitioners state,federal,due process and statutory rights
19 by their reliance upon the immutable and unchangeable circumstances
20 of his commitment offence to find him unsuitable for parole.

21    Petitioner is contending that BPH failed the **'some evidence'**
22 test.  That there was no evidence in the record to support the BPH
23 decision to find him unsuitable for parole.  On the contray the
24 evidence indicated that the petitioner had rehabilitated himself
25 that there was support that he was suitable for parole.

26    Petitioner is also contending that the Board/Attorney General
27 failed to show an explicit articulation of a rational nexus between
28 those facts used for denial of parole and current dangerousness.

1    Petitioner is further contending that the district attorney
2    violated the term/spirit of the plea agreement along with the San
3    Joaquin Superior Court Order from 2/14/05, by not verbalizing the
4    plea agreement on the record, the content of the plea agreement, &
5    eluding to unsubstantial  evidence outside the scope of the record
6    and the plea agreement, refusing to state for the record that they
7    **"recommend/request"** parole.

8    II.   **FACTUAL BACKGROUND**

9    Petitioner appeared at his first parole suitable hearing on
10   or around 6-23-05, in which the district attorney violated the terms
11   of the plea agreement and subsequently the Board of Prison Hearings
12   found the petitioner unsuitable for parole. (see exhibit 1)

13   Petitioner then filed a Habeas Corpus on 4-18-06, alledging
14   that the district attorney violated the terms of the plea agreement
15   and therefore he was entitled to a new hearing and the specific
16   enforcement of the plea agreement. (see exhibit 1)

17   The San Joaquin Superior Court granted the petition on 2/14/07
18   and ordered that **" Respondent shall provide petitioner with a parole**
19   **suitability hearing at the earliest possible date."** (see exhibit 1)

20   Petitioner new hearing was done on 10/29/07, and once again
21   the district attorney violated the terms/spirit of the plea agree-
22   ment and the Board therefore found petitioner unsuitable for parole.

23   Petitioner filed a petition for a writ of habeas corpus
24   challenging the BPH 2007 decision finding him unsuitable for parole
25   on 6/2/09 with the Superior Court of California, County of San
26   Joaquin, case no. SCO4564B.  The petition was denied by the Superior
27   Court on 7/22/09.  (see exhibit 5)

28   Petitioner filed a response to the superior court denial. (exhibit 6)

2

1    On 8/28/09 petitioner filed a petition for writ of habeas corpus

2    in the Court of Appeal of the State of California, Third Appellant

3    District, case no. CO62270, challenging the BPH/Superior Court

4    decision finding petitioner unsuitable for parole.  (see exhibit 7)

5        The Third Appellate Court requested an Informal Response from

6    the Attorney General on 9/03/09.  The Attorney General filed his

7    informal response on 9/18/09. (see exhibit 8)

8        The petitioner filed his oppsition to the informal response on

9    10/08/09.  (see exhibit 9)

10       The Court of Appeal denied the petition on 10/22/09 without a

11   written response.  (see exhibit 10)

12       On 11/10/09 petitioner filed a petition for a writ of habeas corpus

13   in the Supreme Court of The State Of California case no. S177839,

14   challenging the BPH/Lower courts decision in finding petitioner

15   unsuitable for parole.  (see exhibit 11)

16       The California Supreme Court denied the petition on 6/09/10,

17   with a post-card denial. (see exhibit 12)

18       The petitioner has exhausted all of his State remedies as to each

19   ground on which he is requesting action by the federal courts.

20   Therefore petitioner is now filing his federal writ of habeas corpus

21   at this time in the above entitled court.

22   III.  ARGUMENTS

23                                     I

24              THE BOARD VIOLATED PETITIONERS STATE,FEDERAL
                    DUE PROCESS & STATUTORY RIGHTS
25              IN FINDING PETITIONER UNSUITABLE FOR PAROLE
                    BY RELYING UPON THE IMMUTABLE AND
26              UNCHANGEABLE CIRCUMSTANCE OF HIS COMMITMENT
                   OFFENSE TO FIND HIM UNSUITABLE FOR PAROLE
27
         The board violated petitioners state,federal ,due process and
28

                                     3

1 statutory right in finding petitioner unsuitable for parole by rely-
2 ing upon the immutable and unchangeable circumstance of his commit-
3 ment offense to find him unsuitable for parole.

4 The California Supreme Court stated in Lawerence, supra 44 cal 4th
5 at p. 1211:

6     **"The underlying circumstance of the commitment offense alone**
7 **rarely will provide a valid basis for denying parole when there is**
8 **strong evidence of rehabilitation and no other evidence of current**
9 **dangerouness."**

10     In the case at hand the petitioner is contending that there is
11 very strong uncontradicted evidence of petitioners rehabilitation
12 and there was no evidence cited by the board to the contrary and/or
13 that petitioner currently poses a danger society. Not with standing
14 the nature of the commitment offense itself, there was no evidence
15 to support the boards determination petitioner has not been rehabil-
16 itated and/or poses an unreasonable risk of danger to society if he
17 was released on parole.

18     The petitioner took full responcility for his action/crime.
19 (see Board of Prison Hearing Transcripts. will be refered to as (HT)
20 p.50,L. 18-19; refered to as Exhibit 2). There was no evidence
21 presented in there conclusion to show that petitioner's commission
22 of the commitment offense remain probative to the statutory deter-
23 mination of a continuing threat to public safety.

24     The petitioner has no juvenile record of assaulting others, has
25 a stable social history as exhibited by reasonable stable relation-
26 ships with others. While in prison he has enhanced his ability to
27 function within the law upon release by participation in self-help
28 programs, institutional job assignments and committed the crime as

4

1   a result of significant stress in his life; particularly the death
2   of his grandmother...financial situation, recent birth of his son
3   responcibility of raising a family.  He has realistic parole plans
4   which include a place to stay and job offer.  He has a wonderful
5   family support system and he has maintained positive institutional
6   behavior.  He has shown signs of remorse.  He has indicated that
7   he understand the nature and magnitude of the offense and accepts
8   full responsibility for the criminal behavior.

9       The main factor the board used in denying parole was petitioner's
10  commitment offense.  (see exhibit 2, HT p.121 L. 13-25, p. 122 L.
11  1-25, p. 123 L. 1-10).  The Superior Court also agreed with this
12  conclusion stating: "The transcript of the hearing therefore reveals
13  some evidence that petitioner would continue to be a danger to the
14  public if released.  Hence the petition is denied." (see exhibit 5)
15  Neither the court nor the board pointed to where this evidence was
16  located in the record.

17      With respect to psychological factors pertinent to the parole
18  determination states:   " Overall Risk Assesment:  The inmate level
19  of psychopathy is in the low range.  The inmates overall propensity
20  for violence is in the low range when compared to similar inmates.
21  The inmates general recidivism is rated in the low range." (see
22  exhibit 4 Psy. report (2007) p.6).

23      In regards to insight the report states:  " It says his insight
24  into the crime involvement and his overall situation appears intact."
25  (See exhibit 2 HT p. 96 L. 12-14)

26      The petitioner is contending that the evidence/record has estab-
27  lished petitioners rehabilitation, insight, remorse and psychological
28  health is devoid of any evidence supporting a finding that he continues

5

1   to pose a threat to public safety and the board/court has not related
2   the commitment offense to current circumstances or suggested that any
3   further rehabilitation might change the ultimate decision that pet-
4   itioner remains a danger to society if released.

5       Petitioner contends that **"mere recitation of the circumstances**
6   **of the commitment offense, absent articulation of a rational nexus**
7   **between those facts and current dangerousness, fails to provide the**
8   **required 'modicum of evidence' of unsuitability.'** (Lawerence supra, 44
9   Cal. 4th at pp. 1226-1227)

10      Petitioner therefore concludes that his due process and statutory
11  rights were violated by the Boards/Courts reliance upon the immutable
12  and unchangeable circumstance of his commitment offense and that the
13  Board/Court did not meet the required **'modicum of evidence'** of un-
14  suitability, that there decision is not supported by **some evidence** of
15  current dangerousness and therefore their decision should be set aside
16  and/or vacated and petitioner should be granted the appropriate relief.

17                              **II**

18      **BOARD'S DENIAL OF PAROLE IS UNSUPPORTED BY EVIDENCE THAT**
        **PETITIONER POSES UNREASONABLE RISK TO SOCIETY**
19
20      In re Gaul, (2009) DJDAR 617, CA 2 NO. 73930

21  The Board denied parole because the commitment offense was a murder-
22  for-hire and was carried out in a manner that demonstrated a callous
        disregard for the victims suffering.
23

24      In the case at hand the Board basicly said the same exact words
25  to petitioner and denied his parole for the very same reason. (see
        exhibit 2 HT p. 127 L. 7-17)
26

27      The Court reversed the Boards decision stating:

28          " We do not quarrel with the Board's evaluation of the

                                6

1    aggravated nature of the commitment offense, which appears to be the
2    primary ground upon which it denied parole." However as explained in
3    **Lawerence**, supra 44 Cal.4th at page 1214. **"the aggravated nature of**
4    **the crime does not in and of itself provide some evidence of current**
5    **dangerousness to the public unless the record also establishes that**
6    **something in the prisoner's pre or post incarceration history, or**
7    **his or her current demanor and mental state, indicates that the**
8    **implications regarding the prisoner's dangerousness that derive from**
9    **his or her commission of commitment offense remain probative to the**
10   **statutory determination of continuing threat to public safety."**

11       Petitioner is contending that the Board/Court has not met this
12   standard and there assessment of petitioner's institutional programing
13   was irretrievably flawed.

14       The Board stated that they were denying parole due to the fact:
15   " The inmate has programmed in a limited manner" (See exhibit 2, HT
16   p. 128 L. 12-25). The record shows that petitioner programed in
17   a good manner. (see exhibit 2, HT p.48, L. 9-10, p. 93 L. 5-12)

18       The petitioner only had one 115 and that was in 1996 a minor
19   rule violation. (Exhibit 2, HT p.40 L. 2-5)

20       The petitioners work chronos gave him positive reviews, they all
21   indicated that he was a hard worker, reliable, self-motivated, earned
22   the position of special skills and that he has develope marketable
23   skills that can be used to obtain employment once release on parole.
24   (See exhibit 2, HT p. 44 L. 3-25, p. 45 L. 1-7)

25       The petitioner has completed self-help programs while incarcerat-
26   ed. He has signed up for every self-help program that has been made
27   available to him at this institution. He has been active in his
28   religious faith being a representative on the advisory committee.

7

1    (see exhibit 2, HT p.44 L. 1-3)

2         He has completed the **"Mens Violence Prevention Seminar"** Men's

3    Violence Prevention is an extensive training seminar and self-help

4    group for men who want to end the violence. (See exhibit 2, HT p.43

5    L. 22-25)

6         He has been participating with the **"Prison Outreach Program**

7    **(POP)"** since 2005. Which mentors to young adults and teach them

8    how to manage their angry and preventing violence in there life.

9    (See exhibit 2, HT p.46 L. 8-10)

10        He has completed a **" 26 week self-help Anger Management"**

11    program where he worked on processing his angry feelings as opposed

12    to acting upon them. Curriculum instruction in:

13    1) Stress management; 2) Improving communication with others;

14    3) Learning strategies for handling high risk situations;

15    4) Enhancing emotional intelligence; 5) Applying learned techni-

16    ques in real life situations; 6) Healthy ways to deal with anger.

17    (See exhibit 2, HT p.45 L. 7-11)

18        Petitioner has completed **" Parenting Class"** (See Exhibit 2

19    HT p.46 L. 5-8)

20        Petitioner is currently active in AA/NA, his religious faith

21    as a mentor and POP.

22        Petitioner's institutional behavior and programing has shown

23    an enhanced ability to function within the law.

24        The Board stated: **" You know this is a good record"** (See exhibiit

25    2, HT p.48 L.9-10). They also stated: **" a lot of positive stuff"**

26    (Exhibit 2, HT p.48 L. 11-12) Meaning that petitioner had a good

27    programing record not a limited record. The board does not cite to

28    any part of the record to support there conclusion that the petitioner

8

1   had a limited programming and if CDCR offered more programs and/or
2   if the petitioner failed and/or refused to sign up for them and/or
3   how this alledged limited programing shows/proves that petitioner
4   is still a danger to society if released on parole.

5       Petitioner contends not with standing the nature of the com-
6   mitment offense itself, there is no evidence to support the Board's/
7   Courts determination that due to a limited programming, petitioner
8   currently poses an unreasonable risk of danger to society if
9   released on parole.  Petitioner contends that the record does not
10  indicate that he programed in a limited manor but he actualy program-
11  ed in a satisfactory condition and is not a threat to public safety
12  if released on parole.

13                              III

14              THE BOARD/COURT FAILED TO SHOW
                AN EXPLICIT ARTICULATION OF A RATIONAL
15              NEXUS BETWEEN THOSE FACTS FOR DENIAL OF
                PAROLE AND CURRENT DANGEROUSNESS TO THE
16                          . PUBLIC

17

18  In re Burdan 168 Cal App 4th 18, the court stated:

19      "where one or more factors are used to support a denial of
20  parole, the relevant inquiry is whether those factors, when con-
21  sidered in light of the other factors in the record, are predic-
22  tive current dangerousness of the inmate."

23      The board has used several factors for denying parole one
24  was that the petitioner's parole plans was deficient.

25      The Board stated:  " In terms of your parole plans, we find
26  them deficient in the following ways.  Your residential plans are
27  adequate.  In terms of your employment plans sir, we're gonna
28  need a little bit specificity." (see exhibit 2, HT p.125 L. 17-20)

                              9

1       Petitioner is contending this method of specificity was

2    unfair and uncalled for.  The assessment was not consistent with

3    the rules and regulations and/or statutes in regards to parole

4    plans.   One must show that he has obtained sometype of marketable

5    skills to help him in gaining employment if he was released on

6    parole.

7       The petitioner work skills while incarcerated indicated that

8    he became a lead man, which is a form of a manager. His work

9    chronos also indicated that he develope skills that could be used

10   and/or marketable for a manager position and/or to gain lawful

11   employment.  (see exhibit 2, HT p.43 L. 19-20)

12      Therefore the petitioner is contending that his parole plans

13   were realistic and obtainable.  That the Board/Court failed to

14   show an explicit articulation of a rational nexus between this

15   fact for denial of parole and current dangerousness to the public.

16   Due to the above stated reason this petition should be granted

17   and/or given the proper relief deem right by this court.

18

19                                     IV

20   SANTOBELLO REQUIRES THAT THE PLEA AGREEMENT BE CONSTRUED
     ACCORDING TO STATE CONTRACT LAW AND REQUIRES THAT THE TERMS
21                OF A VALID PLEA AGREEMENT BE ENFORCED

22

23      In Brown v. Pool 337 F.3d 1155 the court stated:

24   "Santobello requires that the plea agreement be construed according

25   to state contract law, and requires that the terms of a valid plea

26   agreement be enforced."

27      In the case at hand the District Attorney was suppose to

28   submit a letter to the board recommending/requesting that the

                                    10

1   petitioner be granted parole.  Instead the District Attorney eluded
2   to evidence that was not part of the record and refused to read
3   the content of the plea agreement, refusing to state for the record
4   that they **"recommend/request parole."**  There was not suppose to be
5   any other comments that were not consistant with the terms/spirit
6   of the plea agreement.  (See exhibit 1 p.1)

7       The D.A goes on the record and stated: **" We will not be making
8   a comment at this time with the introductory remarks explaining our
9   position."**  (See exhibit 2, HT p. 80 L. 17-20)

10      The D.A refused to even read the letter into the record even
11  though this was one of the main reasons the court granted a new
12  hearing.  (See exhibit 2, HT p.82 L. 23-25, p.83 L. 1-11 also exhibit 1)

13      The Attorney for the defense requested that the letter be submit-
14  ted and read into the record the D.A and the Board members refused,
15  (See exhibit 2, P.81 L. 5-6, p.82 L. 19-22)

16      This was basicly like an empty formality.  The D.A never states
17  for the record the terms of the plea agreement.  As a matter of fact
18  he trys to misrepresent the facts of the agreement and introduce
19  alledge elements of the crime that was not proven and/or apart of the
20  agreement.  (See exhibit 2, HT p.80 L. 10-11, L. 17-20)

21      The spirit of the letter was to inform the board that petitioner
22  had cooperated with the San Joaquin County's Sheriff's Department
23  and District Attorney's Office, that he gave truthful testimony,
24  that the D.A office **" urge and recommend without reservation that
25  those agencies of state government, having control over inmates
26  prison terms and the granting of parole, release Carl Charles Hancock
27  from actual custody after he has served two-thirds (or the minimum of
28  16 years 8 months) of the 25 years to life sentence."** (see exhibit 3 )

1        Not objecting or not having a comment is not the same and/or

2  in the same spirit as **URGING AND RECOMMENDING PAROLE.** Since the

3  D.A failed to do this they violated the terms of the plea agreement.

4        That under P.C 3046 (c):

5  "The Board of Prison Term shall, in considering a parole for a prisoner

6  consider all statements and recommendations which may have been

7  submitted by the judge, district attorney."

8        The record is void of any statements or facts in-regards to

9  the boards considering the letter from the D.A and/or the plea

10  agreement from the petitioner. There is no record that the board

11  even read the letter. By not reading the letter into the record

12  and the board not mentioning if they have read the letter and/or

13  even considered it violated pc 3046 (c).

14        The D.A in his own words indicated that an attorney for the

15  people words must be consistant with the spirits of the letter

16  other wise it would be a violation of the plea agreement.

17        The D.A stated: **" a habeas petition saying that the district**

18  **attorney violated an agreement and improperly spoke at those procceed-**

19  **ings"** (See exhibit 2, HT p.79)

20        Petitioners attorney also informed the board that the DA's

21  comments was misleading and not part of the plea agreement.

22  Petitioner attorney stated: **"Well, one thing I would object to his**

23  **statement. There was only one charge in this case that was filed**

24  **against Mr. Hancock and I don't think there was any criminality**

25  **after this case"** (See exhibit 2, HT p.82) This was in-regards to

26  the D.A making comments that were not apart of the record.

27        Petitioner is contending that he is entitled to have the specific

28  performance of his plea agreement carried out.

1   **IV. CONCLUSION**

2       The California Supreme Court has made a new rule for judicial

3   review of lifer Board decisions that comports with:

4       1.  the law [Penal Code 3041];

5       2.  bedrock rules of statutory construction [**SHALL IS MANDATORY**];

6       3.  the true mission of lifer parole determination [no evidence

7           of current dangerousness if released].

8       Petitioner is contending that the record fails to show some

9   evidence supporting the boards denial and the Board/Court didn't

10  have an **"articulation of a rational nexus between those facts**

11  **(reason for denial) and current dangerousness"** In re Lawerence, 44 Cal.

12  4th 1181.  Pursuant to Lawerence, even though the board found petitioner

13  unsuitable due to the circumstances of his commitment offense, it

14  needed to further show how those circumstances related to his

15  current dangerousness in light of the other facts in the record,

16  here the board stated the circumstances of the offense, programmed

17  in only a limited manner, parole plans were deficient and had little

18  insight, even though the record clearly shows something very

19  different:

20  1)  Petitioner programmed in a good/manner he had expiated behavior

21      in prison, shows he can get along and work with others, reflects

22      he has rehabilated himself.  He has participated in self-help

23      programs.  He took full respocibility for his role/actions in

24      the crime.

25  2)  Petitioner had a place to stay, he had good/great family support

26      system.  The petitioner work chronos indicated that he was a

27      leadman, he develope vocational/work skilss that were marketable

28      that could be used to gain lawful employment.

13

1   3)  In-regards to insight the psy report stated:  **" It says his**
2       **insight into the crime involvement and overall situation appears**
3       **intact."**  The psy. report indicated the petitioner was suitable
4       for parole, his insight was intact, he was remorseful, assessed
5       petitioner as a **low risk** to the public, his substance abuse was in
6       remition and any future rehabilitation could be a condition of his
7       parole, they indicated he currently had no substance abuse problem.
8   4)  Petitioner made a plea bargain, he took full responcibility for
9       his actions, he has shown remorse.  The District Attorney **urge**
10      **and recommend** that petitioner be released after serving his minimum
11      sentences.

12      Although the commitment offense was callous, the passage of 20
13  years since the crime should have diminished the value factor as a
14  predictor of current dangerousness.  Neverless the Board/Court did
15  not addresss how any of these factors were an indication of petitioners
16  current dangerousness.  Because the Board's/Court finding do not
17  amount to a determination of current dangerousness the Boards/Courts
18  finding of some evidence to support the denial of suitability is
19  unreasonable and a violation of petitioners right to due process and
20  therefore there decision should be vacated and the petitioner grant-
21  ed a release date and/or found suitable for parole.  There was no
22  reliable evidence before the Board/Court supporting its conclusion
23  that petitioner's release would pose an unreasonable risk to public
24  safety.

25      There was no **EXPLICIT "articulation of a rational nexus between**
26  **those facts (reason for denial) and current dangerousness"** as required
27  by Lawerence, 44 Cal.$th 1181. Sotherefore the Board/Court order
28  should be reversed and/or vacated.

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    I, the undersigned, say I am the petitioner in this action.  I declare under penalty
      of perjury under the laws of the State of California that the foregoing allegations
22    and statements are true and correct, except as to matters that are stated on my
      information and belief, and as to those matters, I believe them to be true.
23

24    Date: 8-13-10                          Respectfully Submitted,

25
                                             Carl C. Hancock Jr.
26                                           Carl C. Hancock Jr.
                                             In pro-per
27

28

15

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

CARL C. HANCOCK JR.
                Petitioner,

v.                                          Case Number:

GARY SWARTHOUT, WARDEN(A)

                                            PROOF OF SERVICE

BOARD OF PRISON HEARING

                Respondents


I hereby certify that on        8-13-10            , I served a copy

of the attached _____

by placing a copy in a postage paid envelope addressed to the person(s) hereinafter

listed, by depositing said envelope in the United States Mail at    C.S.P-Solano
                                                                    P.O.Box  4000
                                                                    Vacaville,  CA.  95696

(List Name and Address of Each                I am presently incarcerated at the C.S.P-Solano
Defendant or Attorney Served)          in Vacaville. Due to my incarceration, indigency or
**United States District Court**       minimal funds, and the current policy of CDCR as stated
**for the Eastern District**           in Deputy Director Memorandum 15/04, I cannot provide
**(Sacramento Office)**                the required number of copies as required by the Rules
**501 I street, suite 4-200**          of Court.
**Sacramento, Ca. 95814.**
Therefore, I must respectfully request that the court make the required additional copies and to
serve any required copies on the other parties as necessary.

Furthermore, please send a conformed copy of the documents back to me as a receipt of filing.
I apologize for any inconvenience that may have caused.

        I declare under penalty of perjury that the foregoing is true and correct.


                    _____

                    (Signature of Person Completing Service)

Carl C. Hancock Jr. , H-43946
C.S.P-Solano
P.O.Box 4000, 5-245-L
Vacaville, CA. 95696

# EXHIBIT COVER PAGE:

Exhibit: 1

Description of this exhibit: San Joaquin Superior Court Order Granting Petitioner's **New Hearing**

Number of pages of this exhibit: 4 pages

JURISDICTION: (Check only one)

_____ Municipal Court

_____ Superior Court

_____ Appellate Court

_____ State Supreme Court

**XXXX** United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other:_____

Hanky
FEB 2 7 2007
FILED
SUPERIOR COURT-STOCKTON

SC045651Y3607 FEB 14 AM 11: 15

ROSA JUNQUEIRO, CLERK
SHALOM FRIEDMAN
BY_____

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN JOAQUIN

| | |
|---|---|
| In the Matter of the Petition of | |
| CARL CHARLES HANCOCK, JR. | CASE NO. SC045624B |
| For Writ of Habeas Corpus. | ORDER |

TO: CARL CHARLES HANCOCK, JR., Petitioner and Secretary, BOARD of PAROLE HEARINGS:

Petitioner filed his petition for Writ of Habeas Corpus was filed herein on April 18, 2006. On June 1, the court issued an order to show cause and appointed the public defender's office to represent petitioner. After requesting and receiving an extension of time to do so, the respondent filed its return on July 25. Petitioner did not file any response to the return but, on September 7, filed a letter requesting that the court consider his petition a general denial to the return.

The court having reviewed the documents and pleadings filed by the parties, and good cause appearing therefor, IT IS HEREBY ORDERED THAT:

Respondent shall provide petitioner with a parole suitability hearing at the earliest possible date. At said hearing, respondent is not to consider any opposition which may be raised by the District Attorney's office *based upon the underlying crime*, separate from inmate Hancock's conduct subsequent to his incarceration..

**REASON:** Following entry of a no contest plea, petitioner was convicted of first degree murder. On July 29, 1992, he was given an agreed-upon sentence of 25 years-to-life. As part of his plea agreement, a contract was executed which required petitioner to cooperate and give truthful testimony in another case arising out of the murder.[1] Among

---

[1]Though petitioner was unable to produce a copy of his own plea agreement, he has provided the court with a copy of his codefendant James Oliver Mackey's contract. That document, in relevant part, states that: "The office of [the] District Attorney agrees to offer the same proposal herein extended to Mr. Mackey to codefendant Carl Charles Hancock, Jr." [Ex. B to petition, 1:23-25.] In addition, the transcript of petitioner's sentencing hearing supports petitioner's claim that he received the same agreement. For example, the transcript contains the following statement by Mr. Blansett: "[The victim's sister, Barbara Carnegie] wanted me to also indicate to the Court that the family is still very upset

the provisions of the contract was the following:

> "6.    District Attorney John D. Phillips shall personally write a letter to the Board of Prison Terms and or the California Department of Corrections recommending that ... Carl Charles Hancock Jr. be released at the earliest possible time upon having served the minimum sentence for first degree murder.    California Law now provides that the indeterminate sentence for first degree murder is 25 years to life. It is believed that the earliest possible release date for a person so convicted of first degree murder is two thirds of the minimum or sixteen years eight months. However, the actual release date will be determined by the Board of Prison Terms or its equivalent agency." [Exhibit "B" to petition, 2:4-15.]

On November 20, 1990, Mr. Phillips sent a letter to the Department of Corrections on behalf of Mr. Mackey, enclosing a copy of the agreement. In relevant part, the letter reads as follows[2]:

> "The purpose of this letter is to honor that agreement and commitment to Mr. Mackey and his attorney; to comment upon the extraordinary cooperation of Mr. Mackey; and to clarify that, without the cooperation and prospective testimony of Mr. Mackey, charges would not have been filed against Michael Blatt nor a prosecution initiated." [Exhibit "D" to petition, page 1. Underlining in original.]

> "It is our recommendation that Mr. Mackey be released on parole upon having served the minimum sentence for first degree murder, that is, two-thirds of the minimum (or sixteen years, eight months), providing that he has been a good prisoner.

> "In this regard, it is our observation and belief that Mr. Mackey will do his time without incident or problems. He is intelligent and highly educated; has no prior criminal history' is not generally criminally oriented; and he should interact well with prison management and staff. ..." [Id., at page 2.]

For unknown reasons, it appears that no letter was sent on behalf of the petitioner.

Petitioner received his fist parole consideration hearing on June 23, 2005. At the hearing, the panel was presented with the agreement.

---

at Mr. Phillips for allowing Mr. Hancock to plead – either enter a plea of nolo contendre or plead guilty to first degree murder and that Mr. Phillips would agree to write a letter on Mr. Hancock's behalf asking him to be released at the earliest possible moment." [Reporter's Transcript, July 29, 2992, at 11:1-7.] It is therefore clear that petitioner received the same deal as did Mr. Mackey.

[2]The court was provided with a copy of this letter in conjunction with Mr. Mackey's petition for writ of habeas corpus, filed on February 6, 2006.

Among those persons appearing at the hearing was Eual Blansett Jr., a San Joaquin County Deputy District Attorney. Petitioner contends that Mr. Blansett's comments at the hearing violated the plea agreement and necessitate a new hearing.

The court has reviewed the transcript of the hearing and finds that, while some of Mr. Blansett's comments were permissible, other comments may well have violated the agreement.

Mr. Blansett, in addition to commenting on petitioner's behavior during his incarceration, discussed, in detail, the facts of the underlying crime and petitioner's involvement therein, as well as his conduct after the murder. [See hearing transcript, Ex. 5 to petition, 67:21-68:20; 72:15-77:14; 78:27-79:16.] The obvious implication of Mr. Blansett's statements was that the District Attorney was opposing parole on the basis of the crime itself. These statements appear to the court to violate, at a minimum, the spirit of the plea agreement. *Further, the panel indicated in its decision that the District Attorney's opposition formed part of the basis for its decision to deny parole.* [*Id.*, 104:12-15.]

Respondent replies that there was ample evidence in the hearing transcript which would justify a denial of parole in this case. While this statement is certainly true, the court cannot simply ignore the fact that the panel *expressly* rested its decision, at least in part, on the fact that the D.A. was opposing parole.

As for petitioner's contention that he was harmed by the lack of a copy of the letter agreement, this claim is not borne out by the record. In fact, the panel accepted a copy of Mr. Mackey's letter and acknowledged that one should have been written for Mr. Hancock.

Date:

JUDGE OF THE SUPERIOR COURT
TERRENCE R. VAN OSS



FILED
SUPERIOR COURT-STOCKTON

07 FEB 14 AM 11: 15

ROSA JUNQUEIRO. CLERK
SHALOM FRIEDMAN
BY_____
DEPUTY

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN JOAQUIN

In the Matter of the Petition of

CARL CHARLES HANCOCK, JR.

For Writ of Habeas Corpus.

CASE NO. SC045624B

CERTIFICATE OF SERVICE BY MAIL

I, the undersigned, declare that I am a deputy of the Clerk of the Superior Court of San Joaquin County, State of California, and not a party to the within action. On __FEB 1 5 2007__ ___, I deposited in the United States Post Office at Stockton, California, true and correct copies of the Order regarding the above-entitled petition for writ of habeas corpus, a printed copy of which is hereto attached and made a part hereof, one copy of which being addressed to each of the following named persons at the following named addresses:

Nelson C. Lu, Esq.
Office of the Public Defender
102 S. San Joaquin St., Rm. 1
Stockton, CA 95202
VIA INTER-OFFICE MAIL

COURTESY COPY:
San Joaquin County District Attorney
P.O. Box 990
Stockton, CA 95201
VIA INTER-OFFICE MAIL

State of California
Office of the Attorney General
P.O. Box 944255
Sacramento, CA 94283
ATTN.: Pamela B. Hooley

I further declare that each of said copies so mailed and addressed was enclosed in a separate envelope, sealed, with the postage thereon fully prepaid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Stockton, California on the date above specified.

Deputy Court Clerk

# EXHIBIT COVER PAGE:

Exhibit: 2

Description of this exhibit: Board of Parole Hearing's Transcripts
Refered to as (HT)

Number of pages of this exhibit: 130 pages

JURISDICTION: (Check only one)

_____ Municipal Court

_____ Superior Court

_____ Appellate Court

_____ State Supreme Court

XXXXX United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other:_____

INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )  CDC Number: H-43946
Term Parole Consideration )
Hearing of: )
)
CARL HANCOCK )
─────────────────────────── )

RECORDS COPY

CALIFORNIA STATE PRISON - SOLANO

VACAVILLE, CALIFORNIA

OCTOBER 29, 2007

3:35 P.M.

PANEL PRESENT:

MIKE PRIZMICH, Presiding Commissioner
PAT SHIELDS, Deputy Commissioner

OTHERS PRESENT:

CARL HANCOCK, Inmate
MICHAEL SATRIS, Attorney for Inmate
CHRISTY REGAN, District Attorney's Office
RON FREITAS, District Attorney's Office
JILL JOHNSTON
TOM CARNEGIE
KAREN CARNEGIE
BARBARA CARNEGIE

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____No    See Review of Hearing
_____Yes   Transcript Memorandum

LISA TURNER, WPU Inc

## I N D E X

| | Page |
|---|---|
| Proceedings | 3 |
| Case Factors | 19 |
| Pre-Commitment Factors | 23 |
| Post-Commitment Factors | 37 |
| Parole Plans | 59 |
| Closing Statements | 79 |
| Recess | 120 |
| Decision | 121 |
| Adjournment | 129 |
| Transcript Certification | 130 |

3

1          P R O C E E D I N G S

2          **PRESIDING COMMISSIONER PRIZMICH:**  This is an

3    initial parole consideration hearing for Carl Hancock,

4    CDC number H as in Henry 43946.  Today's date is

5    October 29, 2007 and the time is 3:35.  We're located

6    at California State Prison - Solano.

7          The inmate was received on August 19, 1992.

8    Committed from San Joaquin County.  The life term began

9    on August 19, 1992 and the inmate's minimum eligible

10   parole date is April 30, 2006.

11         Controlling offense for which the inmate has

12   been committed is set forth in case number SC and that

13   is Sam Charles 45624B as in Boy.  Charge in count one,

14   a violation of Penal Code § 187 and that would be

15   murder in the first degree.  The inmate received a term

16   of 25 years to life.  The victim in this case was a

17   Laurence Carnegie C-A-R-N-E-G-I-E.

18         Mr. Hancock, this hearing is being tape recorded

19   and for purposes of voice identification, we will go

20   around the room and introduce ourselves.  I'll start

21   with myself.  I'll introduce myself by saying my first

22   name, saying my last name and then spelling my last

23   name.  I'll go to my left, sir, your right.  Miss

24   Shields will introduce herself.  Once she's done, we'll

25   then go to you, sir.  If you would introduce yourself

1  by saying your first name, saying your last name,

2  spelling your last name and providing us with your CDC

3  number. We'd appreciate that. Once you're done, sir,

4  we will go to your attorney. He will introduce

5  himself. Once he is done, we'll start with the lady in

6  the back of the room. And then we'll go right on down

7  the line. Each individual will introduce themselves by

8  saying their first name, saying their last name,

9  spelling their last name and stating the reason why

10  they're here. Okay? So with that, I do want to note

11  there are two correctional officers in the room.

12  They're here for security purposes only. They won't be

13  participating other than for security, sir. With that

14  I'll get started. My name is Mike Prizmich P-R-I-Z-M-

15  I-C-H. I'm Presiding Commissioner.

16        **DEPUTY COMMISSIONER SHIELDS:** Pat Shields S-H-I-

17  E-L-D-S, Deputy Commissioner.

18        **INMATE HANCOCK:** Carl Charles Hancock Junior,

19  and Hancock H-A-N-C-O-C-K, number H-43946

20        **PRESIDING COMMISSIONER PRIZMICH:** Thank you.

21        **ATTORNEY SATRIS:** I'm Michael Satris S-A-T-R-I-S

22  and I'm the attorney for Mr. Hancock.

23        **MISS JOHNSTON:** Jill Johnston J-O-H-N-S-T-O-N,

24  victim services representative.

25        **DISTRICT ATTORNEY FREITAS:** Ron Freitas, San

1    Joaquin County District Attorney's office.

2         **PRESIDING COMMISSIONER PRIZMICH:**  Could you

3    spell your last name, please?

4         **DISTRICT ATTORNEY FREITAS:**  F-R-E-I-T-A-S

5         **PRESIDING COMMISSIONER PRIZMICH:**  Thank you,

6    sir.

7         **DISTRICT ATTORNEY REGAN:**  Christy Regan R-E-G-A-

8    N, San Joaquin District Attorney's office.

9         **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Sir.

10        **MR. TOM CARNEGIE:**  Tom Carnegie C-A-R-N-E-G-I-E.

11   I'd be Larry's brother.

12        **PRESIDING COMMISSIONER PRIZMICH:**  Okay.

13        **MISS KAREN CARNEGIE:**  Karen Carnegie.  Do you

14   need me to spell it?

15        **PRESIDING COMMISSIONER PRIZMICH:**  Yeah.  Please.

16        **MISS KAREN CARNEGIE:**  C-A-R-N-E-G-I-E.  Victim's

17   wife.

18        **PRESIDING COMMISSIONER PRIZMICH:**  Thank you.

19        **MISS BARBARA CARNEGIE:**  Barbara Carnegie C-A-R-

20   N-E-G-I-E, Larry's sister.

21        **PRESIDING COMMISSIONER PRIZMICH:**  Thank you.

22   Sir, we want to determine for the record if there are

23   any ADA issues that you may have.  One of the ways of

24   doing that is to have you read out loud.  There's a

25   piece of paper taped in front of you that you're

```
 1  looking at right now.  If you could read that out loud
 2  for us, please.  Thank you.
 3         ATTORNEY SATRIS:  We are prepared to stipulate
 4  there are no ADA issues.
 5         PRESIDING COMMISSIONER PRIZMICH:  That's okay.
 6  We'll just go ahead and have him read it out loud.
 7  Thank you.
 8         INMATE HANCOCK:  ADA Statement.  And starting
 9  from the top it says please ask the inmate to read
10  aloud at the hearing.  The Americans with Disabilities
11  Act, ADA, is a law to help people with disabilities.
12  Disabilities are problems that make it harder for some
13  people to see, hear, breath, talk, walk, learn, think,
14  work or take care of themselves than it is for others.
15  Nobody can keep out of public places or activities
16  because of a disability.  If you have a disability, you
17  have the right to ask for help to get ready for your
18  Board of Parole Hearing (BPH Hearing), get to the
19  hearing, talk, read forms and papers, and understand
20  the hearing process.  BPH will look at what you ask for
21  to make sure that you have a disability that is covered
22  by the ADA and that you have asked for the right kind
23  of help.  If you do not get help or if you do not think
24  you got the kind of help you need, ask for a BPH 1074
25  Grievance Form.  You can also get help to fill it out.
```

1      **PRESIDING COMMISSIONER PRIZMICH:** Thank you,

2 sir. Did you understand what you read there?

3      **INMATE HANCOCK:** Yes, sir.

4      **PRESIDING COMMISSIONER PRIZMICH:** Okay. I also

5 looked in the file and found the Form 1073 that you

6 signed on 5/15/07 where you do not request any special

7 accommodation.

8      **INMATE HANCOCK:** That's correct.

9      **PRESIDING COMMISSIONER PRIZMICH:** And that

10 hasn't changed between May and now? I'll ask you a

11 series of questions, sir. Again, intended to get at

12 any disabilities that you may not be aware of that we

13 need to take care of. So if you would just listen to

14 each one of the questions and respond to each one, I'd

15 appreciate it.

16      Sir, do you have any difficulty walking a

17 distance of 100 yards?

18      **INMATE HANCOCK:** No.

19      **PRESIDING COMMISSIONER PRIZMICH:** Do you have

20 any difficulty walking up or down stairs, sir?

21      **INMATE HANCOCK:** No.

22      **PRESIDING COMMISSIONER PRIZMICH:** I notice you

23 have glasses with you but you didn't use them to read.

24 Are they just for distance?

25      **INMATE HANCOCK:** Distance, yes.

1    **PRESIDING COMMISSIONER PRIZMICH:** Okay. So you

2    don't need reading glasses, huh?

3         **INMATE HANCOCK:** No.

4         **PRESIDING COMMISSIONER PRIZMICH:** Not yet. Do

5    you have any difficulty hearing, sir?

6         **INMATE HANCOCK:** No, I don't.

7         **PRESIDING COMMISSIONER PRIZMICH:** And when we

8    went around the room and introduced ourselves, were you

9    able to hear all four corners of the room adequately,

10   sir?

11        **INMATE HANCOCK:** Yes, sir.

12        **PRESIDING COMMISSIONER PRIZMICH:** Have you ever

13   been included in CCCMS or EOP mental health programs.

14   Taken any psychotropic medication, either in prison or

15   on the street?

16        **INMATE HANCOCK:** No.

17        **PRESIDING COMMISSIONER PRIZMICH:** How far did

18   you get in school, sir?

19        **INMATE HANCOCK:** Graduate from the University of

20   Pacific College.

21        **PRESIDING COMMISSIONER PRIZMICH:** Okay. While

22   you were in school, did you take any special education

23   classes, sir?

24        **INMATE HANCOCK:** No, I didn't.

25        **PRESIDING COMMISSIONER PRIZMICH:** Okay. Do you

1   suffer from any disability that you're aware of that

2   would inhibit or not provide you an opportunity to

3   participate in today's hearing?

4       **INMATE HANCOCK:**  No.  Not that I'm aware of.

5       **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Mr.

6   Satris, has your client's ADA rights been met as far as

7   you can tell, sir?

8       **ATTORNEY SATRIS:**  That's right.  That's what I

9   was prepared to stipulate to.

10      **PRESIDING COMMISSIONER PRIZMICH:**  Thank you.

11  Sir, we're gonna describe to you the hearing process.

12  And just for your own comfort, sir, the microphones

13  don't amplify your voice, they only pick it up.  So you

14  don't need to lean into the mic.  Not that I saw that

15  you were doing that, but it just creates a little bit

16  more comfort for you.

17      This hearing is being conducted pursuant to

18  Penal Code § 3041 and 3042 in the Rules and Regulations

19  of the Board of Parole Hearings governing Parole

20  Consideration Hearings for life inmates.  The purpose

21  of today's hearing is to consider your suitability for

22  parole.  To accomplish this, we will consider the

23  number and nature of crimes you were committed for,

24  your prior criminal and social history, any behavior

25  and programming since your commitment.  We've had the

1 opportunity to review your Central File, sir, and
2 you'll be given the opportunity to clarify and correct
3 that record.

4 We'll consider your progress since your
5 commitment, your counselor's report and your
6 psychological evaluation.

7 Sir, you may have already submitted parole
8 plans. And if there's changes in those parole plans
9 like updated letters or what not, we need to hear about
10 those changes here today.

11 We will reach a decision today and inform you
12 whether or not we find you suitable for parole. And
13 we'll inform you of the reasons for our decision. If
14 you are found suitable for parole, the length of your
15 confinement will be explained to you, sir.

16 Before we go any further, I want to advise you
17 we expect you to be totally honest with us today. Not
18 only is honesty a good practice just to follow in every
19 day life, but in today's case, since this hearing is
20 being tape recorded and will ultimately be transcribed,
21 if you don't get a parole date today, future Panels
22 will reflect back on what you said here today. And if
23 you've lied to us, that could affect you in the future.
24 And I'm sure you don't want that.

25 Sir, nothing that happens here today will change

1   the finding of the court. We're not here to retry your
2   case. We may ask you some questions about the case and
3   you can choose to answer our questions or not. But the
4   reason we ask questions about the case is not to try to
5   determine if the court did the right thing or not.
6   They should have considered this versus that. We leave
7   that for the court to have decided, and they did. The
8   reason we ask questions about the case is to determine
9   your suitability for parole. S, we may ask a question
10  about the crime that is intended to get to the
11  understanding of what your frame of mind was then. We
12  want to know if your frame of mind has changed between
13  then and now. Those kinds of things. But we're not
14  going to retry the case.

15      The hearing will be conducted in two phases. I
16  will discuss with you the crime that you were committed
17  for, your prior criminal and social history, your
18  parole plans and any letters of support or opposition
19  that may be in your file. Commissioner Shields will
20  discuss with you your progress since your commitment,
21  your counselor's report and your psychological
22  evaluation. Once we're done, we'll reserve a period of
23  time to come back and ask some clarifying questions.
24  Once we've asked the questions we think we need to ask
25  to satisfy our minds, then we'll go to the District

1   Attorney from San Joaquin County and he'll be given an
2   opportunity to ask you some questions.  Once he's done
3   we'll go to your attorney.  He'll be given an
4   opportunity to ask you some questions.  Once that
5   portion of the hearing is done we'll go back to the
6   District Attorney from San Joaquin.  He'll be given an
7   opportunity to make a closing statement.  Your attorney
8   will then be given an opportunity to make a closing
9   statement, sir.   Then we'll turn our attention to you
10  and you'll be given an opportunity to make a closing
11  statement.  Sir, your closing statement should be
12  directed at why you feel you're suitable for parole.
13  Once you're done, sir, we will then go to the victims
14  who are attending today and they will be given an
15  opportunity to make a statement.  We will then recess
16  for deliberations and determine your suitability for
17  parole.

18       California Code of Regulations states that
19  regardless of the time served, an inmate shall be found
20  unsuitable for and denied parole if in the judgment of
21  the parole panel, the inmate would pose an unreasonable
22  risk of danger to society if released from prison.

23       Mr. Hancock, you have certain rights. Those
24  rights include the right to a timely notice of this
25  hearing, the right to review your Central File and the

*WPU Inc*

1   right to present relevant documents. And sir, I'll ask

2   you, were you given an opportunity to review your

3   Central File?

4           **INMATE HANCOCK:** I was at a time, but it was

5   lately that I haven't been able to complete everything.

6           **PRESIDING COMMISSIONER PRIZMICH:** You didn't get

7   through it all?

8           **INMATE HANCOCK:** Well, I didn't get the end

9   results from the re-hearing. Now, if there's anything

10  that you have, excuse me.

11          **PRESIDING COMMISSIONER PRIZMICH:** That's quite

12  all right.

13          **ATTORNEY SATRIS:** I think Mr. Hancock is

14  prepared to proceed.

15          **INMATE HANCOCK:** I'm prepared to proceed.

16          **PRESIDING COMMISSIONER PRIZMICH:** Okay. You did

17  go through the C-File, though, right?

18          **INMATE HANCOCK:** Yes.

19          **PRESIDING COMMISSIONER PRIZMICH:** That's what

20  I'm trying to get at.

21          **INMATE HANCOCK:** Yes.

22          **PRESIDING COMMISSIONER PRIZMICH:** Okay. And

23  other than the comments I think I was hearing you say,

24  with regard to perhaps the tail end of that last

25  hearing that you perhaps didn't get a chance to see. .

1   Did you see the rest of the items in the Central File?

2       **INMATE HANCOCK:** Well I wasn't clear if there

3   had been anything new that I hadn't seen yet. Because

4   it's from '05 and then the re-hearing. I wanted to

5   make sure that if there was anything else that I didn't

6   see. Then I wanted to make that clear.

7       **PRESIDING COMMISSIONER PRIZMICH:** Okay. All

8   right.

9       **ATTORNEY SATRIS:** In other words, you reviewed

10  your file prior to when the hearing was continued.

11      **INMATE HANCOCK:** Yes.

12      **ATTORNEY SATRIS:** But since then you haven't had

13  the opportunity.

14      **INMATE HANCOCK:** Since then, no.

15      **ATTORNEY SATRIS:** So that's the only question.

16      **PRESIDING COMMISSIONER PRIZMICH:** Okay. All

17  right. What you did review, was the timeframe adequate

18  to get through it?

19      **INMATE HANCOCK:** Yes.

20      **PRESIDING COMMISSIONER PRIZMICH:** Okay. And you

21  understood what was in there?

22      **INMATE HANCOCK:** Yes.

23      **PRESIDING COMMISSIONER PRIZMICH:** Okay. I'm

24  gonna ask Mr. Satris if your client's rights have been

25  met in these three regards, notice of the hearing,

1  review of the Central File with the comments that we've
2  already mentioned and presentation of relevant
3  documents.

4  **ATTORNEY SATRIS:** Yes.  It's Satris, two
5  syllables.

6  **PRESIDING COMMISSIONER PRIZMICH:** I'm sorry.
7  I'm sorry.  Satris.  Okay?  Right.  Sir, you also have
8  the right to be heard by an impartial Panel.  The Panel
9  consists of myself, Mike Prizmich, and Miss Shields.
10  We're the ones that will make the decision with regard
11  to your parole consideration here today.  Do you have
12  an objection to the Panel, sir?

13  **INMATE HANCOCK:**  No.

14  **PRESIDING COMMISSIONER PRIZMICH:**  Mr. Satris?
15  **ATTORNEY SATRIS:** I don't have an objection to
16  the Panel, per se, I do have just a general concern, if
17  not an objection.  Because there's nothing really to
18  object to.  Just to the institutional bias of the
19  Board.  As you said, you're convening and conducting
20  this pursuant to Penal Code § 3041 and it provides
21  that, among other things, that the Board will normally
22  set a parole date at the prisoner's initial hearing and
23  from documents I've reviewed and from my experience,
24  the Board doesn't at all do that rarely, if ever, will
25  set a date at the first hearing.  And even, ever,

1   grants a parole date to a very small percentage of

2   prisoners. But I just don't want to waive any rights

3   along those lines of concurring that in terms of the

4   fairness of the hearing today.

5         **PRESIDING COMMISSIONER PRIZMICH:** Okay. I

6   appreciate that. That is obviously on the record. Are

7   there any other objections, at this point, to the

8   hearing?

9         **ATTORNEY SATRIS:** No.

10         **PRESIDING COMMISSIONER PRIZMICH:** Okay. Sir,

11   you'll receive a copy of our written tentative decision

12   today. Our decision is subject to review by the

13   Decision Review Unit and by the entire Board of Parole

14   Hearings at a meeting held as a body. The decision

15   will become effective in approximately 120 days. And

16   is also subject to review by the governor. A copy of

17   the tentative decision here, today, and a copy of the

18   transcript, sir, will be sent to you.

19         As of May, 2004, there were some major changes

20   in the hearing procedures. Prior to May, 2004, the

21   Panel would render a decision, like we will today. And

22   if you objected to the decision, you could appeal that

23   Panel's decision to the Board of Parole Hearings. What

24   changed after May, 2004, was you still certainly get to

25   make an appeal, but you don't do it to the Board of

1  Parole Hearings. You do it to court versus the Board
2  of Parole Hearings. And I would suggest at the
3  conclusion of today's hearing if that's something that
4  you would consider, certainly talk that over with your
5  attorney. Or in the alternative, if you want to look
6  it up yourself, you can go to the prison law library,
7  look under administrative appeals, correspondence and
8  grievances concerning the Board of Parole Hearings and
9  they'll give you an outline on how to do that.

10        Sir, as I've said before, you are not required
11  to admit or discuss your offense today if you do not
12  wish to. However, the Panel does accept as true, as
13  I've also said, the findings of the court. And you are
14  invited to discuss those facts and circumstances with
15  us here today if you so choose.

16        The Board will consider any prior statements you
17  make and any statements today that you make regarding
18  the offense in determining your suitability. You're
19  helping us determine your suitability for parole.

20        **ATTORNEY SATRIS:** Mr. Hancock is going to rest
21  on the record in terms of the offense.

22        **PRESIDING COMMISSIONER PRIZMICH:** Okay. All
23  right. So we won't discuss the offense in terms of
24  dialogue with him. I'm going to turn my attention
25  right now to Miss Shields and ask if there is any

1  confidential material that exists in the file.  And if

2  so, will we be utilizing that here today?

3  **DEPUTY COMMISSIONER SHIELDS:**  There is

4  confidential material but we will not be using it.

5  **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Thank

6  you.  Okay.  I have a Form 1008, Mr. Hancock.  The Form

7  1008 is a check box form.  Some of the boxes are

8  checked, some of them aren't.  I'm gonna hand it to the

9  District Attorney from San Joaquin County, and it

10  should be on the top of their packet.  Then if she

11  would hand it to Mr. Satris.  And we all have the same

12  documents.  We'll mark it in as Exhibit 1.  Okay.

13  I'll mark that in as Exhibit 1.  Are there any

14  additional documents to be submitted today?

15  **ATTORNEY SATRIS:**  We might submit them in the

16  course of the hearing.  But I don't think there's

17  anything we need to submit now.

18  **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Any

19  preliminary objections beyond the commentary that you

20  had a moment ago?

21  **ATTORNEY SATRIS:**  No.

22  **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Will

23  the inmate be speaking with the Panel on matters not

24  related to the crime itself?

25  **ATTORNEY SATRIS:**  Yes.

1  **PRESIDING COMMISSIONER PRIZMICH:**  On all matters

2  not related to the crime?

3  **ATTORNEY SATRIS:**  Right.

4  **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Sir,

5  since you'll be speaking to the Panel, we are going to

6  swear you in.  So if you'd raise your right hand, sir.

7  Do you solemnly swear or affirm that the testimony you

8  give at today's hearing will be the truth, the whole

9  truth and nothing but the truth, sir?

10  **INMATE HANCOCK:**  I do.

11  **PRESIDING COMMISSIONER PRIZMICH:**  Thank you,

12  sir.  I'm gonna start the hearing by reading into the

13  record the statement of facts.  Reading from the deputy

14  probation officer's report, page one and two, starting

15  under summary of the offense:

16      As a real estate agent, Lawrence Carnegie

17      C-A-R-N-E-G-I-E stood with his back to an

18      open garage door on property at East

19      Tokay Colony Road in Lodi California.  He

20      was shot in the back with the bolt from a

21      crossbow fired by James Mackey and Mackey

22      is M-A-C-K-E-Y.  Mackey had been hiding

23      inside the garage waiting for Carnegie to

24      be lured into a position by the

25      defendant.  So Mackey could shoot

1       Carnegie.

2       **ATTORNEY SATRIS:** I think it's actually Mackey,

3 isn't it?

4       **INMATE HANCOCK:** Yes, it is.

5       **PRESIDING COMMISSIONER PRIZMICH:** Mackey?

6       **INMATE HANCOCK:** Yes.

7       **PRESIDING COMMISSIONER PRIZMICH:** All

8       right. The shooting occurred the evening

9       of February 28, 1989. Moments after

10       Carnegie was shot, a car driven by Denise

11       Brock B-R-O-C-K drove onto the property.

12       Brock and the children in her car saw

13       Carnegie on the ground, Carl Hancock H-A-

14       N—C-O-C-K running towards Brock's car and

15       saw Mackey standing over Carnegie with

16       his back to the car. Those in the car

17       were unable to give sheriff's deputies

18       any more complete description of Mackey

19       than his clothing. Brock was frightened

20       by the activity. She happened upon and

21       quickly backed out of the driveway. She

22       drove to a residence on Tully T-U-L-L-Y

23       Road and called 911 emergency dispatchers

24       and reported what she had seen. When the

25       deputies from the sheriff's department

1   went to the residence on Tokay Colony

2   Road, they found a bloody sleeping bag,

3   the bloody bolt from a crossbow, Lawrence

4   Carnegie's car. Carnegie and the men

5   described by Brock could not be found.

6   Mackey and the defendant had brought the

7   sleeping bag to place the victim's body

8   in it and a fifty pound weight to tie to

9   the body, as they planned to sink the

10   body in Lake Tahoe. The body was placed

11   in the trunk of Mackey's rental car.

12   Because Brock had seen them, Mackey

13   decided to abandon the Lake Tahoe plans

14   and instead drove along State Highway 128

15   towards Mendocino County. A noise was

16   heard from the trunk of the vehicle but

17   the two co-defendants decided it was the

18   fifty pound weight shifting around. A

19   short while later, Mackey stopped the

20   vehicle and the two discovered the victim

21   still alive in the trunk. The defendant

22   tied a noose in the length of a rope

23   around Carnegie's neck and gave the other

24   end to Mackey, who stayed near the front

25   of the car. Mackey pulled on the rope

1       for a period of time until Carnegie died.

2       The crossbow and rope were thrown into a

3       body of water.  The two washed the car

4       and their clothes before returning to

5       Stockton.  Carnegie's body was found the

6       next afternoon in a rural area along

7       Highway 128 in Sonoma County.  Hundreds

8       of hours of subsequent investigation by

9       sheriff's deputies revealed that James

10      Mackey had rented a Ford on February 28,

11      1989, that matched the description of the

12      car Brock had seen parked at the shooting

13      scene.  The car eventually was traced to

14      southern California.  The deputies

15      retrieved the car and had it examined by

16      a criminalist.  Dried blood was found in

17      the Ford that matched Carnegie's body.

18      Mackey was arrested for Carnegie's murder

19      June 1, 1989.  He told investigators,

20      before and after his arrest, several

21      different versions of his role in the

22      murder.  Mackey eventually implicated

23      Carl Hancock as the person who helped

24      kill Carnegie.  Mackey implicated a

25      Michael T. Blatt B-L-A-T-T, a wealthy

```
 1              local business man property developer and

 2              business agent for athletes, as the

 3              individual who solicited and paid Mackey

 4              to have Carnegie killed.

 5              Okay.  Any comments, Mr. Hancock, at all?

 6              INMATE HANCOCK:  No comment.

 7              PRESIDING COMMISSIONER PRIZMICH:  Okay.

 8              ATTORNEY SATRIS:  Other than that he admits.  I

 9   mean, you don't have anything different as far as the

10   facts to say.  Is that right?

11              INMATE HANCOCK:  That's right.  It's correct.

12              PRESIDING COMMISSIONER PRIZMICH:  So you're

13   saying that for him?

14              ATTORNEY SATRIS:  Yes.  I'm saying that for him

15   and he concurs, he agrees.

16              PRESIDING COMMISSIONER PRIZMICH:  Okay.

17              ATTORNEY SATRIS:  He admits to the offense.

18              PRESIDING COMMISSIONER PRIZMICH:  Okay.

19              ATTORNEY SATRIS:  As described in the record.

20              PRESIDING COMMISSIONER PRIZMICH:  Okay.  In

21   terms of juvenile record, I'll go to that now.

22   Juvenile record is none noted.  And adult record, other

23   than the incident offense, there's no adult record.  Is

24   that correct, sir?

25              INMATE HANCOCK:  Yes, sir.
```

1    **PRESIDING COMMISSIONER PRIZMICH:**  When you were

2   in high school, were there any issues?  Did you ever

3   get expelled from high school?

4        **INMATE HANCOCK:**  No.

5        **PRESIDING COMMISSIONER PRIZMICH:**  And you went

6   to college after that?  You went to UOP?

7        **INMATE HANCOCK:**  Yes, sir.

8        **PRESIDING COMMISSIONER PRIZMICH:**  And any issues

9   there at all?

10        **INMATE HANCOCK:**  No.

11        **PRESIDING COMMISSIONER PRIZMICH:**  No problems.

12   Okay.  In terms of your personal and social history,

13   sir, and I'm reading from the '05 psych report.  You

14   were born in Chicago, sir?

15        **INMATE HANCOCK:**  Yes, sir.

16        **PRESIDING COMMISSIONER PRIZMICH:**  And your

17   family moved to the Bay area when you were about three?

18        **INMATE HANCOCK:**  Yes.

19        **PRESIDING COMMISSIONER PRIZMICH:**  And you have,

20   is it four other or three other siblings?

21        **INMATE HANCOCK:**  Well I have three other ones.

22   Two sisters and one brother.

23        **PRESIDING COMMISSIONER PRIZMICH:**  Okay.

24        **INMATE HANCOCK:**  One sister passed.

25        **PRESIDING COMMISSIONER PRIZMICH:**  Oh.  I'm sorry

```
 1  to hear that.  Was that recently, sir?

 2          INMATE HANCOCK:  That was about five or six

 3  years ago.

 4          PRESIDING COMMISSIONER PRIZMICH:  That's too

 5  bad.

 6          INMATE HANCOCK:  My father passed this past

 7  year.

 8          PRESIDING COMMISSIONER PRIZMICH:  And your

 9  passed away?  What did he die from?

10          INMATE HANCOCK:  Massive heart attack.

11          PRESIDING COMMISSIONER PRIZMICH:  Oh.  Your mom

12  still alive?

13          INMATE HANCOCK:  Yes.

14          PRESIDING COMMISSIONER PRIZMICH:  She doing

15  okay?

16          INMATE HANCOCK:  Yes.

17          PRESIDING COMMISSIONER PRIZMICH:  How old is she

18  now?

19          INMATE HANCOCK:  Sixty six, I believe.

20          PRESIDING COMMISSIONER PRIZMICH:  And you have

21  one sister and one brother left.  Is that right?

22          INMATE HANCOCK:  Yes.

23          PRESIDING COMMISSIONER PRIZMICH:  And your

24  sister, how old is she?

25          INMATE HANCOCK:  She's 46.
```

1           **PRESIDING COMMISSIONER PRIZMICH:** And is she

2  doing okay?

3           **INMATE HANCOCK:** She's doing fine.

4           **PRESIDING COMMISSIONER PRIZMICH:** And your

5  brother?

6           **INMATE HANCOCK:** He's doing fine.

7           **PRESIDING COMMISSIONER PRIZMICH:** Okay. Do they

8  visit you here, sir?

9           **INMATE HANCOCK:** My brother's unable to visit

10  from an offense he had.

11           **PRESIDING COMMISSIONER PRIZMICH:** Okay, so he's

12  prevented—

13           **INMATE HANCOCK:** Long time ago, but he's on the

14  verge of coming up right now.

15           **PRESIDING COMMISSIONER PRIZMICH:** Okay. Now

16  what about--

17           **INMATE HANCOCK:** Everybody else can visit.

18           **PRESIDING COMMISSIONER PRIZMICH:** Does your

19  sister visit here?

20           **INMATE HANCOCK:** And mother, yeah.

21           **PRESIDING COMMISSIONER PRIZMICH:** Do they visit?

22           **INMATE HANCOCK:** Yeah. They visit.

23           **PRESIDING COMMISSIONER PRIZMICH:** How often? Do

24  they come together?

25           **INMATE HANCOCK:** Most of the time they do, my

1    mother and my sister.

2         **PRESIDING COMMISSIONER PRIZMICH:**  How often do

3    they visit you, sir?

4         **INMATE HANCOCK:**  Probably twice a month.

5         **PRESIDING COMMISSIONER PRIZMICH:**  Twice a month?

6         **INMATE HANCOCK:**  Twice a month.

7         **PRESIDING COMMISSIONER PRIZMICH:**  In between

8    times do you talk to them on the phone or write them

9    letters or --

10        **INMATE HANCOCK:**  All the time.

11        **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  All

12   right.  Do you have any nieces and nephews, sir?

13        **INMATE HANCOCK:**  Yes, I do.

14        **PRESIDING COMMISSIONER PRIZMICH:**  Do you know

15   how many?

16        **INMATE HANCOCK:**  Altogether I have about eight.

17   Seven, eight  --  Wait, let me count

18        **PRESIDING COMMISSIONER PRIZMICH:**  That's all

19   right.

20        **INMATE HANCOCK:**  I need to count because --

21        **PRESIDING COMMISSIONER PRIZMICH:**  It gets tough

22   to keep track.

23        **INMATE HANCOCK:**  My sister had twins and two

24   others.  That's four.  My brother has two.  That's six.

25   My other sister has three.  That's nine.  So I have

1  nine nephews and nieces.

2        **PRESIDING COMMISSIONER PRIZMICH:** Okay.

3        **INMATE HANCOCK:** I have two grand -- one grand

4  niece, one grand nephew.

5        **ATTORNEY SATRIS:** A number of them have actually

6  written letters to the Board.

7        **PRESIDING COMMISSIONER PRIZMICH:** Yeah. Okay.

8  You married now, sir, or were you married? You still

9  married?

10       **INMATE HANCOCK:** I'm not married. I'll be

11  getting married on December 1st.

12       **PRESIDING COMMISSIONER PRIZMICH:** Were you

13  married before?

14       **INMATE HANCOCK:** Yes, but that was an annulment.

15  We didn't -

16       **PRESIDING COMMISSIONER PRIZMICH:** Did you marry

17  the lady in prison? I mean --

18       **INMATE HANCOCK:** Yes.

19       **PRESIDING COMMISSIONER PRIZMICH:** How long ago

20  was that, sir?

21       **INMATE HANCOCK:** This was in '01.

22       **PRESIDING COMMISSIONER PRIZMICH:** Okay. And

23  you're engaged to be married again?

24       **INMATE HANCOCK:** Yes.

25       **PRESIDING COMMISSIONER PRIZMICH:** And how did

*WPU Inc*

```
 1   you meet this lady?
 2           INMATE HANCOCK:  Through mutual friends.
 3           PRESIDING COMMISSIONER PRIZMICH:  Okay.  And how
 4   long have you known her?
 5           INMATE HANCOCK:  Four years, now.
 6           PRESIDING COMMISSIONER PRIZMICH:  She visits
 7   here on a --
 8           INMATE HANCOCK:  Often.  Almost at least three
 9   times a month.  Two to three times a month.
10           PRESIDING COMMISSIONER PRIZMICH:  Does she live
11   around here?
12           INMATE HANCOCK:  No, she lives in Carson
13   California.
14           PRESIDING COMMISSIONER PRIZMICH:  Is that down
15   south?
16           INMATE HANCOCK:  Yes.
17           PRESIDING COMMISSIONER PRIZMICH:  Your mom and
18   sister, they live in the Bay area still?
19           INMATE HANCOCK:  No.  Actually, my mother moved
20   to Sacramento, the Sacramento area.
21           PRESIDING COMMISSIONER PRIZMICH:  And what about
22   your sister?
23           INMATE HANCOCK:  She moved to the Fairfield
24   area.
25           PRESIDING COMMISSIONER PRIZMICH:  Oh.  That's
```

1  pretty close. So your mother -- she picks up your mom

2  and they come down to visit you?

3      **INMATE HANCOCK:** Yes. Sometimes my mother just

4  comes by herself.

5      **PRESIDING COMMISSIONER PRIZMICH:** All right.

6  You have a son. Is that from the -

7      **INMATE HANCOCK:** That was from before -

8      **PRESIDING COMMISSIONER PRIZMICH:** Before going

9  to prison?

10      **INMATE HANCOCK:** Before going to prison, yes.

11      **PRESIDING COMMISSIONER PRIZMICH:** Okay. How old

12  is he now?

13      **INMATE HANCOCK:** He's 18.

14      **PRESIDING COMMISSIONER PRIZMICH:** Do you have

15  any contact with him?

16      **INMATE HANCOCK:** Yes.

17      **PRESIDING COMMISSIONER PRIZMICH:** How often?

18      **INMATE HANCOCK:** Well, he hasn't come up to

19  visit. He just became eligible to be able to come

20  himself.

21      **PRESIDING COMMISSIONER PRIZMICH:** Yeah.

22      **INMATE HANCOCK:** And I think I've seen him,

23  probably in the last year, I've only seen him about

24  three times all together.

25      **PRESIDING COMMISSIONER PRIZMICH:** Okay. In the

1   in between time do you write him? Do you talk to him

2   on the phone?

3        **INMATE HANCOCK:** I talk to him on the phone and

4   write.

5        **PRESIDING COMMISSIONER PRIZMICH:** What's he

6   doing now? Has he graduated from high school?

7        **INMATE HANCOCK:** He's going to a junior college

8   right now. I forget which one. He's just getting

9   enrolled right now. He just graduated.

10       **PRESIDING COMMISSIONER PRIZMICH:** Yeah. What is

11  he hope to be?

12       **INMATE HANCOCK:** Well right now he's looking

13  into the sports medicine and psychology. That's his

14  favorite. That as well as accounting. He's real good

15  with numbers.

16       **PRESIDING COMMISSIONER PRIZMICH:** Okay. Is he

17  left handed?

18       **INMATE HANCOCK:** Yeah.

19       **PRESIDING COMMISSIONER PRIZMICH:** Usually

20  accountants are.

21       **INMATE HANCOCK:** Yeah.

22       **ATTORNEY SATRIS:** I never knew that.

23       **PRESIDING COMMISSIONER PRIZMICH:** Yeah. Most of

24  'em are. Prior to incarceration, you owned your own

25  company. It was a landscaping company and

1   construction.   Was it construction landscaping?

2       **INMATE HANCOCK:**   Well, construction/landscaping.

3   Both of 'em.   We did everything basically.

4       **PRESIDING COMMISSIONER PRIZMICH:**   Okay.   In

5   terms of your substance abuse history, sir, how long

6   did you own that company?   A couple years?   Was that

7   it?

8       **INMATE HANCOCK:**   About two years.   Yeah.

9       **PRESIDING COMMISSIONER PRIZMICH:**   Okay.   Pardon?

10       **INMATE HANCOCK:**   Approximately.

11       **PRESIDING COMMISSIONER PRIZMICH:**   Okay.   It says

12   prior to, in terms of your substance abuse history, you

13   used marijuana from 18 to 27 years old.   How frequently

14   was that, sir?

15       **INMATE HANCOCK:**   Well, sometimes on weekends,

16   after, you know, at parties.

17       **PRESIDING COMMISSIONER PRIZMICH:**   So it was more

18   a social thing?

19       **INMATE HANCOCK:**   It was a social thing.

20       **PRESIDING COMMISSIONER PRIZMICH:**   What about

21   your use of alcohol?

22       **INMATE HANCOCK:**   Same thing.

23       **PRESIDING COMMISSIONER PRIZMICH:**   You only drank

24   on weekends?

25       **INMATE HANCOCK:**   Yes.

1          **PRESIDING COMMISSIONER PRIZMICH:**  Ever get

2    drunk?

3          **INMATE HANCOCK:**  Yes.

4          **PRESIDING COMMISSIONER PRIZMICH:**  How often do

5    you think it -

6          **INMATE HANCOCK:**  What I did when I drank, I

7    didn't get completely inebriated, but I did drink.  And

8    I did get drunk.

9          **PRESIDING COMMISSIONER PRIZMICH:**  Every time you

10   drank did you get-

11         **INMATE HANCOCK:**  No.  Not every time.  I would

12   just drink socially just to - in many --

13         **PRESIDING COMMISSIONER PRIZMICH:**  But it always

14   seemed to get you drunk?  Is that-

15         **INMATE HANCOCK:**  When I was, whether it was in

16   my own head, I was able to drive and still able to

17   maintain.

18         **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Any

19   other?  Use cocaine or heroin or anything like that?

20         **INMATE HANCOCK:**  No heroin.  I have used

21   cocaine.

22         **PRESIDING COMMISSIONER PRIZMICH:**  Oh.  And how

23   did you ingest that into your body?  How'd you get it

24   in?

25         **INMATE HANCOCK:**  Snort.

*WPU Inc*

1       **PRESIDING COMMISSIONER PRIZMICH:** You snorted?

2       **INMATE HANCOCK:** Yes. Through the nostrils.

3       **PRESIDING COMMISSIONER PRIZMICH:** Any pills?

4       **INMATE HANCOCK:** No.

5       **PRESIDING COMMISSIONER PRIZMICH:** Any PCP or any

6 of those kinds of things?

7       **INMATE HANCOCK:** No.

8       **ATTORNEY SATRIS:** As the record shows, he kind

9 of got into the cocaine a little heavily in the months

10 - weeks and months before the offense.

11       **PRESIDING COMMISSIONER PRIZMICH:** Yeah. And how

12 often were you using the cocaine, sir?

13       **INMATE HANCOCK:** At what time? Just in the

14 period--.

15       **PRESIDING COMMISSIONER PRIZMICH:** Heavily.

16       **INMATE HANCOCK:** Well, heavily I would say

17 probably two or three times a week.

18       **PRESIDING COMMISSIONER PRIZMICH:** Two or three

19 times a week? Pretty expensive habit.

20       **INMATE HANCOCK:** Yes.

21       **PRESIDING COMMISSIONER PRIZMICH:** Cocaine,

22 alcohol and marijuana are three entirely different

23 narcotics, sir. What was the attraction to any or all?

24       **INMATE HANCOCK:** I think what it was, just

25 looking into it from within, that I would try to use

1   one and offset the other. And it, you know, for me I

2   can't say it was the right thing to do. But it seemed

3   like one would offset the other. And when I did

4   another one, it would offset the other.

5        **PRESIDING COMMISSIONER PRIZMICH:** When you say

6   offset, what do you mean?

7        **INMATE HANCOCK:** It would create sort of a

8   balance. And you know, looking back into it, there was

9   no balance in it at all. But in my mind, or what I was

10  thinking (indiscernible)

11       **PRESIDING COMMISSIONER PRIZMICH:** So were you

12  doing essentially all three?

13       **INMATE HANCOCK:** Not at the same time. If I

14  came down from cocaine, then I would, you know, I would

15  have a drink. And if I felt that I was getting too

16  drunk, I would smoke some marijuana. And, you know,

17  and try to find some kind of balance in that, which of

18  course, that's kind of chaotic. But that's how it

19  went.

20       **PRESIDING COMMISSIONER PRIZMICH:** Okay. And

21  you're son was alive at the time?

22       **INMATE HANCOCK:** No, actually at the time,

23  towards the end, he's been – well, since I've been in

24  prison. Eighteen years. He's 18. So, these events

25  was prior to, you know, coming into the world. She was

 1   still pregnant.

 2          PRESIDING COMMISSIONER PRIZMICH:   Okay.

 3          INMATE HANCOCK:  I started to indulge more.

 4          PRESIDING COMMISSIONER PRIZMICH:   Okay.   Why do

 5   you think you were doing that?

 6          INMATE HANCOCK:   Well, it was a number of things

 7   going on in my life.  I can say that the stress of my

 8   grandmother had passed away.  It was a number of

 9   things.  If it's okay, you know, I have it right here

10   where I can actually (indiscernible) a little bit

11   better.

12          PRESIDING COMMISSIONER PRIZMICH:   Can you maybe

13   just recall what was going on?

14          INMATE HANCOCK:  Well, yeah.  I can recall it.

15   Actually, it was the things that come to mind right off

16   the top is that I was at a downward spiral as far as my

17   business failing.  You know, I had a child on the way.

18          PRESIDING COMMISSIONER PRIZMICH:   So narcotics

19   was a solution, you think?

20          INMATE HANCOCK:   Narcotics, well—

21          PRESIDING COMMISSIONER PRIZMICH:   I mean - or is

22   that what you thought?

23          INMATE HANCOCK:   I think that that was -

24   actually it numbed me to a certain extent as far as the

25   success that I was not.

1      **PRESIDING COMMISSIONER PRIZMICH:** Okay.

2      **INMATE HANCOCK:** (indiscernible-overlapping)

3      **PRESIDING COMMISSIONER PRIZMICH:** It created an

4    illusion.

5      **INMATE HANCOCK:** An illusion. Yeah, I could say

6    that. That would be proper to say.

7      **PRESIDING COMMISSIONER PRIZMICH:** Okay. I'm

8    going to turn your attention to Miss Shields for her

9    commentary and questions at this point.

10     **DEPUTY COMMISSIONER SHIELDS:** I don't have any

11   questions.

12     **PRESIDING COMMISSIONER PRIZMICH:** No. Your

13   post—

14     **DEPUTY COMMISSIONER SHIELDS:** Start my (33:39

15   indiscernible)

16     **PRESIDING COMMISSIONER PRIZMICH:** Yeah.

17     **DEPUTY COMMISSIONER SHIELDS:** What I want to do

18   now is talk about what you've done since you've been

19   incarcerated. And let me start out with you have a

20   classification score of 28 points. Is that right?

21     **INMATE HANCOCK:** Yes.

22     **DEPUTY COMMISSIONER SHIELDS:** And you're

23   classified as medium A. You do not have an INS hold.

24   Your current work assignment is PIA book binding.

25     **INMATE HANCOCK:** Yes.

1    **DEPUTY COMMISSIONER SHIELDS:**  Is that true?  Are

2    you working on a specific are there?

3    **INMATE HANCOCK:**  Actually, I'm welding.  I'm

4    doing carpentry and electronics.  The section that I'm

5    in is the maintenance department.  So actually I'm

6    fixing machines and doing, you know--

7    **DEPUTY COMMISSIONER SHIELDS:**  So you're not

8    really doing book binding, you're doing--

9    **INMATE HANCOCK:**  No.  Nobody does book bindery

10   up there anymore.

11   **DEPUTY COMMISSIONER SHIELDS:**  Really?

12   **INMATE HANCOCK:**  See, they run a DMV department

13   where they make the handicap (sp) plaquerds.  They're

14   doing the construction signs and things for--

15   **PRESIDING COMMISSIONER DOYLE:**  Caltrans

16   **INMATE HANCOCK:**  Yeah.  Caltrans.  A number of

17   other things, but—

18   **DEPUTY COMMISSIONER SHIELDS:**  Okay.

19   **INMATE HANCOCK:**  Book binding is not something

20   that goes on up there anymore.

21   **DEPUTY COMMISSIONER SHIELDS:**  And I have that

22   your work evaluations are average to above average.  As

23   far as certificates, I have that you completed a

24   customer services course in 2005.  And 2002 you

25   completed an operator's safety training course.  And I

1   think you had a third thing and I'm not seeing that.

2   Do you have other certificates?

3        **INMATE HANCOCK:** That would be the POP program,

4   Prisoner's Outreach Program. And that's current. I

5   don't know if they added that to the (indiscernible).

6        **DEPUTY COMMISSIONER SHIELDS:** Okay. Actually,

7   that comes next. Do you have any vocational

8   certificates like woodworking, carpentry, anything like

9   that?

10       **INMATE HANCOCK:** Well, actually, the memorandum

11   or the laudatory chrono would explain the job that I'm

12   doing.

13       **DEPUTY COMMISSIONER SHIELDS:** Okay. Well I'm

14   going to get to the chronos in a minute. So --

15       **ATTORNEY SATRIS:** Well, you mentioned already,

16   the certificate, right, from 2002 that had to do with

17   forklifts and so forth?

18       **DEPUTY COMMISSIONER SHIELDS:** Right. And then--

19       **ATTORNEY SATRIS:** Yeah.

20       **DEPUTY COMMISSIONER SHIELDS:** And the customer

21   service.

22       **ATTORNEY SATRIS:** Yeah.

23       **DEPUTY COMMISSIONER SHIELDS:** I'm just looking

24   for certificates.

25       **ATTORNEY SATRIS:** Right. I think those are the

*WPU Inc*

1  two certificates.

2      **DEPUTY COMMISSIONER SHIELDS:** Because that's the

3  language of what we do. As far as disciplinaries, you

4  had one 115 in 1996 and that was something related to

5  the weight --

6      **INMATE HANCOCK:** Well that's when they had the

7  weight program here. They don't have weights anymore.

8  But they had a fence that was about four feet high and

9  it was time for the yard recall. And one of the

10 officers said go ahead and just step over the fence

11 because the other officer didn't come. So we stepped

12 over the fence. Then the other one came. And they

13 just, you know, they wrote it up for a --

14     **DEPUTY COMMISSIONER SHIELDS:** Okay. Got it.

15     **INMATE HANCOCK:** That's it.

16     **ATTORNEY SATRIS:** That was an administrative

17 rules violation, correct?

18     **DEPUTY COMMISSIONER SHIELDS:** I had that as a

19 115. There was --

20     **ATTORNEY SATRIS:** It's a 115 but there's two

21 levels of 115's. Serious and Administrative. And it

22 was an administrative.

23     **DEPUTY COMMISSIONER SHIELDS:** Well, I think it's

24 somewhat, I mean, for my purposes, it's somewhat self-

25 explanatory what he did. I mean, he didn't lead a

1  riot.

2          (overlapping and somewhat indiscernible)

3          **ATTORNEY SATRIS:** Yeah. Right. I mean they

4  actually --

5          **DEPUTY COMMISSIONER SHIELDS:** Okay. I got it.

6  Okay.

7          **ATTORNEY SATRIS:** -- Classify them and ones that

8  are super minor 115's are deemed (37:25 indiscernible)

9          **DEPUTY COMMISSIONER SHIELDS:** I don't get the

10 point you're trying to make.

11         **ATTORNEY SATRIS:** That it was an administrative,

12 it was classified as an administrative rules violation

13 as opposed to "serious rules violation".

14         **DEPUTY COMMISSIONER SHIELDS:** Okay. And I mean-

15 -

16         **ATTORNEY SATRIS:** And that just shows you just

17 how minor it is.

18         **DEPUTY COMMISSIONER SHIELDS:** Well, I think we

19 can look at -- what I would prefer to do is to look at

20 the incident as described. I mean, that's how I'm

21 approaching that.

22         **ATTORNEY SATRIS:** Okay. Before we move away

23 from the completed certificates -

24         **DEPUTY COMMISSIONER SHIELDS:** No. I'm sorry.

25 I'm going to go through this my way. I have a system

1  about how I do it and then if I miss anything, you can
2  let me know at the end.

3      **ATTORNEY SATRIS:** Oh. Okay.

4      **DEPUTY COMMISSIONER SHIELDS:** Let me go to the
5  psychological. And there are actually two that I want
6  to reference. There was one that was done by Preston
7  Davis. That's not your most recent one. That was
8  3/18/05. And both of these are somewhat similar. But
9  I did want to note some things that Dr. Davis noted
10 that the more recent psychologist didn't. And one was
11 a notation that you had not upgraded vocationally or
12 educationally since you've been here. A notation that,
13 -- and I'll get back to you, sir, in a minute. -- that
14 you said that you had started to attend AA in 2005.
15 And I didn't see any documentation of that. And
16 there's one other thing actually, that I'll back to in
17 a minute or two.

18      The most current psych evaluation is by Dr.
19 Starrett S-T-A-R-R-E-T-T, and that was completed
20 8/31/07. And this is in a new format that the Board
21 has implemented. So I'm going to go over it. It's
22 sort of a multi-axial way of taking a picture of a
23 potential parolee.

24      First of all, the only diagnosis that you've
25 been given is, in this case, other substance abuse, in

1   controlled environment remission. And essentially, on
2   all the factors, Dr. Starrett rated you in the low
3   range as far as propensity for future violence. And I
4   just realized I'm missing something. Historically,
5   you're rated in the low moderate. And this is based on
6   a history of substance abuse, involvement in unstable
7   relationships, and your age at the time of the crime.
8   Other than that, you were evaluated in the low range
9   and your overall rating was in the low range.

10      Let me now go to, and I'll come back to that in
11  a minute. Let me now go to the chronos. And these
12  are, I want to do them -- because this is an initial, I
13  want to start with the oldest and go forward. Starting
14  in 1999 you have what appears to be, it is a laudatory
15  chrono from work commending you for maintaining the
16  safety of the work environment. In 1999, there's
17  another work chrono that said that you have excellent
18  work habits and attendance and that makes you a
19  valuable worker in the factory. Perform well in the
20  capacity of lead man in the heat stamp department. And
21  actually, the next chrono which is also in 1999,
22  documents that you completed the Men's Violence
23  Prevention seminar. That's an extensive training
24  seminar and self-help group for men who want to end
25  violence. It's ten sessions. Then in 2001 there's a

1   commendation for your participation as the Islam faith
2   representative for the religious advisory committee the
3   institution. Then there's a request for an override.
4   And what that is, is PIA is asking to retain you where
5   you currently are because you're an overall benefit to
6   the bindery operation and also to give you an
7   opportunity to further your work and training skills.
8   2004, it's another chrono from work that says you've
9   been very reliable and since you earned a position of
10  a, oh, a special skills A number, which is a step from
11  becoming a lead man in the print department. It points
12  out you've had four and a half years experience on the
13  digital paper cutter. Five years of experience in
14  quick print heat stamper, producing disabled license
15  plates. Commends you for getting the work done. Here
16  is one in 2004 from a building officer saying he's
17  known you for the past two years. And he was also your
18  supervisor when you were a barber. He said he found
19  you mature and responsible at all times. Self
20  motivated, respectful and courteous to staff and
21  inmates alike. And spend your off-duty time studying
22  and counseling younger inmates. Here's another letter
23  - well, now that you've worked for - this is 2005, that
24  you worked for the loose leaf bindery for ten years.
25  You've worked in numerous departments, obtaining a

1    skill level A-3.  You've had no disciplinary actions in

2    over ten years.  It says you stand above the fray with

3    a neat, clean appearance, calm effective method of

4    communication.  It says that you're displaying what you

5    learned in Anger Management, Prison Outreach.  He is

6    Bill (sp) Cooley, Industrial Supervisor.  And then the

7    last one that I have is 2006 and this is from a 26 week

8    anger management program.  And then it explains what

9    the content is.  And it says that you satisfactorily

10   completed the Anderson and Anderson How to Manage Anger

11   curriculum on April 25, 2006.

12          Let me ask you, have you been attending AA?

13          **INMATE HANCOCK:**  From time to time, yes.

14          **DEPUTY COMMISSIONER SHIELDS:**  Okay.

15          **INMATE HANCOCK:**  We've been on lockdown for the

16   last four months, so I haven't been attending.

17          **DEPUTY COMMISSIONER SHIELDS:**  Okay.  I thought

18   that you got chronos here.  They don't give chronos for

19   AA attendance?

20          **INMATE HANCOCK:**  I believe it's automatically

21   supposed to go into your C-File.  And if it's not in

22   there, then I would have to check on it and see --

23   because they have different supervisors all the time.

24   And they have volunteers.  So it changes from

25   personnel.

| 1 | **DEPUTY COMMISSIONER SHIELDS:** Okay. Let me give |
| 2 | you a chance. Have I missed anything, now? |
| 3 | **ATTORNEY SATRIS:** Yeah. I think that -- well, |
| 4 | just going back to the certificates. I don't know if |
| 5 | that makes a difference. There was a certificate for |
| 6 | the parenting class. That was already talked about |
| 7 | somewhat, the parenting. But that certificate of |
| 8 | completion goes back to 1999. And then I think you may |
| 9 | have skipped - did you skip the chrono regarding the |
| 10 | POP Program - Prisoner's Outreach Program? |
| 11 | **DEPUTY COMMISSIONER SHIELDS:** I may have. |
| 12 | **DISTRICT ATTORNEY REGAN:** Why don't you just |
| 13 | state that -- |
| 14 | **DEPUTY COMMISSIONER SHIELDS:** And let me just |
| 15 | say parenthetically, is that I read all these, but to |
| 16 | enter it into the record verbally is just - |
| 17 | **ATTORNEY SATRIS:** Yeah. |
| 18 | **DEPUTY COMMISSIONER SHIELDS:** But you go ahead |
| 19 | and do that. |
| 20 | **ATTORNEY SATRIS:** So there's a chrono dated May |
| 21 | 11, 2005, that documents his participation for the |
| 22 | prior two years in that program. And maybe Mr.-- I |
| 23 | know Mr. Hancock would have a bit more to say about |
| 24 | that because that's quite a meaningful program for him |
| 25 | that he still participates in. Although I didn't see, |

1  again, they're not always real good about getting the

2  chronos in the Central File. But, that's something

3  you're still doing, isn't it?

4  **INMATE HANCOCK:** Yes.

5  **ATTORNEY SATRIS:** And then there is just an

6  update in terms of the work program. There was a

7  memorandum that was done October 18, 2007 that we'll

8  submit if it's - I don't see the file yet. It sort of

9  just brings up to date on the work.

10  **DEPUTY COMMISSIONER SHIELDS:** Okay. It's a

11  laudatory chrono. Okay. Well this is -- basically

12  says that you've now worked there for 12 years. You

13  communicate well. You have a good work ethic. Well,

14  it's actually pretty much the one at ten years that

15  you're above the fray with a neat clean appearance,

16  calm, effective means of communication. It actually is

17  pretty much verbatim of the other one. Let's see. And

18  you have offers of employment upon your release. But

19  again, it's an unequivocally positive chrono. If you

20  have anything else, this would be-

21  **ATTORNEY SATRIS:** No, I don't think there's

22  anything else in the way of documentation. There are

23  references to the religious activities that Mr. Hancock

24  does. But that might be something you'll -

25  **DEPUTY COMMISSIONER SHIELDS:** Well -

1       **ATTORNEY SATRIS:** And he—

2       **DEPUTY COMMISSIONER SHIELDS:** Okay.

3       **ATTORNEY SATRIS:** Go ahead. I was just going to

4 say, you know, he does a lot of informal counseling and

5 so forth of younger inmates and tries to be a positive

6 influence through that work.

7       **DEPUTY COMMISSIONER SHIELDS:** Okay. I guess,

8 sir, let me just ask you. For me, personally, I want

9 to get down to what weight to give things. You know,

10 this is a good record. It's not a great prison record.

11 But it's a good record. You've done, you know, a lot

12 of positive stuff. I certainly have seen gentlemen

13 come in here and have more certificates, more things

14 like that. But all of this pales when I place it

15 against your crime. And the thing for me is, I don't

16 know that any of this really addresses the issue of how

17 did this happen? How on earth did this happen? And

18 how do we know it's not going to happen again?

19       **INMATE HANCOCK:** Well, I've written out. Now,

20 you might want to hear this verbatim. But just looking

21 inside of why I, you know, even brought myself to

22 participate and to actually follow through.

23       **DEPUTY COMMISSIONER SHIELDS:** Well, sir, let me

24 just, you know -- and you will have another chance to

25 speak. But let me phrase this again. And this is kind

| | |
|---|---|
| 1 | of important.  I'm not asking you the answer for |
| 2 | yourself.  I want you to put yourself in my shoes and |
| 3 | help me with a very big problem that's in front of me |
| 4 | today.  I mean, this is one of the larger crimes that |
| 5 | I've seen, you know, sitting on this side of the table. |
| 6 | I mean, this is a big crime.  And I don't want to |
| 7 | trivialize other crimes.  But this is a very big |
| 8 | incident that occurred in your life.  I'm trying to, in |
| 9 | my mind, go, well this is nice.  But how do I take that |
| 10 | and apply this to what happened?  Me.  How can I solve |
| 11 | this problem?  How do I know when you're in a crunch |
| 12 | you're not going to do this again? |
| 13 | **INMATE HANCOCK:**  Want me to answer? |
| 14 | **DEPUTY COMMISSIONER SHIELDS:**  Yes. |
| 15 | **INMATE HANCOCK:**  Okay.  First of all, looking at |
| 16 | the events that I experienced at that time as far as, |
| 17 | as I said earlier, a spiral that I was in myself.  You |
| 18 | know, as far as using drugs.  You know, doing things |
| 19 | out of the nature of what I was raised to do.  You |
| 20 | know, my moral obligation to society and the whole |
| 21 | thing of that nature, I allowed myself to be influenced |
| 22 | by my understanding that it was hard for me to say no |
| 23 | to somebody that I cared for or that I loved.  One way |
| 24 | that I know for sure that I wouldn't fall into this |
| 25 | particular situation again is that first of all, you |

 1  know, if there came a situation where I'm, you know,
 2  feeling desperate or everything is going south for me
 3  or not in a direction that I'm foreseeing. And that I
 4  wouldn't refer back to, you know, using drugs, using
 5  excuses as far as the things that's happening in my
 6  family. You know, not letting a financial situation
 7  press me to do anything that would cause me to be
 8  financially secure and putting life above money. This
 9  is something that I've reflected on that put me in the
10  situation, or that I accepted from outside of my good
11  nature of even before my commitment offense. And I
12  would not go back to doing that. I would not go back
13  to using drugs. I haven't used drugs. This is one
14  thing that immobilized my sensibilities to be able to
15  justify the crime that I created as far as the murder,
16  as far as the murder for money or anything that enticed
17  me to, you know, follow through on what I followed
18  through on. I take full responsibility, according to
19  the crime that I created, as far as the murder of Mr.
20  Larry Carnegie. I take full responsibility. In my
21  mind, at the time, you know, I would think that
22  somebody else, it was on somebody else I helped. This
23  was something that I'm not fully guilty of or that I
24  can't say that I did this on my own. This is in the
25  past. But now I understand. Just looking within

1   myself, that I'm fully responsible for everything that
2   I've done concerning this case and concerning the
3   murder of Mr. Larry Carnegie. And I'm not trying to, I
4   wouldn't try to justify by any means the life of
5   another human being. At this point right here or
6   forever. For something that I need as far as substance
7   or money or anything that I thing might appease me.

8       **DEPUTY COMMISSIONER SHIELDS:** Let me end it.
9   You can talk some more. What bothers me the most is
10  the possibility that this guy, this poor man, was alive
11  in a trunk and that you knew that. And I still asked
12  you to put yourself in my shoes. And you haven't been
13  able to do that yet. Can you put yourself in your
14  shoes. What do you think he felt. Put yourself in his
15  shoes. What do you think he felt when he's in the
16  trunk of the car? Probably thinking he's gonna die.
17  And what is it, I don't care how many laudatory chronos
18  you have, how am I supposed to make the leap from
19  laudatory chronos to go, oh, this guy has changed and
20  it's okay to let him out now.

21      **INMATE HANCOCK:** This is a process that I'm-
22  I'm processing even as I sit here. And as far as me
23  trying to help children, you know, not just through the
24  POP program, but these are at risk children that are
25  starting to drink, starting to use drugs, starting a

1   life of crime.  Which I have to look in -- I give my
2   own self and my situation as far as where I felt my
3   mind was at the time.  And I share this with the
4   children and their families and try to save them from
5   coming into a situation like this.  Which I make myself
6   available for as much as I can get out, twenty four
7   hours a day, if I can communicate.

8       **DEPUTY COMMISSIONER SHIELDS:**  I still don't hear
9   how you changed the person that could not respond to
10  the person in the trunk of that car.  Forget the
11  financial pressure.  Forget all that stuff.  There's a
12  second thing here.  And the second thing is, this isn't
13  in the heat of passion or anything.  This is, as time
14  goes on, when you had time for the light bulb to go on,
15  there was somebody in the trunk of the car.  How do I
16  know you're still not the callous person that wouldn't
17  go, whoa, this thing went south.  I'm gonna man up,
18  take the blame now.  If he doesn't die, I won't do life
19  in prison.  Did that cross your mind?

20      **INMATE HANCOCK:**  I can say that that somewhat
21  crossed my mind.  But I wasn't in a state of mind, or
22  clear state of mind, being that I was actually using
23  the drugs, and I can't say that that was clear in my
24  mind.  I was, by all means, unstable mentally at that
25  time.

```
 1          DEPUTY COMMISSIONER SHIELDS:  That's all I have.
 2          PRESIDING COMMISSIONER DOYLE:  Okay.  Mr.
 3   Hancock, before I get into your parole plans and
 4   letters of support and opposition, I do want to ask you
 5   some questions.  You said that you were attending AA or
 6   NA.  Or a combination.
 7          INMATE HANCOCK:  Yes.  AA/NA.
 8          PRESIDING COMMISSIONER DOYLE:  Okay.  And that
 9   as is the case in many facilities, they close down for
10   various reasons.  I understand that.  How long did you
11   attend?  What was your attendance like?  How many years
12   or months or--
13          INMATE HANCOCK:  Well, I would say all together,
14   I attended off and on for about a year, year and a
15   half.
16          PRESIDING COMMISSIONER DOYLE:  And how recently
17   was that?
18          INMATE HANCOCK:  Well, the last time that I went
19   to AA was probably around seven months ago.
20          PRESIDING COMMISSIONER DOYLE:  Okay.
21          INMATE HANCOCK:  We was locked down for four
22   months.
23          PRESIDING COMMISSIONER DOYLE:  Yeah.  I
24   understand.  Did you derive any benefit out of any of
25   that at all, sir?
```

1          **INMATE HANCOCK:**  Well, what happens at the AA/NA

2     meetings is everybody tells their stories about, you

3     know, how they proceeded through a day.  You know,

4     whether it was cocaine, alcohol --

5          **PRESIDING COMMISSIONER DOYLE:**  Right.  I

6     understand.

7          **INMATE HANCOCK:**  And these were just sharing the

8     stories.  And I shared my story and that they gave me,

9     and I did.  And I'm not the only one that's going

10    through these same kind of problems.

11         **PRESIDING COMMISSIONER DOYLE:**  Right.  That's

12    part of the purpose of sharing stories.  Yeah.  Because

13    the first word in the first step is what?  Do you know?

14         **INMATE HANCOCK:**  The first step, if I remember

15    correctly, is -

16         **PRESIDING COMMISSIONER DOYLE:**  I'm not asking

17    you to recite it.  I'm just - And you skipped right

18    over it.  The first word is we.  We admit it.  And the

19    purpose of that is, see, because you skipped right over

20    that.  You started into the -- but the purpose of that

21    is that very often, alcoholics and people that are

22    addicted to narcotics, view the world only from their

23    perspective.  They think they're the only ones going

24    through this.  And part of the process, because you

25    mentioned process a minute ago, is to break that down.

1  And one of the ways to break it down initially is to

2  find out that you are a part of a larger group.  So

3  that's the initial importance of all that.  And I'm

4  going to ask, did you do any of the twelve steps at

5  all?  Did you work through any of them?  And I'm not

6  going to quiz you on the steps in terms of having you

7  recite them because I don't believe in that.  But I do

8  want to know if any of them had any impact on you.

9          **INMATE HANCOCK:**  Well, actually, we never went

10  over the steps.  I would come from time to time.  I

11  don't know if I was available or in attendance enough

12  to actually get the steps.

13          **PRESIDING COMMISSIONER DOYLE:**  They usually talk

14  about doing the steps because that's an integral part

15  of the process.  The stories are important.  They're

16  kind of the introduction to the whole - because that

17  kind of catches you.  The real meat of the process is

18  the steps.  And the reason that's important is that it

19  does a lot of the - it directs you in a pretty orderly

20  way -- The self-searching, the self-introspection that

21  typically individuals need who have abused alcohol.  It

22  helps you get through all of that, explain why you did

23  all of the things you did.  It's all your own work,

24  usually with a sponsor somewhere, but it's a process

25  that kind of one step leads to another.  Sounds to me

1   like you're doing a part of the twelve step program,

2   which is the part that reaches out and helps others.

3           **INMATE HANCOCK:** Right.

4           **PRESIDING COMMISSIONER DOYLE:** Yeah. And I

5   understand that makes you feel good. And that's good

6   for the efforts. You know, especially the kids that are

7   receiving benefits of that. And I don't think we've

8   covered that enough. And I want to ask you a little

9   bit about the POP program. I am familiar with it, but

10  I want you to articulate it. But that's at the tail

11  end of the twelve step program, that reaching out and

12  helping other people. There's a whole process that is

13  often good for many, many people, that an individual go

14  through to get through the wreckage, if you will, of

15  the past. And it kind of works its way through. But

16  let me ask you about the POP program. Tell me a little

17  bit about it.

18          **INMATE HANCOCK:** Well, the POP program consists

19  of children from the ages nine to seventeen that are at

20  risk, for the most part. And they have been either

21  summoned by a judge to attend this program, or their

22  parents are concerned enough about them, you know, from

23  incidents at school or on the streets, you know—

24          **PRESIDING COMMISSIONER DOYLE:** So they actually

25  come into the facility?

1    **INMATE HANCOCK:** Yeah.

2    **PRESIDING COMMISSIONER DOYLE:** But it's not like
3    the Scared Straight.

4    **INMATE HANCOCK:** It's not. It's more
5    psychological because kids are not scared these days.
6    And that's realized. But as far as what we do with
7    these kids, we bring the parents, the mother or whoever
8    attends. Usually it's more mothers than it is fathers.

9    **PRESIDING COMMISSIONER DOYLE:** Yeah.
10   Unfortunately.

11   **INMATE HANCOCK:** And we bring 'em through the
12   facility. We have a session and introduce ourselves as
13   POP members. It's about 12 of us altogether on the one
14   and two yard combined. So what we do is we give them
15   an overview of what prison life really is really like.
16   And you know, we find out, you know, we get a precursor
17   from them as far as why they're here. You know, they
18   have the tags and the pictures on them. So we have an
19   idea of what they are in here for. So, I mean, because
20   of course they'll tell us something else. But we
21   already have an idea of what it is. Anyway, we go from
22   that point and actually take them on a tour. And take
23   them, you know, we have specific cells that we take the
24   mother and the son, we take 'em through the yard, you
25   know, to the gym where it's, you know, triple bunks,

58

1  and no room for movement.  And give 'em a question and

2  answer period.  You know, we show 'em the pictures of—

3          **PRESIDING COMMISSIONER DOYLE:**  The question

4  answer is with the other inmates?  Or just you guys?

5          **INMATE HANCOCK:**  No, actually, we're guiding

6  them.  And, you know, it's orderly.  So they're lined

7  up, you know, they have pink suits on so, you know,

8  they can be recognized as POP participants.  But we

9  take 'em through the yard, the facility, let 'em know

10  what types of dangers that are in here.  And what they

11  could be facing.  And you know, as far as what's

12  available, you know, you have to ask for toilet paper.

13  You can be killed in any minute.  You know, how it's

14  segregated throughout the, you know, prison.  If you

15  don't know, if you're not involved with a gang, you

16  will be classified and not by the laws here.  But the

17  people that are in here already will, you know, will

18  claim you.  And that's –

19          **PRESIDING COMMISSIONER DOYLE:**  What benefit do

20  you think that has achieved?

21          **INMATE HANCOCK:**  Well, actually it's not to

22  scare 'em.  It's just to let them see, you know, as

23  well as we have a lineup of pictures where people been

24  murdered in here.  Many of 'em.  You know, we lay 'em

25  out, let 'em see what it is the facility provides this

1   for us.  And we let 'em know these are mistaken

2   identities, you know.  And I think that's one of the

3   sections or the portions of the tour that touches them

4   as far as being mistaken as somebody else and being

5   murdered at any given time.  Most of these kids are

6   very young, and it's male and female.  So it's not just

7   male oriented.  So a lot of time we get finished, we

8   bring 'em back to the visiting room which is a open

9   area where they can feel more comfortable talking.  We

10  break down in sections and we get to the core of the

11  problem of why they did what they did.  So, you know,

12  it's more of a psychological program than Scared

13  Straight.

14       **PRESIDING COMMISSIONER DOYLE:** Yeah.  I

15  understand.  I understand the difference.  In terms of

16  your parole plans, I'm going to read initially from

17  your counselor's report.  And I think the most recent

18  one refers me back to the '04 counselor's report.  It

19  says -- Upon release, subject plans to reside with his

20  parents, Carl and Gloria Hancock.

21       Now, your father has passed.

22       **INMATE HANCOCK:** He's passed.

23       **PRESIDING COMMISSIONER DOYLE:** Sorry to hear

24  that.  And that's in Richmond, sir?

25       **INMATE HANCOCK:** They were living in Richmond.

1          PRESIDING COMMISSIONER DOYLE:  She's in

2    Fairfield, now?

3          INMATE HANCOCK:  Now my mother's in Sacramento.

4          PRESIDING COMMISSIONER DOYLE:  Sacramento.  Your

5    sister is in Fairfield.

6.         INMATE HANCOCK:  Fairfield, yes.

7          PRESIDING COMMISSIONER DOYLE:  Gotcha.  And

8    we'll get to those letters in a minute.

9          Subject plans to obtain gainful employment and

10   working with your brother, Brian.

11         INMATE HANCOCK:  Yes.

12         PRESIDING COMMISSIONER DOYLE:  And he's a -

13         INMATE HANCOCK:  Petitioning consultant.

14         PRESIDING COMMISSIONER DOYLE:  He's a what?

15         INMATE HANCOCK:  Petitioning.  They, his

16   business consists, I mean if you'd like to see—

17         PRESIDING COMMISSIONER DOYLE:  Do I have that in

18   my file here?

19         INMATE HANCOCK:  Yes.

20         PRESIDING COMMISSIONER DOYLE:  Okay.  I won't

21   worry about that just yet.

22         INMATE HANCOCK:  He's a national petitioning

23   consultant, you know, which, you know, what they do is

24   they get signatures, you know, concerning different

25   bills that's, you know, coming out and they—

1    PRESIDING COMMISSIONER DOYLE:  Oh, I see.  Okay.

2        INMATE HANCOCK:  So all over the United States,

3    actually. But-

4        PRESIDING COMMISSIONER DOYLE:  But your

5    employment would be as a computer technician?

6        INMATE HANCOCK:  Yes.  And basically, doing

7    office work.

8        PRESIDING COMMISSIONER DOYLE:  Okay.  And how is

9    it that you're familiar with computers?

10       INMATE HANCOCK:  Well actually-

11       PRESIDING COMMISSIONER DOYLE:  I didn't see that

12   in your vocs here.

13       INMATE HANCOCK:  Actually, this is something I,

14   you know, I took just to familiarize myself and

15   actually I went into UOP as a computer science major.

16       PRESIDING COMMISSIONER DOYLE:  Oh, okay.

17       INMATE HANCOCK:  But I ended up, you know, after

18   I went through the process of not knowing what I wanted

19   to do.  I decided to, you know, that communications

20   mass media systems was what I really wanted to do.

21       PRESIDING COMMISSIONER DOYLE:  Okay.  Have you

22   kept up with the change in computer since-

23       INMATE HANCOCK:  Well, actually, they don't

24   offer much computer access here in the prison.

25       PRESIDING COMMISSIONER DOYLE:  So it's been .

1   difficult for you to-

2          **INMATE HANCOCK:**  When I get a chance, I mean, if

3   there's something available, it'd just be — it doesn't

4   go outside of the prison.  It's inner-institutional.

5          **PRESIDING COMMISSIONER DOYLE:**  Okay.

6          **INMATE HANCOCK:**  I have had access to that.

7          **PRESIDING COMMISSIONER DOYLE:**  Okay.  Why don't

8   I go to the letters right now, of support.  Because you

9   have them in two different categories.  One, job

10  offers.  And one letters of support.  So let me —

11  listen up and make sure I get 'em all.  And go through

12  those right now.

13         August 18, 2007, from a Lorraine Silas S-I-L-A-

14  S.

15         **INMATE HANCOCK:**  Yes.

16         **PRESIDING COMMISSIONER DOYLE:**  And Miss Silas is

17  your aunt and godmother.  Is that accurate, sir?

18         **INMATE HANCOCK:**  That's correct.

19         **PRESIDING COMMISSIONER DOYLE:**  She writes a

20  letter of support.  So is it your mother's --

21         **INMATE HANCOCK:**  My mother's sister.

22         **PRESIDING COMMISSIONER DOYLE:**  -- sister?

23  Writes a letter of support.  It sounds like a nice

24  lady.  She lives in —

25         **INMATE HANCOCK:**  St. Louis.

63

1        PRESIDING COMMISSIONER DOYLE:  Oh.  St. Louis.

2   I was looking for that.  Okay.  A letter dated August

3   7, 2007, from Antoinette Hancock Lawrence.

4        INMATE HANCOCK:  Yes.  That's my aunt.

5        PRESIDING COMMISSIONER DOYLE:  That's your other

6   aunt?

7        INMATE HANCOCK:  That's my father's sister.

8        PRESIDING COMMISSIONER DOYLE:  Okay.  Writes a

9   letter of support.  Is she still in the Bay area, sir?

10        INMATE HANCOCK:  Yes.  She's in Richmond.

11        PRESIDING COMMISSIONER DOYLE:  Okay.  It talks

12   about living with your mother but writes a letter of

13   support on your behalf, sir.  Okay.  Letter dated

14   August 6, 2007, a Dr. Nanette Finley Hancock, PhD.

15   This is your other aunt?

16        INMATE HANCOCK:  That's my other aunt, yes.

17        PRESIDING COMMISSIONER DOYLE:  She's a marriage

18   and family psychotherapist.

19        INMATE HANCOCK:  Yes.

20        PRESIDING COMMISSIONER DOYLE:  And where is that

21   at?

22        INMATE HANCOCK:  That's Richmond.

23        PRESIDING COMMISSIONER DOYLE:  Richmond.

24        INMATE HANCOCK:  And she has another business,

25   or office, in Oakland, California.

64

1      **PRESIDING COMMISSIONER DOYLE:** It says – I

2   intend to offer him emotional and financial support and

3   encouragement upon his release.  What type of financial

4   support is it?  She just—

5      **INMATE HANCOCK:** She owns two houses on her

6   block.  She's financially secure.  She has probably

7   about four estates.

8      **PRESIDING COMMISSIONER DOYLE:** Okay.  So she's

9   got money and she's just--

10      **INMATE HANCOCK:** Yeah.  She worked with the

11   military and she has many degrees.

12      **PRESIDING COMMISSIONER DOYLE:** Okay.  Yvonne

13   (sp) Seewright.

14      **INMATE HANCOCK:** Yes.

15      **PRESIDING COMMISSIONER DOYLE:** I don't see a

16   date on that unless it's hidden from me.

17      **INMATE HANCOCK:** Actually—

18      **PRESIDING COMMISSIONER DOYLE:** Who is she to

19   you, sir?

20      **INMATE HANCOCK:** She's a friend of the family.

21      **PRESIDING COMMISSIONER DOYLE:** Okay.  She's

22   known you since you were born, I guess, huh?

23      **INMATE HANCOCK:** Yes.

24      **PRESIDING COMMISSIONER DOYLE:** So she's friends

25   of your mom and dad?

65

```
1         INMATE HANCOCK:  Yes.

2         PRESIDING COMMISSIONER DOYLE:  Okay.

3         INMATE HANCOCK:  Oh, here's the - this is

4   Jackson Street, Riverside, California.

5         PRESIDING COMMISSIONER DOYLE:  Miss Seewright?

6         INMATE HANCOCK:  Yvonne.  Yes.

7         PRESIDING COMMISSIONER DOYLE:  Okay.  Oh it's,

8   yeah, I've got that but I was looking for the date.

9         INMATE HANCOCK:  Oh.  Okay.

10        PRESIDING COMMISSIONER DOYLE:  She has five

11   children.

12        INMATE HANCOCK:  Yes.

13        PRESIDING COMMISSIONER DOYLE:  And she writes a

14   letter of support on your behalf.  A letter from the

15   public defender's office dated June 8, 2005, it's

16   relatively old.  But it was your attorney in the case,

17   Ronald Abernathy.

18        INMATE HANCOCK:  Yes.

19        PRESIDING COMMISSIONER DOYLE:  And he writes a

20   letter of support on your behalf, sir.  Acknowledges it

21   was a heinous crime.  D.C. Trucking, May 5, 2005.  This

22   is relatively old, sir.  And that's Clifford -

23        INMATE HANCOCK:  Dabney.  That's my cousin.

24        PRESIDING COMMISSIONER DOYLE:  What is his last

25   name?
```

1       INMATE HANCOCK:  Dabney.

2       PRESIDING COMMISSIONER DOYLE:  Dabney?

3       INMATE HANCOCK:  Yes.

4       PRESIDING COMMISSIONER DOYLE:  D-A-B-N-E-Y?

5       INMATE HANCOCK:  Yes.

6       PRESIDING COMMISSIONER DOYLE:  Okay.  Writes a

7  letter of support.  February 28, 2005, Carolyn Young.

8  It's a friend of yours, sir?

9       INMATE HANCOCK:  Yes.

10      PRESIDING COMMISSIONER DOYLE:  Writes a letter

11  of support on your behalf.  Has known you since high

12  school, I guess, huh?

13      INMATE HANCOCK:  Yes.

14      PRESIDING COMMISSIONER DOYLE:  A letter dated

15  February 23, 2005, (sp) Alem Abu Qadri?  Is that how

16  you say that?

17      INMATE HANCOCK:  What?

18      PRESIDING COMMISSIONER DOYLE:  This is a letter

19  from A-B-U Abu Qadir Q-A-D-I-R Alem.  Do you know who

20  that is?

21      INMATE HANCOCK:  Oh.  Alem.  Yeah.  He's an Imam

22  in the Bay area.

23      PRESIDING COMMISSIONER DOYLE:  Okay.  Where is

24  that?

25      INMATE HANCOCK:  That's in San Francisco.

1        PRESIDING COMMISSIONER DOYLE:  Okay.

2        INMATE HANCOCK:  And he works with the juvenile

3   criminal justice.

4        PRESIDING COMMISSIONER DOYLE:  How long have you

5   known him, sir?

6        INMATE HANCOCK:  Since I've been in Solano,

7   which is since '95.

8        PRESIDING COMMISSIONER DOYLE:  Did he come here

9   and visit?

10        INMATE HANCOCK:  All the time.  A matter of

11   fact, he works with the Imam, the chaplain that works

12   here, and he has a community on the street that's kind

13   of large.

14        PRESIDING COMMISSIONER DOYLE:  Okay.  All right.

15        INMATE HANCOCK:  So he was –

16        PRESIDING COMMISSIONER DOYLE:  He writes a

17   letter of support for you, sir.

18        INMATE HANCOCK:  He's also offering a job, too.

19   That's also in there.

20        PRESIDING COMMISSIONER DOYLE:  What job did he

21   offer?  I don't–

22        INMATE HANCOCK:  Well he—

23        PRESIDING COMMISSIONER DOYLE:  It talks about–

24        INMATE HANCOCK:  Well, the juvenile centers is

25   something that he has been running.

1      **PRESIDING COMMISSIONER DOYLE:** Okay. I don't

2  see that in here, though.

3           **INMATE HANCOCK:** It's-

4      **PRESIDING COMMISSIONER DOYLE:** He makes-

5  program of sobriety offers things such as residential

6  treatment available up to six months along with

7  ancillary services that are connected to housing,

8  employment, job readiness, supportive programs that

9  assist individuals coming home these types of

10 circumstances. So it's a transitional housing? Is

11 that what you're saying?

12          **INMATE HANCOCK:** Yes. It is. It is.

13      **PRESIDING COMMISSIONER DOYLE:** All right.

14 February 1, 2005, a letter from Rand Chapman?

15          **INMATE HANCOCK:** Yes.

16      **PRESIDING COMMISSIONER DOYLE:** And a friend of

17 yours?

18          **INMATE HANCOCK:** Yes. He graduated from UOP.

19      **PRESIDING COMMISSIONER DOYLE:** Okay.

20          **INMATE HANCOCK:** On the same football team as

21 well.

22      **PRESIDING COMMISSIONER DOYLE:** Writes a letter

23 in support. Writes a letter in support of you, sir.

24 He's living in Maryland now, huh?

25          **INMATE HANCOCK:** Yes.

1      PRESIDING COMMISSIONER DOYLE:  Sounds like he's

2   doing well.  Brian Hancock, Sr.

3      INMATE HANCOCK:  Yes.

4      PRESIDING COMMISSIONER DOYLE:  That's December

5   1, 2004.  Is this your brother, sir?

6      INMATE HANCOCK:  My brother.  Yes.

7      PRESIDING COMMISSIONER DOYLE:  He writes a

8   letter of support on your behalf.  NPC.  What is that?

9   The trucking firm that we spoke of?

10      INMATE HANCOCK:  No.  That's the National

11   Petition—

12      PRESIDING COMMISSIONER DOYLE:  Oh.  Okay.  All

13   right.  All right.  All right.

14      INMATE HANCOCK:  And he has the, actually—

15      PRESIDING COMMISSIONER DOYLE:  Where is that

16   located?

17      INMATE HANCOCK:  It's based in Vallejo.  But he

18   moves around.  I mean, sometimes his job calls for him

19   to go—

20      PRESIDING COMMISSIONER DOYLE:  How much would he

21   employ you for?  Do you know?

22      INMATE HANCOCK:  Well he has right here,

23   everything that—  $12 an hour, that's the, you know,

24   plus commission for every claim.  Do you have his—

25      PRESIDING COMMISSIONER DOYLE:  No.  I have

70

1  another one here. Maybe we'll get to the job offers in

2  a minute. That's probably in a different section.

3  That's not contained in the letters of support I have.

4       **INMATE HANCOCK:** Oh. Okay. All right.

5       **PRESIDING COMMISSIONER DOYLE:** November 30,

6  2004. These are getting pretty old. I'm not sure -

7  Carolyn Young. 2004, November 19, Roderick Jones.

8  November 15, 2004, K. Cannon. That's a counselor?

9       **INMATE HANCOCK:** K. Cannon. That's my

10  counselor.

11       **PRESIDING COMMISSIONER DOYLE:** Who wrote this?

12  Oh, Antoinette Kirkland. I see. Okay.

13       **INMATE HANCOCK:** That's where it went to.

14       **PRESIDING COMMISSIONER DOYLE:** Okay. Gotcha.

15  November 6, 2004, Jasmine J-A-S-M-I-N-E, is that it?

16       **INMATE HANCOCK:** Thompson.

17       **PRESIDING COMMISSIONER DOYLE:** Thompson?

18       **INMATE HANCOCK:** That's my niece.

19       **PRESIDING COMMISSIONER DOYLE:** Okay. Writes a

20  supportive letter. November 4, 2004, this is Brian

21  Hancock again. I think we've already dealt with that

22  one. Dr. Natalie Finn Hancock. We've already dealt

23  with this one. DC Trucking. We've already spoken of

24  this one. These are previous letters. Anthony Simeon.

25       **INMATE HANCOCK:** Simeon.

1     **PRESIDING COMMISSIONER DOYLE:** A friend' of

2   yours, writes a letter of support. Gregory D. Thomas,

3   August 1, 2004, another supportive letter. Virginia

4   Taylor, July 11, 2004, supportive letter. And again,

5   we're going back over the same stuff. So this looks

6   like kind of a repeat and older letters. So I'm going

7   to move on. Unless there's one that you want me to

8   look at, sir.

9     **INMATE HANCOCK:** Well, actually, I have copies

10   of the most recent ones, '07, that should be in the

11   file.

12     **PRESIDING COMMISSIONER DOYLE:** Yeah. That's--

13   Yeah. We've already covered that.

14     **INMATE HANCOCK:** Okay.

15     **PRESIDING COMMISSIONER DOYLE:** We're just

16   redundant here. I'm going to go to your job offers.

17   Accounting, Hawkins and Simeon.

18     **INMATE HANCOCK:** Simeon, yes.

19     **PRESIDING COMMISSIONER DOYLE:** Simeon. And this'

20   is a job offer for -

21     **INMATE HANCOCK:** Accounting. This is an

22   accountancy firm.

23     **PRESIDING COMMISSIONER DOYLE:** Right. I

24   understand. You would be employed as the office

25   manager?

*WPU Inc*

1          **INMATE HANCOCK:** Yes.

2          **PRESIDING COMMISSIONER DOYLE:** Okay. And it

3    goes through, there's a number of pages here, five or

4    six, relative to a contract, a job offer contract of

5    employment. A gross salary of $31,200 per year, right?

6          **INMATE HANCOCK:** Yes.

7          **PRESIDING COMMISSIONER DOYLE:** Okay. And what

8    would you be doing? I mean, what does an office

9    manager do?

10          **INMATE HANCOCK:** Actually, I would be managing

11    the office. Whatever he asked me to do.

12          **PRESIDING COMMISSIONER DOYLE:** Do you know

13    anything about accounting, sir?

14          **INMATE HANCOCK:** Not a whole lot.

15          **PRESIDING COMMISSIONER DOYLE:** Okay.

16          **INMATE HANCOCK:** But I can learn. I mean as far

17    as, I don't know if he would have me doing the

18    accounting itself-

19          **PRESIDING COMMISSIONER DOYLE:** Okay.

20          **INMATE HANCOCK:** But as far as—

21          **PRESIDING COMMISSIONER DOYLE:** The one thing I

22    noticed, yeah, the one thing I noticed in here that

23    wasn't covered. Generally speaking, in terms of

24    accounting, they usually want employees to be bonded

25    that are working with-- Does that present a problem?

1   I don't notice any of that commentary in here at all.

2       **INMATE HANCOCK:**  I don't think it would be a

3   problem.  He's the owner.  So he would--

4       **PRESIDING COMMISSIONER DOYLE:**  Okay.  But he has

5   a license, and the license needs support behind it, and

6   often times the-  Yes, sir.

7       **ATTORNEY SATRIS:**  I don't think Mr. Hancock

8   would be acting as an accountant.  He would just be,

9   you know, office receptionist, manager of the office,

10  is the -

11      **PRESIDING COMMISSIONER DOYLE:**  Okay.  Well it

12  might be something you'll want to ask him about.

13      **INMATE HANCOCK:**  Okay.

14      **PRESIDING COMMISSIONER DOYLE:**  It may present a

15  problem.  Then another letter following that.  It's a

16  December 2004, another 2004.  This is your brother,

17  sir, right?  Petitioning Consultants?

18      **INMATE HANCOCK:**  Yes.

19      **PRESIDING COMMISSIONER DOYLE:**  NPC.

20      **INMATE HANCOCK:**  Yes.

21      **PRESIDING COMMISSIONER DOYLE:**  Okay.  In

22  Vacaville.  The base salary on this one, and that is

23  the computer technician or computer guy?

24      **INMATE HANCOCK:**  Well, actually this would be

25  the same type of work as far as managing office.  Now,

1  there's another part to this, as well.  He's talking

2  about the NPC, right?

3  **PRESIDING COMMISSIONER DOYLE:**  Right.

4  **INMATE HANCOCK:**  Now, I would also be, I mean,

5  what he does is he gets the signatures from the tax, I

6  mean, not from the tax-

7  **PRESIDING COMMISSIONER DOYLE:**  Voters.

8  **INMATE HANCOCK:**  Yeah.  From the voters, you

9  know, the taxpayers, and you know, for different bills.

10  So this job is not stationary.  It moves.  It moves

11  from state to state, city to city.  So, it-

12  **PRESIDING COMMISSIONER DOYLE:**  Yeah.  Originally

13  I think what we were talking about was that you were

14  gonna be a computer technician.

15  **INMATE HANCOCK:**  Well, that's gonna be part of

16  the job.

17  **PRESIDING COMMISSIONER DOYLE:**  So that's a

18  computer technician and manager?  So your base pay is

19  twelve bucks an hour and then a commission of three

20  dollars per claim?

21  **INMATE HANCOCK:**  Right.  And the claims, when

22  the claims come in is when you get the signature.

23  That's the claim.  So if I get 1,500 signatures in a

24  day-

25  **PRESIDING COMMISSIONER DOYLE:**  Right.  Do you go

1   out and actually get the signatures yourself, sir?

2         **INMATE HANCOCK:**  Yeah.

3         **PRESIDING COMMISSIONER DOYLE:**  Okay.  Who

4   handles the transportation if you go out of state?

5         **INMATE HANCOCK:**  My brother does.

6         **PRESIDING COMMISSIONER DOYLE:**  He pays for all

7   this?

8         **INMATE HANCOCK:**  Yes.

9         **PRESIDING COMMISSIONER DOYLE:**  Okay.  There's

10  another offer of employment.  There's no date on that.

11  Offer of employment - it's the same thing.  All right.

12  Did I cover your letters adequately, sir?  You got

13  everything down?

14        **ATTORNEY SATRIS:**  Well, there were a number of

15  letters in addition.  I mean, I think there were a good

16  maybe ten or fifteen of various other folk that were

17  either longtime family friends or -

18        **PRESIDING COMMISSIONER DOYLE:**  Yeah.  They're

19  usually the older dated ones.  That's why I tried to

20  get some of their names in the record for ya.

21        **ATTORNEY SATRIS:**  But I think, like Verlinda

22  Williams, old friend wrote a letter.  Another cousin,

23  Frank Hancock.  Barbara Nious N-I-O-U-S.

24        **INMATE HANCOCK:**  Kim (sp) Quates was my fiancé.

25  That's another one.

1     **ATTORNEY SATRIS:** That isn't in here at all, I
2  don't think.

3     **PRESIDING COMMISSIONER DOYLE:** So you have that
4  with you, sir? Why don't you give that to me.

5     **INMATE HANCOCK:** Yeah. Okay. Do you want this
6  copy here?

7     **PRESIDING COMMISSIONER DOYLE:** Well, we'll give
8  it back to you. Just if you want it in the record,
9  we're gonna need to look at it and --

10     Okay. Letter's dated September 17, 2007, Kim,
11  how do you say her last name?

12     **INMATE HANCOCK:** Quates.

13     **PRESIDING COMMISSIONER DOYLE:** Quates?

14     **INMATE HANCOCK:** Yes.

15     **PRESIDING COMMISSIONER DOYLE:** Q-U-A-T-E-S
16  Quates. This is your fiancé, sir?

17     **INMATE HANCOCK:** Of now, yes.

18     **PRESIDING COMMISSIONER DOYLE:** Writes a letter
19  in support. Okay. We will give that- Yes, sir?

20     **INMATE HANCOCK:** Did you get the one on my
21  mother?

22     **PRESIDING COMMISSIONER DOYLE:** I believe I did.
23  But I may be mistaken. Her name, sir?

24     **INMATE HANCOCK:** Gloria Hancock.

25     **PRESIDING COMMISSIONER DOYLE:** I don't think I

```
 1  did.  I don't think I remember reading that one, now.
 2         ATTORNEY SATRIS:  There is an older one she
 3  wrote with her husband-
 4         PRESIDING COMMISSIONER DOYLE:  What's that?
 5  What's the date on that?
 6         ATTORNEY SATRIS:  The newer one is the September
 7  17, 2007 letter.
 8         PRESIDING COMMISSIONER DOYLE:  That would be the
 9  more-
10         ATTORNEY SATRIS:  Yeah.
11         PRESIDING COMMISSIONER DOYLE:  Gloria Hancock,
12  letter dated September 17, 2007.  Your mother, sir.
13         INMATE HANCOCK:  Yes.
14         PRESIDING COMMISSIONER DOYLE:  It says in the
15  second to last paragraph - If released from prison, his
16  family and I will do everything we can to provide him
17  with housing, counseling, spiritual guidance through
18  our church and monetary assistance and anything else he
19  may need.  What kind of house does she -- how many
20  bedrooms does she live in?  What size is her house?
21         INMATE HANCOCK:  Well she, actually, she just
22  moved out of the big house where her and my father had
23  moved into, which had like four bedrooms.  And that was
24  too much for her.  So she's in a two bedroom house by
25  herself - no, apartment, right now.
```

*WPU Inc*

1    **PRESIDING COMMISSIONER DOYLE:**  Apartment.  Okay.

2    Does she have anybody living with her, sir?

3         **INMATE HANCOCK:**  No.

4         **PRESIDING COMMISSIONER DOYLE:**  Okay.  And that

5    is in Sacramento?

6         **INMATE HANCOCK:**  Yes.

7         **PRESIDING COMMISSIONER DOYLE:**  Okay.  Paradise

8    Cove Psychological Services.  What's this?

9         **INMATE HANCOCK:**  Oh, that's the name—

10        **PRESIDING COMMISSIONER DOYLE:**  Yeah.  We've

11   already done this.

12        **INMATE HANCOCK:**  That was my aunt.

13        **PRESIDING COMMISSIONER DOYLE:**  Yeah, we already

14   did that.

15        **INMATE HANCOCK:**  I didn't detach that.

16        **PRESIDING COMMISSIONER DOYLE:**  Okay.  We're

17   gonna keep this here for the time being.  We'll make

18   sure you get it back.  Anything else you'd like to add?

19        **ATTORNEY SATRIS:**  No.  Just that there were

20   about five or ten more letters.  I don't know that they

21   need to individually be gone over, but (overlapping

22   indiscernible) acknowledge that support.

23        **PRESIDING COMMISSIONER DOYLE:**  Yeah.  There were

24   quite a few.  Okay.  Miss Shields, any questions from

25   you?

 1 | **DEPUTY COMMISSIONER SHIELDS:** No.

 2 | **PRESIDING COMMISSIONER DOYLE:** Okay. At this

 3 | point, we're gonna go to the District Attorney from San

 4 | Joaquin County for any questions he might have, keeping

 5 | in mind sir, that the inmate does not wish to speak to

 6 | the crime.

 7 | **DISTRICT ATTORNEY FREITAS:** No questions.

 8 | **PRESIDING COMMISSIONER DOYLE:** Okay. Mr. Satris?

 9 | **ATTORNEY SATRIS:** I don't think I have any

10 | questions.

11 | **PRESIDING COMMISSIONER DOYLE:** Okay. All right.

12 | We're going to go to closing, sir.

13 | **DISTRICT ATTORNEY FREITAS:** Thank you,

14 | Commissioners. As the Commissioners have pointed out

15 | on more than one occasion when we're here is a re-

16 | hearing of an initial hearing. The initial hearing

17 | resulted in a four year denial. That was on June the

18 | 23rd of 2005. What was filed after that was a habeas

19 | petition saying that the district attorney violated an

20 | agreement and improperly spoke at those proceedings.

21 | And I see from the nods of both of your heads that both

22 | of you are quite aware of this and what, in fact, is

23 | going on.

24 | When initially taken into custody, Mr. Hancock

25 | entered into an agreement with the elected district

1   attorney, Mr. John Phillips, who has since retired.

2   And an agreement that was abided to by Mr. Eual

3   Blansett, that the district attorney's office would not

4   object to him being paroled at the earliest time. So,

5   Mr. Blansett attended the hearing in 2005 and it was

6   found that he in fact violated that agreement, by in

7   fact his presence in the manner that he in fact spoke.

8   The agreement was based, not only upon this crime, but

9   it was also following the murder of the victim in this

10  case, Laurence Carnegie. He also agreed to participate

11  in the murder of a second individual, a John Farley.

12  This football player, who was also a rival of Mr.

13  Blatt. And based upon those two crimes, he was in fact

14  entered into the agreement with the district attorney's

15  office. So that I no way violate the agreement, and

16  the spirit of the agreement or the letter of the

17  agreement, we will not be making a comment at this time

18  with these introductory remarks explaining our

19  position. And we'll leave that to the family to in

20  fact make their comments.

21      PRESIDING COMMISSIONER DOYLE: Okay. Thank you,

22  sir.

23      DISTRICT ATTORNEY FREITAS: Thank you.

24      PRESIDING COMMISSIONER DOYLE: Mr. Satris?

25      ATTORNEY SATRIS: Yes. I didn't know. Did you

1  want to go over - you kind of went over the 3042 notice

2  from the-

3          **PRESIDING COMMISSIONER DOYLE:** Yeah, I think the

4  DA is here to -

5          **ATTORNEY SATRIS:** But there was a letter that

6  was submitted.  Do you have that from the district

7  attorney's office?

8          **PRESIDING COMMISSIONER DOYLE:** I don't think I

9  do.

10          **DISTRICT ATTORNEY REGAN:** I have the original

11  here with me today.

12          **PRESIDING COMMISSIONER DOYLE:** This was the

13  letter.  The DA has spoken.  And I don't have it in my

14  file.  So we'll just leave it at that.  So go ahead,

15  sir.

16          **DISTRICT ATTORNEY REGAN:** I don't think they're

17  going to object to any late delivery of this.

18          **ATTORNEY SATRIS:** We don't object.  We'd like

19  the Board to consider it.  It's effectively their

20  response to the 3042 notice.

21          **PRESIDING COMMISSIONER DOYLE:** Yeah.  I don't

22  have it in my file.

23          **ATTORNEY SATRIS:** Are you intending to submit

24  that today?  I mean that was the plan.  That was the

25  idea.

1       **PRESIDING COMMISSIONER DOYLE:**  Yeah.  I think

2    he's made a statement and that covers the issue well

3    enough for me.  I mean, I understand his position, so.

4       **ATTORNEY SATRIS:**  Well, one thing I would object

5    to his statement.  There was only one charge in this

6    case that was ever filed against Mr. Hancock.  And I

7    don't think there was any criminality after this one.

8       **PRESIDING COMMISSIONER DOYLE:**  So why don't you

9    just go ahead and make your commentary.

10      **ATTORNEY SATRIS:**  Okay.  And -

11      **DEPUTY COMMISSIONER SHIELDS:**  Could we pause for

12   a moment, sir?

13      **PRESIDING COMMISSIONER DOYLE:**  Go ahead, sir.

14      **ATTORNEY SATRIS:**  All right.  You did overlook

15   the opposition letters, too.  I don't know if that's a

16   matter.

17      **PRESIDING COMMISSIONER DOYLE:**  You're right.  I

18   did do that.  There is quite a few opposition letters.

19      **ATTORNEY SATRIS:**  But we would request that you

20   give the district attorney an opportunity to submit the

21   letter he has prepared for purposes of this hearing,

22   because it goes beyond his brief remarks.

23      **DISTRICT ATTORNEY FREITAS:**  I think, speaking of

24   Mr. Satris remarks, it appeared that from the

25   sentencing in 1992, when I was a lowly misdemeanor

1  deputy and not party to any of these discussions, it

2  was said that a letter would be written.  However, that

3  letter was never obtained from Mr. Phillips who, in

4  fact, retired.  Or Mr. Blansett, who in fact retired,

5  also.  We recreated the spirit of the letter, the terms

6  of which are easy, because a letter was actually

7  generated for the co-defendant who also cooperated, Mr.

8  Mackey, and we've created that.  I've signed that for

9  the district attorney today.  I have it here available

10 so that we would in no way be violating our agreement

11 at the time of sentencing.

12      **PRESIDING COMMISSIONER DOYLE:**  Let me ask you

13 this, Mr. Satris.  The letter that he is attempting to

14 submit, that you have, does it in any way violate the

15 spirit of the agreement?

16      **ATTORNEY SATRIS:**  No.  It's consistent with it.

17 I think, except, largely consistent.

18      **PRESIDING COMMISSIONER DOYLE:**  All right.  Why

19 don't you give it to me.  Could I see the letter?

20      **ATTORNEY SATRIS:**  Of course.

21      **PRESIDING COMMISSIONER DOYLE:**  October 25, 2007.

22 This is written by James Willett, is that accurate?

23      **DISTRICT ATTORNEY FREITAS:**  That is a newly

24 elected District Attorney and I signed it on his

25 behalf.  He was not available for signature today.

1    **PRESIDING COMMISSIONER DOYLE**:  Okay.  In terms

2    of opposition letters, April 14, 2006, Martin Quinn

3    opposes.  Goes through the case itself.  Thomas J.

4    Carnegie writes a three page letter of opposition, and

5    the date was stamped July 3, 2005.  Lawrence Strewsbury

6    S-T-R-E-W-S-B-U-R-Y, June 11, 2005, writes a letter of

7    opposition.  Pamela Zastrow-Curtin C-U-R-T-I-N, June 1,

8    2005, writes a letter of opposition.  May 31, 2005,

9    Michael and Michelle Shell S-H-E-L-L writes a letter of

10   opposition.  May 30, 2007, Marsha Ramos R-A-M-O-S

11   writes a letter of opposition.  May 27, 2005, Mary Beth

12   Adams writes a letter of opposition.  Darrell Frommer

13   F-R-O-M-M-E-R, California State Assembly, letter dated

14   May 26, 2005 -

15               I write on behalf of the Carnegie family

16               to strongly urge you to deny parole of

17               Carl Hancock for the egregious and

18               ruthless murder of Laurence Carnegie.

19               Hancock was cold and calculated as he

20               made plans to meet with Laurence several

21               weeks before the murder.  He lured

22               Laurence to a location, lying in wait,

23               before shooting him with a bow and arrow,

24               then kicking and beating him.  Hancock

25               then attempted to hide the crime he

```
 1          committed by driving three hours away to
 2          a remote location to dispose of the body.
 3          Laurence Carnegie was a caring husband
 4          and father of three.  Carl Hancock has
 5          cheated his children from a father, and
 6          his entire family from a loving man.
 7          This was a heinous premeditated murder
 8          for hire.  Laurence suffered immeasurably
 9          at the hands of the merciless man who
10          deserves to spend the rest of his natural
11          life in prison.  The Carnegie family is
12          hard working, respected, charitable
13          family in the area with whom I have been
14          personal friends for many years.  I
15          cannot fathom the pain they have endured
16          to Hancock's horrific action.  Hancock
17          has proven himself to be a danger to
18          society.  As a lawmaker entrusted with
19          public safety, I urge you to deny the
20          parole of Carl Hancock.  Respectfully,
21          Darrell Frommer, Majority Leader,
22          California State Assembly, 43rd District.
23              May 26, '05, it's (98:08 indiscernible) one of
24     Larry's cousins, writes a letter opposing release.  May
25     25, '05, Carol Mitchell, objecting to release of Carl
```

1   Hancock.  May 1, 2005, John L. Doel D-O-E-L, writes a

2   letter of opposition.  John Valenti V-A-L-E-N-T-I,

3   April 28, 2005, writes a letter of opposition.  April

4   28, 2005, a Joel Castner C-A-S-T-N-E-R writes a letter

5   of opposition.  April 27, 2005, June Castner.  It's a

6   letter of opposition.  Thomas Carnegie, I don't see the

7   date on this one.  Writes a letter of opposition.

8   April 25, 2005, Tony (sp) Lathantia, I'm not sure of

9   the pronunciation of that, writes a letter of

10  opposition.  April 24, 2005, two page letter from Susan

11  Eubanks E-U-B-A-N-K-S, writes a letter in opposition to

12  parole release.  4/24/2005, I can't read the writing.

13  He's a pharmacist.  Writes a letter of opposition to

14  the release.  Mike Namba N-A-M-B-A, another pharmacist,

15  writes a letter in opposition.  It's stamped April 5,

16  2005.  Okay, with that, sir, your closing.

17          **ATTORNEY SATRIS:**  Are you speaking to me?

18          **PRESIDING COMMISSIONER DOYLE:**  Yes, sir.

19          **ATTORNEY SATRIS:**  Okay.  Thank you.  Well, I

20  think the issue is rather candidly framed by the Deputy

21  Commissioner here, who observes this was a large crime

22  in the sense of a grave crime.  And what is it about

23  you, Mr. Hancock, since then that has changed?  And

24  what is it about you overall, Mr. Hancock, that will

25  provide us with sufficient assurance that, upon

1  release, if confronted with various stressful stress in

2  your life, you will not succumb to it the way you did

3  in this case, and resort to violence as an apparent way

4  to solve your concerns and the pressures upon you.

5  Because it does seem very clear that this crime was a

6  product of a number of stressors and other acts upon or

7  effects upon Mr. Hancock at the time.

8       So let me kind of take that question and try to

9  answer it in my argument here. And the first thing I

10  would say about that is, well, you do it the way you do

11  it in every case. And you do it by reference to the

12  rules and regulations that have been promulgated by the

13  Board to guide itself in answering that question, which

14  has different degrees of difficulty, of course,

15  depending on the individual case. And you start with

16  Penal Code § 3041. And one of the things that it says

17  is Board promulgate regulations that will carry out our

18  parole plan and also take into consideration the rules

19  of court that apply to sentencing decisions. And a

20  very important rule of court that is pertinent to the

21  Board's determination of whether Mr. Hancock is going

22  to engage in violence again upon his release is the

23  notion, the consideration that goes to culpability of

24  well, was the prisoner induced to commit this crime by

25  others and had no apparent predisposition to do so?

1   And it's very clear in this case, we have admittedly,
2   plainly, Mr. Mackey recruiting, and that's the word
3   that's been used throughout the records here, Mr.
4   Hancock to participate in this crime.  So that's an
5   important consideration.  Mr. Hancock, not on his own,
6   would tend to engage in any act of violence, not, let
7   alone one of this magnitude.  But he was vulnerable, as
8   he's noted, out of a kind of blind loyalty to a trusted
9   friend of his who had never given him any indication
10  earlier.  I don't think Mr. Mackey has any criminal
11  history.  Mr. Hancock had none.  So it wasn't like he
12  was hanging out with the wrong crowd.  But certainly,
13  he was, in the end, vulnerable to the entreaties and
14  the recruitment that ultimately was put out there by
15  Mr. Mackey.  And no doubt, as the letter from the
16  public defender, Mr. Hancock's lawyer, points out, you
17  know, behind that you have this specter of Michael
18  Blatt who he calls as like the proverbial Pied Piper,
19  for someone like Mr. Hancock who was so involved in the
20  sports and the athletics.  And here's this mogul
21  businessman who supposedly is wanting this act done for
22  himself that he will then facilitate Mr. Hancock.  And
23  Mr. Hancock, as he said through, you know, incredibly
24  bad judgment at the time with a number of other
25  pressures imposing on him, sees this as a way out of

1   his problems. And as he stated to the Board, he put

2   his own short term concerns ahead of the life of

3   another. And he would never do that again, he says

4   now. And that is because he has followed through on

5   adopting the values that would not put him back in that

6   state of way. The religious principles that he has

7   adopted and those values that really do go back to his

8   upbringing.

9       Okay. So, I think one short answer, and Mr.

10  Hancock gave a long answer. I think the short answer

11  would be, well, I've certainly learned from this. I've

12  learned of my - what I could be capable of, what

13  distorted and wrong thinking can bring me to. And I'm

14  going to never, ever get into that mindset again. And

15  so he has learned and learn from that downward spiral

16  that he said he went into within that context.

17      And he has mentioned a number of other things at

18  different times. He was someone who, he called it

19  pride. You know, he was the first in his family to

20  graduate from high school, let alone go to college and

21  graduate from college. And so was the model and

22  successful man in his circle of friends and family, and

23  couldn't go to them at that point with the notion that,

24  hey look, I'm not making it out here. Things are

25  falling in on me. They're tumbling around on me and I

1  don't know how to handle it.  And I need help.  He

2  wasn't, at that time, able to do that because he was

3  holding himself up as the model in everybody else's

4  eyes.  And he has learned that, that too, is something

5  that he needs to - that he's aware of and that he can

6  go and ask for help and expose his own weaknesses and

7  vulnerabilities.

8       So that when that goes, then -- let me go then

9  to the regulations.  Once you get past the rules of

10  court and the one regulation about the crime, in terms

11  of suitability, is, did he commit the crime as a result

12  of significant stress in his life, especially if the

13  stress is built over a long period of time.

14       So we do have that.  That obviously applies

15  here.  And in fact, what you have are all the other

16  circumstances of suitability that do permit this Board

17  to conclude that Mr. Hancock has no reasonable

18  likelihood of going out and engaging in any kind of act

19  like this again.  There is fair assurance by

20  application of its own rules.  And that starts with

21  going back to day one. Is there a stable social history

22  here?  And yes, there is a stable social history.  And

23  that's shown by the record, as you've gone over his

24  social history.  And also by all of the letters from

25  the family and friends, which show what a conforming

1   individual Mr. Hancock was.  And that his family
2   generally is a positive, social, stable environment
3   around him.

4        And then you go, well, did he have a juvenile
5   record?  Was he out there assaulting others as a kid.
6   And the answer to that, again, is no he's not.  So that
7   further solidifies the notion that he's a reasonable
8   risk.

9        And then you go on to, well, are there signs of
10  remorse?  Has he performed acts which tend to indicate
11  the presence of remorse?  Or indicating that he
12  understands the nature and magnitude of the offense?
13  And that also is laid out through the record that goes
14  back many, many, many years, certainly to the time of
15  sentencing.  And according to the letter from the
16  public defender, much earlier than that.  All through
17  the course of the prosecution.  I mean, as he states
18  here, he admitted to the offense from day one.  And
19  this was before there was even any kind of offer out
20  there of benefit to him from this.

21       And he has, in past reports, understood that he
22  committed a grave crime.  That he must serve a
23  substantial sentence for.  And he does have that twenty
24  five to life sentence that he is serving.  And he's
25  prepared to serve it as appropriate punishment for the

1  gravity of his crime.

2      And then you get on to lack of criminal history.

3  Well does he lack any significant history of violent

4  crime?  And of course, he lacks any history, of any

5  crime.

6      His age.  Does his present age reduce the

7  probability of recidivism?  And I think this was

8  discussed a little bit at the time of the sentencing,

9  how Mr. Hancock was sort of out in the world on his own

10 for the first time, outside of the support structure of

11 the student athlete, who's assisted throughout.  And

12 there's maybe a little bubble of protection for that

13 person until they get into the world where that support

14 isn't there.  And Mr. Hancock was a young man then,

15 trying to make his way.  Not making it in the world on

16 his own very well, as he's explained today.  And he's a

17 much different, older, more mature man today, where his

18 age significantly reduces the probability of

19 recidivism.

20     Understanding and plans for the future.  Has the

21 inmate made realistic plans for the future or developed

22 marketable skills that can be put to use upon release?

23 And we have that very clearly in the record, too.

24     And then the final regulation that guides the

25 Board's decision in determining whether, in light of

1    this crime, is this person going to be a success on

2    parole, where he's suitable for parole, is his

3    institutional behavior.  Do his activities indicate an

4    enhanced ability to function within the law upon

5    release?  And the Deputy Commissioner called it a good

6    record, you know, not a great record.  I would say it

7    is a very, very good record.  It is free of serious

8    disciplinaries.  There is the single administrative

9    rules violation.  So his activity here, or his

10   behavior, certainly indicates a desire to and more than

11   that, an ability to conform to the law upon his

12   release.

13        And then of course, you have the institutional

14   activities, in addition to just to the disciplinary

15   free behavior, where he is, you know, out there doing

16   productive good work where you have that recorded

17   through the number of memos and chronos that the Board

18   went over today.  Where he's just a spectacularly

19   dedicated, responsible person on the job.  And also in

20   all of his relations with both staff and other inmates.

21        And so that's another thing you look at is,

22   well, what do other people have to say about him?  How

23   do they perceive him?  What do they see in this time

24   that he's spent, 15 plus years?  And you did go over

25   the chronos, laudatory chronos, he has received from

1   various staff since his incarceration.  Where they

2   state very plainly that from everything they have seen

3   about him in this time, that he would be a, they use

4   different languages, but a viable candidate for parole.

5   A good candidate for parole.  Suitable candidate for

6   parole.  Would make a positive contribution to society.

7   And along those lines.  So you take those views of

8   people who have experienced him.

9        You look at what he is doing to improve himself

10  very consciously.  And of course, the religious work

11  and activity that he has adopted and gone through, will

12  aid him very well in terms of the religious principles

13  and also just the support the religious community will

14  give him.  And you have that in the letters, too, where

15  they will offer everything from residence to employment

16  activities to counseling activities.

17        And then, finally, what do the forensic experts

18  have to say?  And so then you look at the psych

19  reports.  And of course, those were gone over.  But let

20  me just go on a little more there because you have the

21  most recent report of 2007.  September 2007.  It says

22  his parole -- Actually, I skipped that, didn't I?

23  Somehow I did - oh, no, understanding of plans for the

24  future similar to the parole plans are feasible and

25  realistic and appropriate as they, no doubt, are here.

1   And that's another indication.  Look at the support
2   that he has in the community.  Another basis that
3   bolsters the conclusion that Mr. Hancock, despite the
4   gravity of the crime that he committed 15 plus years
5   ago, now, has enough support out there that there is
6   little, if any, risk of re-offense.

7   The only diagnostic thing, as mentioned, was
8   substance abuse, which is now in controlled remission
9   in the institution.  And the doctor notes he is clean
10  and sober.  Did not see that as an issue that could not
11  be addressed on parole, with whatever condition of
12  treatment for that needs to be made.  And goes over his
13  risk assessment using the objective measures that they
14  have.  And as it is, it's all low.  It's all low.  So
15  that - and he goes on and explains at some length why
16  that's the case.  And says he could further explore the
17  causal factors of the crime by talking with counselor,
18  religious person, sponsor or mental health
19  professional.  We know that's not available by the
20  institution.  I would ask, I asked the last Panel, to,
21  if you think that needs to be done, to have him pursue
22  a program, you know.  He's done everything in the
23  institution in terms of the resources available, to
24  address that issue.

25  And according to the psych reports, if you look

*WPU Inc*

1    at clinical insight, he rates in the low range based on

2    this factor.  He's responded well to treatment.  He's

3    precluded from psychotherapy by virtue of his general

4    population status.  Not in CCCMS program, he's too

5    healthy for it.  But if the recommendation is, if he's

6    paroled, you know, these interventions can be part of

7    the inmate's parole plans, which Mr. Hancock is

8    prepared to do, to comply with.

9         And in the prior evaluation, it also noted the

10   various programming, and so forth, that he has done,

11   the religious programming, and all.  And particularly

12   on the insight.  It says his insight into his crime

13   involvement and his overall situation appears intact.

14   He does not appear to utilize the psychological defense

15   mechanisms of denial or rationalization concerning his

16   crime, commitment or situation.  He takes blame for his

17   role and sees his prior judgment as poor.  While as

18   current insight and judgment seemed good.

19        So what gives the Board assurance that Mr.

20   Hancock would not pose an unreasonable risk is the very

21   fact, that as grave as the crime was, it was his single

22   criminal act of violence in his entire life and was

23   foreign from the person who he is now, and indeed the

24   person that he was to that point.  It was a product of

25   a number of situational factors that came together,

1   that are unlikely to ever be repeated and ever unlikely
2   that Mr. Hancock is going to permit himself, even if
3   there were some situational factors like that around,
4   that he would succumb in the same way.  Rather, he's
5   alert to and motivated to address any issues that might
6   come up that affect his behavior and attitudes.

7        So, on that basis, I would ask that you do set a
8   parole date.  He does have life with parole.  And
9   you're entitled to parole unless you present an
10  unreasonable risk.  And everything that surrounds the
11  commitment offense shows that he would not be an
12  unreasonable risk.  And on that basis, we would ask,
13  that despite the offense itself, that the Board find
14  that there's no continuing risk form it, to this day,
15  and punish him as he should be punished for the gravity
16  of his crime.  And you have your rules and regulations
17  that do that. But admit, or recognize, the fact that
18  this crime was a once in a lifetime kind of event for
19  Mr. Hancock.  And there's no likelihood or even
20  possibility that it would ever reoccur.  Thank you.

21        **PRESIDING COMMISSIONER DOYLE:**  Thank you.  Mr.
22  Hancock, now is your opportunity to make a closing
23  statement.

24        **INMATE HANCOCK:**  Okay.. I wanted to reiterate
25  something. I was going to read before.

1    **PRESIDING COMMISSIONER DOYLE:**  Go ahead.

2    **INMATE HANCOCK:**  Now, this was a question that I

3    asked myself.  And the question was - Is, given the

4    good character and morals as reflected in my post

5    commitment record, how could I have done such an

6    immoral and violent act as the killing of another

7    person for money?  Now, as I get some introspection,

8    first there's no good reasonable or justifiable reason

9    to kill another human being at all.  I can't and won't

10   place blame on no one except for myself.  I could not

11   previously explore core reasons how I could do such a

12   thing.  But after searching within my soul, in the time

13   that I've been doing, with time I've realized my

14   downward spiral was only mine.  I'm not blaming it on

15   anybody.

16       And it was induced by a combination of things,

17   including the use of drugs, as I would call an

18   immobilizer.  Being depressed behind my failing

19   business, my child on the way, eviction from my

20   apartment, trying to maintain a reputation with all my

21   peers as being in good shape, like I was doing well and

22   actually I wasn't, and on top of my social position.

23   This was to appear to be a regular UOP college graduate

24   or as a prior student.  Also what's clear to me is I

25   feel the need to be, or I needed to be approved and

1  validated by my peers.  That's how I felt.

2       And this fed into a long history of mine which

3  we've mentioned earlier, or Mr. Satris mentioned

4  earlier, is that I have a, and I would say it was a

5  problem, it's been a problem in my life that I, you

6  know, as far as me being loyal to my friends and those

7  who I associated with.  I've done it blindly.  And this

8  was another incident that I, you know, no questions

9  asked.  I'm, you know, if you needed some help, I'm

10 gonna do it.  I'm, you know, not to go all the way into

11 that, but blind loyalty is something that I exercised

12 throughout my life.  And now I'm really realizing what

13 it is looking from the inside out.

14      I was not operating under the good balance of

15 nature which I spent my whole life practicing, which is

16 what I've been taught by my family and the community

17 that I was brought up in.  This was up until my

18 commitment offense.  I'm not denying that I was not

19 involved in the event of the murder in the first degree

20 of Larry Carnegie.  I admit that fully.  Or even

21 preparing and/or accepting instructions to do so.

22      By my loyalty to my family and friends, I

23 realize it was very hard to say no.  This is another

24 problem that I realize I had.  Or, at the time, that I

25 have, I don't have anymore.  I wouldn't tell my friends

1    no out of trust and out of what I would call loyalty.
2    And that has changed for me now and it's not hard for
3    me at all to tell anybody that I associate with or
4    family members or whoever's close to me, no.   And this
5    is under most of the situations, circumstances that I
6    experienced in my lifetime.

7         But therefore, by going through those actions
8    and actually following through, I placed myself and all
9    the souls around me in jeopardy.  And I take blame for
10   that and to this day I still have nightmares about the
11   incident.  And I pray on it and I pray for the family,
12   for the Carnegie family.  That's all I can do.

13        Now, as far as trying to help in any kind of
14   way, if the family wanted my help or they wanted me to
15   do something, or, I mean, if it came down to me working
16   for that family for the rest of my life or doing
17   something that was feasible to them, then, I've stated
18   before that I'm even willing to do that as well.

19        I allowed my unfavorable events prior to the
20   murder to affect my morals, my post-commitment
21   character and my life, and others and everybody that
22   I've met.  So I can say that I was desperate to seem
23   normal to my peers, to my family.  And knowing that I
24   wasn't normal as far as "being a college graduate",
25   being successful and having people to look at me in the

1   sense that they thought I was actually doing good.

2        I went to the extreme to start using drugs, and

3   drugs, being marijuana, cocaine and alcohol.  These

4   vices that are what I indulged in.  They served as a,

5   what I would call a numbing device, to reality.  And

6   reality was still reality.  It didn't change anything,

7   for the most part.

8        At this point, my character and my moral pass

9   transformed and assisted my need to be validated by all

10  the people that knew me or thought that they knew me,

11  as far as peers and good friends.  Yet, to answer the

12  part about financial help, everything, or the financial

13  situation I was in, I was vulnerable and I was

14  desperate in these times.  Not wanting to accept the

15  fact that as far as me, managing my life financially

16  and socially, was unbalanced.  So, to change, you know,

17  to end this, if I had to live under a bridge and there

18  was a situation where I can become a millionaire by

19  harming somebody, I would live under a bridge for the

20  rest of my life.

21        So the money is not a, you know, through my

22  religious practice, and through what I involve myself

23  in right now, as far as counseling and being counseled,

24  money is not an object in my life like it was before.

25  So I just want to end with that and also to say that

1   forever I'll be praying for the Carnegie family.  And

2   that's all I can do at this point.

3        **PRESIDING COMMISSIONER DOYLE:**  Thank you, sir.

4   We're going to go to the Carnegie family, but first

5   they asked that Rita Carnegie, the mother of Laurence

6   Carnegie, she had a videotape that she wished to submit

7   and that we're not able to provide that.  Apparently

8   there's some equipment issues.  So there's a three page

9   commentary.  Actually, it's just a little over two

10  pages from Rita that I'm going to read.  And this is a

11  transcription from the video statement.

12              I am Rita Carnegie, mother of the

13          murder victim, Larry Carnegie.  I

14          strongly oppose the parole of Carl

15          Hancock.  He and his accomplice, James

16          Mackey, murdered my son.  Hancock does

17          not seem to realize the enormity of this

18          terrible, evil act.  I do.  I recognize

19          the evil within him.

20              Hancock was a charming guy that

21          everybody liked.  Maybe they still do.

22          But of course, he didn't murder anyone

23          else's son, just mine.  He was the father

24          of two young sons of his own.  He

25          received a free scholarship and graduated

from one of the finest private
universities in the world, but instead of
building on the terrific opportunities he
had, he squandered it all and chose to
commit such a disgusting, brutal, savage
act.  He was not provoked under duress,
nor impaired.  He didn't even know Larry.
He acted on his own free will.

    He told the psychologist in 1989
that he felt his participation in the
murder would help him reach a new level
financially.  That he'd be "set for
life".  He does not take full
responsibility for all the cold planning
and cunning that went into this cruel
crime.  It shouldn't have all been so
gruesome and grotesque and unimaginable
for the son of a good family.  I think of
all those letters from the family and
friends written in 1989, before he
confessed, telling about what a great guy
Carl was and how he could never commit
such a crime.  And there he was.
Plotting, planning, calculating and
dreaming of his payday.  He actively

1  strangled a good man and ruined the lives

2  of others so that he could be "set for

3  life".

4     There were many opportunities to

5  walk away, and yet Carl Hancock stayed.

6  And there just wasn't one victim in this

7  evil crime.  Hancock also actively

8  stalked a second good man, John Farley,

9  to be another murder victim.

10    Larry worked and earned his way

11  through life.  He honorably served six

12  years in the National Guard then put

13  himself through the University of

14  Pacific, graduating with a Doctor of

15  Pharmacy degree.  When life put bumps in

16  my son's life, he persevered and worked

17  and worked and worked.  When life put

18  bumps in Mr. Hancock's life, he chose

19  death.  Not his own, but the deaths of

20  two other innocent, good, decent men.

21    I lost a wonderful son.  He gave me

22  his father's big hugs and kisses.  I can

23  barely put into words the devastation

24  this has had on my family and how it

25  hangs over us like a dark cloud.  I am

| | |
|---|---|
| 1 | not interested in any remorse.  What I |
| 2 | see is a great evil fake.  Carl Hancock |
| 3 | is devoid of true conscience and humanity |
| 4 | and because of this, he will always be a |
| 5 | threat to the rest of us.  He deserves to |
| 6 | spend the rest of his life in prison |
| 7 | where he can be "set for life". |
| 8 | I am now 85 years old and too old to |
| 9 | be around in the future.  But this parole |
| 10 | board should realize that Carl Hancock is |
| 11 | not one to be trusted and must serve his |
| 12 | whole life in prison.  It could be one of |
| 13 | your children next.  Signed, Rita |
| 14 | Carnegie, mother of Larry. |
| 15 | Okay.  With that, we'll now turn our attention |
| 16 | to the members of the Carnegie family.  Is there |
| 17 | someone that would like to speak?  Just introduce |
| 18 | yourself and- |
| 19 | **ATTORNEY SATRIS:**  Commissioner, two statements. |
| 20 | **PRESIDING COMMISSIONER DOYLE:**  Okay.  Ma'am, if |
| 21 | you could just introduce yourself and go ahead and make |
| 22 | your statement. |
| 23 | **MISS KAREN CARNEGIE:**  I'm Karen Carnegie.  And I |
| 24 | met Larry when I was 22 at a real estate seminar.  And |
| 25 | we dated for some months before we decided to get |

1   married the following year.  And our honeymoon was a
2   three month trip around the world.  And when we came
3   back, we were co-owners of a real estate office
4   together.  And Larry had moved to Stockton to attend
5   UOP pharmacy school.  But he preferred real estate.
6   And he only worked as a pharmacist one day a week for
7   the first few years that we were married.

8       And he had so much going for him.  He was very
9   athletic.  He was very funny.  And he had a lot of
10  friends.  And he had me laughing every day that I knew
11  him.  And he never drank and he never smoked and he
12  didn't take drugs.  But he really liked to have
13  parties.  He liked to throw big parties.

14      And we both wanted a large family.  And our
15  first daughter was born three years after we were
16  married.  And then two years later we had another
17  daughter.  And two years after that we had a third
18  daughter.  And Larry was an excellent father.  And he
19  took hours and hours of video tapes of the girls.  And
20  I thank God that he did because that's the only way
21  that I can hear his voice or they can see what he looks
22  like.

23      And each girl has suffered through their
24  childhood and now their adulthood without their dad.
25  They have had no dad to come to their games, their

1  birthdays, Christmas, graduations.  And they each keep

2  a photo of him in their rooms to remind them that they

3  once had a father.

4       But this world is not a safe place because

5  someone like Carl Hancock can kill your father.  So

6  that he can earn a little money.  So he can get $2,500

7  or $5,000 or whatever it was he thought he was gonna

8  get.

9       And I don't think there's any amount of therapy

10  for any of the girls that will make it right in their

11  minds or in my mind.  And I can't escape it.  Whether

12  I'm sleeping or awake, it's always there.  And

13  remembering happy times with our family is painful

14  because of what Carl Hancock did on February 28, 1989.

15       And Carl Hancock is an actor.  He built up

16  Larry's trust.  He was meeting with him, calling him,

17  all with the intention of killing him.  And Larry

18  trusted him enough to say 'help me, I've been shot', to

19  Carl.  But all Carl did was kick him, beat him, choke

20  him and choked Larry to death.  And then he lied about

21  it for months.  And Carl was covered with Larry's

22  blood.  His shirt, he threw it out the window of the

23  car as he drove away with Larry in the trunk.  And it

24  was completely soaked with blood.  And they drove for

25  hours before they stopped the car.  They went to the

1   trunk and they strangled my best friend to death.  And

2   then they came back to Stockton and they pretended that

3   nothing happened.

4       But our lives were changed forever.  Three

5   little girls who adored their father.  And they were

6   age five and three and six months old.  They started a

7   journey with their mother of moving from house to

8   house, trying to find safety and peace.  And one of

9   those girls has bravely fought for her life for the

10  past two years against a rare form of cancer.  But she

11  is so much like her father.  She's courageous and

12  tenacious and persistent and unyielding.  And I miss

13  Larry so much.  But I can see parts of him in his

14  daughters.  And we're lucky people to have known and

15  shared our lives with him.

16      Carl's family is Christian.  And they're

17  offering him spiritual help.  But the problem is that

18  he's now Muslim.  And he still, or his attorney, is

19  still bringing James Mackey into it, saying that

20  because of James, Carl did this.  And I said a lot of

21  times, right after it happened, that if I had to live

22  in a teepee or live under a bridge, I would do it if I

23  could have Larry back.

24      So, to sum it all up, I'm opposed to any parole

25  for Carl Hancock.

1   **PRESIDING COMMISSIONER DOYLE:**   Thank you, Miss

2   Carnegie.   Did you want to say something?

3   **MR. TOM CARNEGIE:**   Yeah.

4   **PRESIDING COMMISSIONER DOYLE:**   If you would

5   state your name first, please.

6   **MR. TOM CARNEGIE:**   My name is Tom Carnegie.   I'd

7   be Larry's brother.   First thing I wanted to say was

8   that we're not able to get some of the help from the

9   county of San Joaquin that would happen in a normal

10   situation.   And we could have a ton more letters in

11   there, but it's very difficult to go out and ask people

12   to write these letters because it's painful to bring it

13   up.

14       We've tried to run ads in the Stockton Record,

15   which I'm sure the community would respond to.   But the

16   paper won't run them.   Okay?   The DA's office is

17   prohibited, due to the nature of the deal there, from

18   really providing us with any help.   So here you have

19   the taxpayers, us, the innocent people being, you know,

20   victimized again where we have to go out and solicit

21   letters.   I could have so many that I could bury you

22   with this thing because the crime was so egregious.

23       The other thing was -- There were a couple

24   things -- I just wanted to address a couple things that

25   kind of came up.   Because I have to kind of speak as

110

1  the DA, because I can't get their help, before I make a
2  comment.

3          The record of Carl in prison is not clean.  If I
4  had a problem with -- and I knew I could get out, or
5  had to make some mark in order to get out, my record
6  would be perfect.  My record would be, in here for 16
7  or however many years it is, 16 years -- And somebody's
8  doing your room and board for ya, okay?  The walls
9  would be covered with every plaque available that I
10  could possibly have earned for a vocation or whatever
11  to get out of here.  Okay?  That would have happened.

12          Some of these things, boy, I think it's kind of
13  delusional.  I've read some of those offers of, I don't
14  know, an accountant or a technical person.  I'm dealing
15  with computers every day.  I'm telling you, it is
16  extraordinarily complicated and it's not even my trade.
17  Okay?  I don't know how you'd be doing these things.

18          But anyway, the record in prison, you have the
19  marks there and that 115 and the other thing and to sit
20  there and downgrade 'em, it's like, hey, you know, like
21  just nothing.  Well what do you mean it's nothing?
22  It's on there.  You would have wanted a perfect record.
23  Perfect record to meet all the marks.

24          There's the elusions that he was stoned or
25  something or whatever it was for the crime.  He wasn't

1 | stoned. Okay? And it's just -- admitting the offense,
2 | it was admitted after his cousin was arrested and
3 | pointed him out. And that was like months down the
4 | road.

5 |       Anyway, let me get into what I wanted to say.
6 | Anyway, my name is Tom Carnegie. I'm Larry Carnegie's
7 | older brother. We were roommates and playmates for 18
8 | years. And as children we played in the back yard all
9 | summer long, countless games, active in Boy Scouts,
10 | little league baseball.

11 |       I went to UOP pharmacy school, graduated in '72.
12 | Earned my way into there. Paid all the debts. Larry
13 | fulfilled his military obligations, followed me to UOP
14 | pharmacy school. Graduated in '77. He was acquainted
15 | with a classmate who was a real estate agent. So Larry
16 | was interested in that. And he began working for them.
17 | And he met Karen through some of these real estate
18 | classes and they were partners in Riverboat Realty and
19 | eventually owning the business. Larry and Karen were
20 | married. They had three children. They attended
21 | church every Sunday. Active church participants.
22 | Hosted foreign exchange students. Owned their own
23 | business. Owned their own home. They were successful
24 | and popular. And, you know, they earned it the old
25 | fashioned way. You know, they went out and hustled for

1   it, okay?

2        Larry went to college and that's what he did

3   with his college education. You have someone here who

4   has gone to college and now he's going to work for 12

5   bucks an hour doing whatever. I mean, how rational is

6   that?

7        All of this success (145:43 indiscernible)

8   changed when this murder, which was motivated by greed

9   and personal gain, robbed us of Larry and brought the

10  holocaust to our family. And the facilitator and the

11  predator, the perpetrator, one of was Carl Hancock.

12       The result of this was just terrible

13  devastation. My dad was a man of purpose and pride.

14  He grew up on a small Pennsylvania farm with seven

15  other kids. He only went to the eighth grade, but he

16  was a man of high moral principles. And he set an

17  example. He believed in example. And he lived that

18  way. He showed respect to everyone. He'd been all

19  over the world. He survived where many of his friends

20  and compatriots didn't. After this episode happened,

21  dad never went to church anymore. He never got down on

22  his knees and prayed at night anymore. He was just

23  gone. He never said it, but his will to live, his

24  spirit, was just stone dead. And that's from Carl

25  Hancock.

1    And when I was visiting my mom in the hospital a

2  couple weeks ago, she talked to me about the sadness

3  from Larry's death. I knew that that's the way she

4  felt because I'm surprised to hear it because she never

5  really laid it on anybody.

6    And the sentencing remarks in court, Carl stated

7  that he would not have killed Larry if he knew that

8  Larry had three children. Please note, he doesn't say

9  he would not kill at all, he just wouldn't kill anymore

10 parents. He wanted the money to straighten out his

11 life. God, how is that possible? By ending somebody

12 else's life.

13    He was, as I said, a graduated of a prestigious

14 educational institution. And everybody has trials and

15 tribulations. I mean, I've had jobs that I've lost.

16 I've had large sums of money that I've lost. I haven't

17 gone and killed anybody to cover my situation. Why the

18 senselessness? There's no excuse. Morality is learned

19 as a child. Okay? It's too late as an adult. He had

20 several weeks as a mature, four year college educated

21 adult, to think about the morality of stalking not one,

22 but two individuals. Larry was actually the second

23 choice initially. They wanted this guy Farley first.

24 And they changed and decided to do Larry first and John

25 Farley second. And Mr. Hancock was involved in both of

1   these, the planning. He lied to Larry's face. To his

2   face. You know, how treacherous, you know, to sit

3   there and lie to each other about it. And then, you

4   know, bring it together while somebody with the cross

5   bow bolt that's about this long, puts it right through

6   your chest while you're sitting there encouraging him

7   to sit right there. I mean, really. It's just

8   unbelievable. What incredible callousness. What a

9   lack of humanity.

10       Mr. Hancock and a friend of his, Tom Minor, --

11   actually, this is out of the court testimony, you can

12   look it up -- actually stalked the intended first

13   victim which was John Farley. And Mr. Minor, who was a

14   friend of Carl's, said that he did not want to

15   participate in the crime. He did not want to do that.

16   And Carl ignored the advice. He just went ahead.

17       He's not sorry for the family. He's not sorry

18   for the crime. He's sorry he's in prison, you know?

19   You're just listening to the psychobabble that they

20   tell him to tell everybody so he can get out and do

21   whatever. What's he gonna do when somebody says, hey,

22   we know you were in prison for killing a guy. So I

23   need some help on killing a guy. What's gonna happen

24   then? You know, what's he gonna say?

25       He clearly should have been executed for this

1  crime because it is so outrageous. It is premeditated

2  for several months. Despicable treachery. Brutal.

3  Cruel. The victim suffered for at least four hours.

4  You know, and to sit there and say well the weights

5  were rolling around in the trunk. Right. He had a 200

6  pound guy rolling around in the trunk. And you know

7  that he's hurting. I just, God, the suffering is just

8  disgusting.

9       And there were choices. When they first shot

10  him, he could have helped him. Carl could have helped

11  him. He could have helped him before he got beat up on

12  the ground. He could have said hey, I'm not gonna hold

13  this guy. He could have helped him at any point along

14  the line. He watched my brother die three times.

15  Watched Larry die three times. Watched him die.

16       Carl made all the free choices for the satanic

17  acts he performed. And they're his free choices. You

18  know, to shine this off as stoned, he wasn't. He

19  wanted the money. It was all about money. All about

20  making him look good. He wanted the money. The

21  choices didn't bother him then. They don't bother him

22  now. What bothers him, he's here, you know?

23       In his testimony to the police, you know, well

24  on the one hand you're sitting here with the -

25  listening to oh, he cooperated with the police.

*WPU Inc*

1  According to this, it says in his police testimony that
2  he was only present at the crime scene. Well, that's
3  really owning up. That's really helping law
4  enforcement, which was part of the plea bargain. The
5  reason that the guy who hired him didn't go to jail was
6  because of all the lying. And that's where we are
7  today. The lying.

8        There was no crime -- there's no crime without
9  Carl Hancock. He is the primary stalker. He alone
10 spoke with Larry. He alone, with Larry, visited the
11 real estate property. He actually reviewed Larry's
12 execution sites with my brother. Hilarious. He went
13 out for pizza on the evening of the crime because Larry
14 was going to be late for his own execution. He drove
15 the getaway car to the crime scene. He looked Larry in
16 the face and lured him to the proper spot so that he
17 could be shot. He was standing so close to Larry, he
18 was splattered by the crossbow. And as I said, that
19 bolt is sixteen inches long, it's about this long. So
20 it went through him, entirely through him, and landed
21 out in the field. Think that caused any pain? Think
22 the victim suffered any? Do you think? What do you
23 think?

24       He watched as his co-conspirator kicked and beat
25 the victim's face in, pulverizing his face, according

*WPU Inc*

1  to the autopsy. Think he suffered? And the victim

2  wasn't dead yet. So Mr. Hancock helped get the

3  mortally wounded victim into the trunk of the car. He

4  drove for four hours. Well, he was passenger in the

5  car, I guess he couldn't get it going. And then after

6  four hours, they pulled over to the side road, pulled

7  out a rope and the two of 'em each pulled one end and

8  Larry died for the third time. He made certain he was

9  dead, and just tossed his body over the ravine. Just a

10  few minor problems, but basically a job well done.

11        They had the presence of mind to steal Larry's

12  wallet and ID, tossing it off of one of San Francisco

13  Bay's bridges. And then they could go back to stalking

14  the originally intended victim. Well, the one that was

15  supposed to be first. It was the perfect crime except

16  that Mrs. Brock drove into the crime scene as the crime

17  occurred. If it hadn't been that, Larry's body would

18  be at the bottom of Tahoe and we would never have known

19  what happened. We'd have just had the anguish that

20  people have wondering what happened. Except he's not

21  there.

22        Carl should have been executed for this and

23  quite frankly, he couldn't be executed enough times,

24  slowly enough, and often enough to begin to remotely

25  retribute the crimes and losses. This is strictly

1  personal gain.  No respect for life.  No morality.  No

2  right and wrong.  Not even an afterthought.  Two months

3  of planning two very premeditative homicides.  You

4  cannot let him -- there's a reason that he's in this

5  prison, because he can't be released beyond these

6  walls.  These walls separate those on the outside who

7  have goodness in their heart, from those with the evil

8  and cold heart of Satan.

9          I want to just give you an example, just a

10 second, real quick, it's real quick, short story.

11 About ten years ago there was an airplane crash at the

12 Santa Rosa airport.  It's a Sunday morning, 6:30.  Two

13 computer geeks are working in an office installing some

14 computers in a warehouse.  They hear planes taking off

15 just in the basic two or three minute intervals, okay?

16 And then suddenly, the roar of one of those engines

17 quits, sputters, and a moment later they hear this just

18 horrific crash.  The two of them go to the warehouse

19 door, look out the window, and they see this Cessna

20 airplane upside down and in flames, about 100 yards

21 away from them.  The pilot is still in the plane.  He's

22 upside down in the burning plane.  The pilot is moving,

23 but he's not climbing out.  So these two geeks, these

24 two computer geeks, look at each other and then they

25 grab some blankets that they had in the thing and they

1  sprint across the runway. They get out there and they
2  crawl the last 100 foot to get to the cockpit. It's on
3  fire, it's flaming, it's dangerous, it could explode.
4  And they get in and they pull this guy out of there.
5  And they drag him out and they're all getting pelted by
6  the flames and everything. They're about 100 foot from
7  the plane and the plane explodes, disintegrates.
8  They're showered with debris. Miraculously, they're
9  not injured. Lots of second degree burns, cuts,
10  scrapes. The two geeks are interviewed by the Santa
11  Rosa Press Democrat newspaper reporter. The reporter
12  asked 'why did you guys take such a risk?' The two
13  geeks replied, well, we just could not stand there and
14  watch someone die.

15       Carl stood there three times. There's a
16  difference between those who respect life and those who
17  do not respect life. Outside the great walls of this
18  prison stand the computer geeks, our family, and
19  everyone else in society who respect life, liberty and
20  the pursuit of happiness. On the inside of the wall,
21  locked out of society forever, belong Carl Hancock, all
22  the violent perpetrators, and everyone else who does
23  not understand respect for life, liberty and the right
24  to pursue happiness. And that agreement they signed,
25  or whatever that thing was, was in total opposition to

1   the family.  And I don't want this guy out.

2        **PRESIDING COMMISSIONER DOYLE**:  Thank you, sir.

3   We are now going to recess for deliberations.  The time

4   is 6:12.

5        (Thereupon, the recording was stopped)

6                    R E C E S S

7                    --o0o--

1 | **CALIFORNIA BOARD OF PAROLE HEARINGS**

2 | **D E C I S I O N**

3 | **DEPUTY COMMISSIONER SHIELDS:** We're back on the

4 | record, Commissioner.

5 | **PRESIDING COMMISSIONER DOYLE:** Okay. We are

6 | back on the record in the matter of Carl Hancock, CDC

7 | number H as in Henry, 43946. The Panel has reviewed

8 | all information received from the public and relied on

9 | the following circumstances in concluding that the

10 | prisoner is not suitable for parole and would pose an

11 | unreasonable risk of danger or a threat to public

12 | safety if released from prison.

13 | We make the finding based on a number of

14 | different factors. The first I'll speak to is the

15 | commitment offense itself. The offense was carried out

16 | in a manner that was cruel and callous, noting that the

17 | victim in this case was essentially set up for the

18 | murder, lured to a location and then essentially

19 | properly positioned for a crossbow to be fired into his

20 | back.

21 | The offense was carried out dispassionately and

22 | calculated. We note that there was some planning, not

23 | only in the murder itself, but there was some level of

24 | dialoging that led up to the murder that certainly goes

25 | **CARL HANCOCK  H-43946   DECISION PAGE 1    10/29/2007**

1  to the issue of calculation.  And the murder itself

2  was, that I'll speak to in more depth in just a second,

3  was dispassionate.

4      The victim was abused.  There was an initial

5  firing into the victim's back of a crossbow.

6  Ultimately, then, the victim went down and was set upon

7  and beaten and kicked, placed in a car and driven away

8  for a period of possibly up to four hours.  When it was

9  discovered the victim had not yet expired, he was

10 ultimately choked to death.  Certainly, the gravity and

11 the magnitude and the degree to which both of these

12 subjects went to kill this poor man was a callous

13 disregard for human suffering.

14     In terms of the motive for the crime, it's hard

15 ever to find a reason or rationale for a murder, but in

16 this case, it is the most trivial of all possible

17 motives.  And that was financial gain.

18 We reached our conclusions based upon the statement of

19 fact that was contained in the deputy probation

20 officer's report.  On page two and three that I've

21 already read into the record, but the murder occurred

22 on February 28, 1989, wherein Mr. Carnegie was lured to

23 an area.  Was ultimately shot in the back.  Once he

24 went down he was beaten, placed in the trunk of

25 **CARL HANCOCK  H-43946    DECISION PAGE 2    10/29/2007**

1   a car with the intent of driving him to Tahoe, but
2   fortunately, or unfortunately, depending on one's
3   viewpoint, someone else had come by during this process
4   and the plans were changed, which ultimately in all
5   likelihood, led to the solution of this crime itself.

6          Mr. Carnegie was later found to be still alive
7   in the trunk of the car and was literally choked to
8   death by both the subjects in this case.  His body was
9   then dropped off some miles later.  I believe it was in
10  Sonoma County where it was ultimately dropped off.

11         We note, continuing with our decision in this
12  case, we note that in addition to the crime, the inmate
13  has programmed in a limited manner while incarcerated.
14  We would like to see more programming, particularly in
15  terms of his insight into the death itself.  And the
16  horrific nature of that death, without utilizing or
17  relying upon the stressors that he continually brings
18  up with regard to the crime itself.
19  Another human being died and died in a most horrific
20  way.   There is a level of understanding that we believe
21  everyone has to come to, without regard to excuses that
22  you provide for yourself.  And one of the ways to do
23  that is to program. ˙ If the facility doesn't have
24  programming, I only mentioned AA and NA before,
25  CARL HANCOCK  H-43946   DECISION PAGE 3    10/29/2007

1   because most facilities have those programs. And if

2   they don't have the onsite programs, they are readily -

3   - the books relative to AA and NA are readily easily

4   checked out of the prison library. And you can look

5   into those. The Alcoholics Anonymous Big Book, they

6   call it. It's a blue covered book. The AA 12x12,

7   which is the 12 steps and 12 traditions. More

8   importantly, the 12 steps, which deal with the process

9   that we spoke earlier of, Mr. Hancock, regarding the

10  self, a journey that we believe that you would be

11  helpful in doing. But there are other books. And we

12  suggest if they don't have the AA programs or there

13  aren't any other classes for you to go to, that you, in

14  lieu of that, check out books and do, essentially, book

15  reports on behalf of yourself. And present those to

16  the Board. And the reason we ask you to do that,

17  because then the Board, when we get our packets, will

18  ask you questions about it and try to determine just

19  how in depth that you got with regard to the book

20  report. So that's something.

21          You're a learned man, sir. That's something

22  that's readily available to you and we are going to

23  suggest that if there aren't any AA programs or other

24  self-help programming on the facility, that you take

25  **CARL HANCOCK   H-43946    DECISION PAGE 4    10/29/2007**

1   that course.  There should be, though.  I mean, over
2   time, that's something that you should be able to get
3   yourself into.  It's important if you choose a 12 step
4   program, that you do the working through the steps with
5   another individual, as I was mentioning to you before.
6   Because very often individuals will utilize their own
7   self program and never call themselves on the stuff
8   that you need to be called on.  That's why another
9   individual can sit through and go through some of the
10  more difficult parts of the steps, the 12 steps, and
11  not allow you to not accept responsibility.  That's
12  really the benefit of all that.  So we hope that you do
13  that.  It's best if you do it with somebody.  But
14  sometimes it's not available.  And we suggest that you
15  think about the alternative and get some books and
16  review those, sir.

17        In terms of your parole plans, we find them
18  deficient in the following ways.  Your residential
19  plans are adequate.  In terms of your employment plans,
20  sir, we're gonna need a little bit more specificity.
21  Being a manager at some place, particularly a place
22  like an accounting firm, we're gonna want to hear some
23  dialogue back and forth.  It's wonderful that you've
24  made that offer.  But managing takes more than just
25  **CARL HANCOCK   H-43946   DECISION PAGE 5   10/29/2007**

1   managing the office, which is what your commentary was.
2   We need to know what it is you're going to be doing.
3   And we need to dialogue with you back and forth to find
4   out that you know what you're doing, you know, and it's
5   not just some commentary that you're throwing out.  So
6   you're going to need to provide us a little bit more.
7   I mean, the letters were fine.  And I really have
8   concern that with regard to an accounting firm that you
9   may not be able to be bonded.  I may be wrong on that.
10  But that's something that someone else is gonna ask
11  down the road.  And you're gonna need to be able to
12  cover it in some way.  So that's something I would look
13  into.

14       But you're gonna need more specificity with
15  regard to your work.  Computers change on a daily
16  basis, sir.  And having some computer skills at some
17  point, even a year back, can be problematic.  I'm not
18  saying it will be.  But that can be problematic.  So
19  you're going to need to address all that if that's the
20  area you wish to go to.  So we find that the parole
21  plans are deficient in that area.

22       And in terms of your compliments, sir, you have
23  stayed relatively clean during your time in prison.
24  You received one 115 and that was back in '96.  And
25  **CARL HANCOCK   H-43946    DECISION PAGE 6    10/29/2007**

1   your work record seems to be good in terms of your

2   commentary, your work supervisor's commentary with

3   regard to you.

4          In a separate decision, the hearing panel finds

5   the prisoner has been convicted of murder. And it is

6   not reasonable to expect parole would be during the

7   next five years. The prisoner committed an offense in

8   an especially cruel manner. He lured Mr. Carnegie into

9   an area and then essentially positioned him so that he

10  could be shot. He was then beaten, thrown in the car

11  and later strangled to death.

12         The offense was carried out dispassionately and

13  certainly calculated. The victim was certainly abused

14  as a result of all this. The offense was carried out

15  in a manner which demonstrates exceptional callous

16  disregard for human suffering. And the motive was

17  financial in nature.

18         In terms of the psychological report, since this

19  is a five year denial, sir, we are going to ask that a

20  new psychological evaluation be performed prior to the

21  next hearing. And that we are going to ask you, sir,

22  to cooperate with that psychological evaluation.

23         Before I conclude, I'm going to turn to

24  Commissioner Shields and ask if she has any further

25  **CARL HANCOCK  H-43946    DECISION PAGE 7    10/29/2007**

1  comments.

2      **DEPUTY COMMISSIONER SHIELDS:**  Well, I would like

3  to add, sir, and I hope you will take this as something

4  you can work on.  I was struck by your inability to

5  empathize with anyone other than yourself.  And I think

6  if you look at this transcript, almost every sentence

7  you said started with "I".  And I think that an

8  inability to empathize with other people is really

9  fatal to any plans that you have to parole.  And you

10  need to start to work on that.  And it's not something

11  where you can run off to mental health and say oh, I

12  don't seem to have any empathy.  It's something that

13  you can work on with people in religions.  There are a

14  variety of ways to work on that.  But I gave you a

15  number of opportunities, some lighthearted and some

16  serious, to show some empathy for somebody other than

17  yourself, and you continued to revert to these really

18  trivial excuses that blurred what really went on.  So,

19  I hope you will take that to heart and good luck to

20  you, sir.

21      **PRESIDING COMMISSIONER DOYLE:**  Okay.  With that

22  sir, we want you to remain disciplinary free.  If

23  available, participate in self-help.  And we will be

24  ordering a new psychological evaluation.  We wish you

25  **CARL HANCOCK   H-43946   DECISION PAGE 8    10/29/2007**

```
 1   luck, sir.  The time is now 6:46.  Good luck.

 2              (Thereupon, the recording was stopped)

 3                          --oOo--

 4                A D J O U R N M E N T

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21   PAROLE DENIED FOR FIVE YEARS.

22   THIS DECISION WILL BE FINAL ON:  FEB 2 6 2008

23   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE,

24   THE DECISION IS MODIFIED.

25     CARL HANCOCK   H-43946   DECISION PAGE  9  10/29/2007
```

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, Lisa Turner, as the Official Transcriber,

hereby certify that the attached proceedings:

In the matter of the Life      )      CDC Number:   H-43946
Term Parole Consideration      )
Hearing of:                    )
                               )
 CARL HANCOCK                  )
                               )

CALIFORNIA STATE PRISON - SOLANO

VACAVILLE, CALIFORNIA

OCTOBER 29, 2007

3:35 P.M.

Were held as herein appears.  Further, this transcript

is a true, complete and accurate record, to the best of

my ability, of the recorded material provided for

transcription.

Lisa Turner

LISA TURNER
November 18, 2007
WPU Inc

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:  **In re Carl C. Hancock**
No.:        **C062770**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On September 18, 2009, I served the attached **INFORMAL RESPONSE** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 1300 I Street, Suite 125, P.O. Box 944255, Sacramento, CA 94244-2550, addressed as follows:

2 Copies:
Carl Charles Hancock, Jr., H-43946
California State Prison, Solano
P.O. Box 4000
Vacaville, CA 95696-4000
*In Pro Per*

1 Copy:
3rd Appellate District Appellate Program
2407 J Street, Suite 301
Sacramento, CA 95816

1 Copy:
San Joaquin County Superior Court
222 East Weber Avenue, Room 303
Stockton, CA 95202

San Joaquin District Attorney's Office
222 East Weber Avenue, Room 202
Stockton, CA 95202

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on September 18, 2009, at Sacramento, California.

L. Goodwin
Declarant

Signature

SA2009312648
30862780.doc

# EXHIBIT COVER PAGE:

Exhibit: ___3___

Description of this exhibit: Letter of Recommendation for earliest
possible release date from San Joaquin
District Attorney J. Phillips

PLEA BARGAIN DEAL.

Number of pages of this exhibit: 2 pages

JURISDICTION: (Check only one)

_____Municipal Court

_____Superior Court

_____Appellate Court

_____State Supreme Court

XXXXX United States District Court

_____United States Circuit Court

_____United States Supreme Court

_____California Department of Corrections, 602 Exhibit.

_____Other:_____

**JOHN PHILLIPS** Case 2:10-cv-02215-MCE-CKD   Document 1   Filed 08/...

**DISTRICT ATTORNEY**
**San Joaquin County**

Office of the District Attorney
San Joaquin County Courthouse, Rm. 202
222 E Weber Ave. Stockton, California 9520
P.O.Box 990, Stockton, California 95201
Telephone:(209) 468-2400

October 25, 2007

Board of Parole Hearings
Post Office Box 4036
Sacramento, CA 95812-4036

Re: <u>People v. Carl Charles Hancock</u>

Dear Board,

I am the incumbent District Attorney of San Joaquin County, California. Per an agreement made
with the previous District Attorney John Phillips and defense attorney Ronald Abernathy, I am
writing this letter to reiterate the position of our office at the time Mr. Hancock entered his plea.

On February 28, 1989, Laurence Carnegie was murdered in San Joaquin County and, after a
massive investigation, arrests were made of James Oliver Mackey on June 1, 1989, and of Carl
Charles Hancock, Jr., on July 6, 1989. At that time, it was our belief that another person,
Michael Blatt, was the instigator-contractor for this murder; however, there was not sufficient
evidence to support that belief.

A written plea and sentence agreement was entered into with Mr. Hancock, through his attorney,
Ronald Abernathy. That agreement provided, in part, that Mr. Hancock "will give truthful
testimony relative to the murder of Laurence Carnegie and as the persons responsible therefore,
in exchange for the opportunity to enter a plea of guilty or no contest to murder in the first
degree, without any enhancements or special circumstances being filed."

The agreement further provided that "District Attorney John D. Phillips shall personally write a
letter to the Board of Parole Hearings and/or the California Department of Corrections
recommending that Carl Charles Hancock...be released at the earliest possible time upon having
served the minimum sentence for first degree murder."

<u>The purpose of this letter is to honor that agreement and commitment to Mr. Hancock and his
attorney; to comment upon the extraordinary cooperation of Mr. Hancock; and to clarify that,
without the cooperation and prospective testimony of Mr. Hancock, charges would not have been
filed against Michael Blatt nor a prosecution initiated.</u>

On November 7, 1989, Mr. Hancock entered a plea of no contest to the charge of first degree murder of Laurence Carnegie as contained in San Joaquin County Superior Court Information Number 45624.

Sentencing was deferred to July 29, 1992, at which time Mr. Hancock was sentenced to State Prison for the term of twenty-five years to life.

It is our recommendation that Mr. Hancock be released on parole upon having served the minimum sentence for first degree murder, that is, two-thirds of the minimum (or sixteen years, eight months), providing that he has been a good prisoner.

In this regard, it is our observation and belief that Mr. Hancock will do his time without incident or problems. He is intelligent and highly educated; has no prior criminal history; is not generally criminally oriented; and he should interact well with prison management and staff.

Since August 30, 1989, Mr. Hancock has cooperated with the San Joaquin County Sheriff's Department and District Attorney's Office in connection with the case of People v. Michael Blatt, San Joaquin County Superior Court Information Number 46070.

Hancock was solicited to kill Carnegie and a former professional football player, John Farley, with whom Blatt had personal and legal problems. Impressed by Blatt's wealth and power, Hancock agreed to the murder.

Hancock made admissions to San Joaquin Sheriff's investigators implicating Blatt as the person behind the killing.

For the reasons set forth herein, I urge and recommend without reservation that those agencies of state government, having control over inmate prison terms and the granting of parole, release Carl Charles Hancock form actual custody after he has served two-thirds (or the minimum of 16 years 8 months) of the 25 years to life sentence.

Thank you for your attention regarding this matter.

Sincerely,

James P. Willett
District Attorney
County of San Joaquin

Per agreement made by then incumbent District Attorney of San Joaquin County, John Phillips on November 20, 1990.

# EXHIBIT COVER PAGE:

Exhibit: 4

Description of this exhibit:(2007)  Psychological Evaluation Report
of petitioner

Number of pages of this exhibit: 7 pages

JURISDICTION: (Check only one)

_____ Municipal Court

_____ Superior Court

_____ Appellate Court

_____ State Supreme Court

XXXX United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other:_____

## PSYCHOLOGICAL EVALUATION ADDENDUM
### FOR THE BOARD OF PAROLE HEARINGS
### SEPTEMBER 2007 CALENDAR
### FORENSIC ASSESSMENT DIVISION
### CALIFORNIA STATE PRISON - SOLANO

## I. IDENTIFYING INFORMATION

| | |
|---|---|
| **Inmate Name:** | **Hancock, Carl** |
| **CDC Number:** | **H-43946** |
| **DOB (*Current Age*):** | **07-30-1963** (*currently 44 years old*) |
| **Controlling Offenses:** | **PC §187, Murder First Degree** |
| **Date of Offenses (*Age at time*):** | **02-28-1989** (*then age 25*) |
| **Sentence:** | **25 years to Life** |
| **County of Commitment:** | **San Joaquin County** |
| **Date Entered into CDCR:** | **08-19-1992** |
| **Date Received at CTF - Solano:** | **08-10-1995** |
| **Placement Score:** | **28** |
| **CDCR Forensic Evaluator:** | **Richard Starrett, Ph.D., Ph.D.** |
| **Date of Evaluation:** | **08-23-2007** |

## II. SOURCES OF INFORMATION

The inmate's Central File (C-File) and Unit Health Record (UHR) were reviewed. He was interviewed for the purpose of the current evaluation on August 23, 2007. He was informed that the interview was not confidential, and that a report with the results of the evaluation would be submitted to the Board of Parole Hearings (BPH) to assist in determining his suitability for parole. The inmate appeared to understand the nature and purpose of the evaluation and the possible consequences of the interview to the best of the inmate's ability. Unless otherwise indicated, the inmate agreed to participate in the interview. For reasons not limited to the possibility that an individual may have a mental disability or condition, which may qualify under the Americans with Disabilities Act, the evaluation was conducted by a licensed psychologist. Also, it is the conclusion of the undersigned examiner that it was not necessary to provide auxiliary aids or assistance to achieve effective communication. This evaluator is not responsible for any inaccurate statements, or subsequently changed opinions, expressed by the inmate.

This current report is an addendum for update to the BPH, and only information relevant to the current assessment, and more recent to prior reports, will be addressed. The psychological evaluation from 2001 should be consulted for any questions or concerns regarding background information unless clarified otherwise below.

INMATE COPY



## III.  QUESTIONS POSED BY MOST RECENT (*2006*) BPH

After the inmate's 2006 BPH hearing, the panel subsequently submitted BPH Form 1000(a) requesting an updated psychological assessment of the inmate to include:

1) The prisoner's violence potential in the free community;

2) The significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from the use/abuse of same when released;

3) The extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes; and,

4) The need for further therapy programs while incarcerated.

## IV.   INTERVIEW INFORMATION

At the outset of the interview, for the purpose of this report to inform the Board of Parole Hearings, the planned focus was to update any information relative to the most recent full evaluation, as well as to deal with any unexamined issues relative to intrapersonal functioning at the time of the index offense.

Mr. Hancock is a 44-year old divorced, African American male of Muslim faith. The inmate was oriented to person, place, and time. He was alert and cooperative. His simple registration was intact. There was impairment in his short-term memory. He did not remember any of the three words across time. He was very nervous during this interview. The inmate's simple abstract thinking was intact. His mathematical ability was weak. He could not do multiplication in his head. His complex problem solving was intact. He did appear to understand proverbs.

At the current time, the inmate denies any problems with depression, anxiety, mood swings, or a mood disorder. He denies any auditory or visual hallucinations. He denies any delusional or paranoid thinking. He denies any eating or sleeping problems. He denies experiencing any mental health problems as a child. He denies any suicidal or homicidal thinking.



INSTITUTIONAL PROGRAMMING: The inmate entered CDCR on August 19, 1992, and has thus served approximately 15 years of a Life sentence. His placement score as of September 12, 2006 was 28, down from 49 in 1995. The inmate has received one (1) CDC-115, in 1996. He has received six (6) CDC-128As with the most recent in 2001.

The inmate graduated from high school and received his Bachelor's Degree in communications while in the community. The inmate has had no educational upgrades while incarcerated, but he would like to obtain a Master's Degree. The inmate has completed no vocations. He has been in PIA for approximately 12 years. He is currently learning electronics, welding, and carpentry. The inmate teaches classes, and has also worked as a barber. The inmate reportedly has excellent work ratings (subject to verification). The inmate has been active in AA for 12 years, and continues to be active in the DOP program and the NVP program since his last Board. He was involved in self-help in the past. The inmate is reportedly active in his religion, and works as a teacher. The inmate has no known

INMATE COPY



health problems. He is not in the mental health system. The inmate's father passed away since his last appearance before the Board.

INSIGHT / SELF-ASSESSMENT: The inmate stated his personal strengths include his ability to communicate with everybody, his ability to make others feel comfortable, and his positive outlook. The inmate stated his weaknesses or the areas he continues to work on are his patience and his gullibility. His biggest accomplishment so far is controlling his anger and keeping in touch with family members. The inmate's biggest change is his increasing maturity.

PAROLE PLANS IF GRANTED A RELEASE: The inmate plans to parole to the Bay Area, and live with his brother. He indicated that he has a job offer with his brother. He also has community ties and support through the local church. The inmate's parole plans seem feasible and appropriate, if verified.

INMATE UNDERSTANDING OF LIFE CRIME: The inmate was charged with PC §187, Murder First Degree.

Summary of the Crime: On February 28, 2989, the victim was lured to the 1452 East Tokay Colony Road, Lodi, California, regarding a real estate purchase. Subject lured victim into position and his crime partner shot the victim in the back with a crossbow. The victim's body was placed into the trunk of a rental car. A short time later, the victim was discovered to still be alive. At that time, subject and his crime partner used a rope to strangle the victim to death. The crossbow and the rope were discarded into a body of water, and the victim's body was dumped in a rural area along Highway 128 in Sonoma County.

The subject and his crime partner were subsequently arrested and confessed to the murder. They implicated a local wealthy businessman named Michael Blatt, as the person who solicited and paid for the victim's murder. They were to receive $20,000.00 from Blatt for the murder.

*Resource documents: Probation Officer's Report (POR), page 1-3.*

Prisoner's Version: As documented in the POR, pages 2-3, subject admits to his involvement in the murder. He stated that the circumstances causing him to be involved with the murder included the following: his business was suffering financial difficulty, his grandmother had recently passed away, he had started using drugs and alcohol, his girlfriend had become pregnant, and he would do almost anything to get back on the right track. Subject and his crime partner were to receive $20,000.00 from Blatt for murdering the victim. Subject remains remorseful for his participation in the victim's death and prays for the victim's family.

*Resource documents: POR, pages 1-3.*

The inmate stated he has no prior arrest history. The records confirm the inmate had no juvenile or adult arrest history prior to the crime in question.

The inmate was given the opportunity to read the Probation Officer's Report and his prior version. The inmate stated his version is the same (offered no clarifications or corrections).

INMATE COPY

At the time of the crime, the inmate was 25 years old. He had started a family about three years prior. He had been working construction for about two and a half years. He was drinking beer, but was not associating with any criminals.

When asked why he committed this crime, the inmate stated he was enticed by the money. Stressors in the inmate's life included that his business was suffering financial difficulties, his grandmother had passed away, he was using alcohol and drugs, his girlfriend was pregnant, and they badly needed money. The inmate also felt pressured to succeed after graduating from college and to look good in his family's eyes. Immediately prior to the crime, the inmate had consumed a six-pack of beer. He had consumed hard liquor three nights prior, and had also been using marijuana and cocaine. Another factor contributing to the crime was the inmate's blind loyalty to his friends. He did not feel like he could say no to them. His thinking was not clear because of the all of the areas mentioned above, especially the alcohol and drug consumption. The inmate does not recognize any other influences from his childhood, family history, prior relationships, or environment that predisposed him to act out violently in this manner.

When asked about his feelings regarding the loss of life and the effect on the victim's family, the inmate stated he prays for the family. He would like to be able to somehow demonstrate to the family how sorry he is, and he will help them in anyway he can, if they want him to. He would like to see the family have some kind of closure. He now realizes how precious life is. He is trying to help children through POP. The inmate believes the only way he can make restitution for something like this is by helping the family through deeds and actions.

When asked how he has changed so that something like this would not happen again, the inmate stated he now wants to be with his family all the time. He is involved in self-help and helping others in the community. He said he will make himself available to the family at any time to help them. He is not using alcohol or drugs any longer. His values have changed, and his focus is no longer on money. The inmate stated he has had to separate himself from negative thoughts, and he has learned to use self-talk to stay positive.

MENTAL HEALTH CONCERNS OR PERSONALITY DISORDERS: The inmate has no severe mental disorder at the current time. The inmate meets the diagnostic criteria for Other Substance Abuse. The inmate began using alcohol in high school and college and drugs in his early 20's. Alcohol and marijuana and cocaine were involved in his controlling case. The inmate readily admits it was causing him problems. He has been clean and sober now throughout his incarceration.

## V. DIAGNOSTIC IMPRESSION

| Axis I: | 305.90 | Other Substance Abuse, in controlled environment remission. |
|---------|--------|-------------------------------------------------------------|
| Axis II: | V71.09 | No Diagnosis on Axis II |
| Axis III: | | None. |
| Axis IV: | | Incarceration for life term. |
| Axis V: | | GAF: 80. |



INMATE COPY

HANCOCK, Carl    H-43946                    4                    Solano          September 2007 BPH

## VI. PREVIOUS EVALUATION SUMMARIES

A Psychological Evaluation dated March 18, 2005 does not diagnose the inmate with any clinical or personality disorders. The author concluded the inmate poses a medium risk of violence if released into the public at that time.

A Psychiatric Evaluation dated July 28, 1995 does not diagnose the inmate with any problems. The author stated that the inmate's violence potential is less than that of the average parolee.

## VII. VIOLENCE RISK ASSESSMENT/CONCLUSIONS

The Board of Parole Hearings' questions will be addressed for each issue presented, as noted in an earlier section of this report.

### 1) *The prisoner's violence potential in the free community;*

The current research literature indicates that an empirically based approach is the most reliable and valid method for assessing risk of future violence. In the present evaluation, two separate assessment guides were used to help estimate this individual's risk for future violence in the community: the Psychopathy Check List Revised (PCL-R) and the History Clinical Risk Management 20 (HCR-20). The LS/CMI (Level of Service/Case Management Inventory) was utilized as an objective, actuarial assessment of the inmate's risk for general recidivism. The data for scoring these instruments were obtained from information derived in both the inmate interview and the files reviewed. These measures are widely used, and are supported by years of research in the risk assessment field. They have been cross validated with various forensic populations, including United States males in correctional settings; however, the following results need to be regarded with some level of caution since some individuals may possess idiographic differences that could limit the applicability of these instruments. The evaluator has taken these factors into consideration in determining how much weight to allot each of the measures and in formulating an overall estimate of risk for future violence in the community. Estimates of risk for violence will be presented categorically: low, moderate, or high.

PCL-R: The PCL-R was scored to assess the inmate's level of psychopathy, a trait that has been linked to episodes of repetitive aggression and criminality. Information used in this assessment includes data from the inmate's records and his verbalizations in the current interview. The inmate scored in the **low** range of psychopathy, or at the 6th percentile relative to the population of incarcerated males in the norming group. His personality traits (Factor 1) are at the 6th percentile, and his past antisocial behaviors (Factor 2) are at the 17th percentile.

HCR-20: The HCR-20 was scored, based on data in the inmate's records and information obtained in the current interview, to assess for level of risk for future violence.

**INMATE COPY**

Historical: In regards to historical factors that predict future violence, the inmate would rate in the <u>low moderate</u> range in his propensity for future violence. This rating is based on the inmate's history of substance abuse, his involvement in unstable relationships, his not establishing a solid career, and his age at the time of the crime.

Clinical/Insight: The inmate would rate in the <u>low</u> range in his propensity for future violence on this factor. The inmate does not have a negative attitude. He does not have active mental health symptoms, and he is not impulsive. The inmate has responded well to treatment. The only elevation on this scale is due to the inmate's insight not yet being fully developed.

Risk Management: The inmate would rate in the <u>low</u> range on the risk management factor. The inmate has been able to handle compliance, stress, and destabilizers well while incarcerated. The inmate's parole plans seem feasible.

The inmate's overall propensity for violence is in the **low** range when compared to similar inmates.

LS/CMI: This instrument was scored, based on data from the inmate's records and information obtained in the current interview, for level of future risk for general recidivism. The inmate's general recidivism is rated in the **low** range.

OVERALL RISK ASSESSMENT: The inmate's level of psychopathy is in the ***low*** range. The inmate's overall propensity for violence is in the ***low*** range when compared to similar inmates. The inmate's general recidivism is rated in the ***low*** range.

### 2). *The significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from the use/abuse of same when released*;

The inmate openly acknowledged that his use of alcohol, cocaine, and marijuana were contributing factors to the committed offense. He acknowledged that he had been drinking alcohol and hard liquor and using marijuana and cocaine for several days prior to the controlling offense. The inmate has totally embraced AA, self-help, and his religion in attempts to remediate this problem. It is recommended the inmate continue substance abuse treatment while incarcerated and such treatment is a significant part of his parole plans.

### 3) *The extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes;*

The inmate stated that he takes full responsibility for the crime. The inmate acknowledged that alcohol and drugs were contributing factors, and he also admitted that he was strongly influenced by money, and he wanted to continue to his image of success. Additional stressors at the time included his girlfriend's pregnancy and his grandmother passing away. Moreover, the inmate stated he was blindly loyal to this friend, and did not seem to be able to say no. He also felt a lot of pressure to succeed, and had separated himself from his family. The inmate does not recognize any factors from his childhood, including prior relationships with his family or neighborhood, which contributed to the case. It is recommended this

**INMATE COPY**

individual talk to a religious person, counselor, sponsor, or mental health individual regarding the causal factors in this crime and develops a remediation plan.



### 4) *The need for further therapy programs while incarcerated.*

The inmate does not currently present as a candidate for noteworthy change as a result of psychotherapy, from which he has been precluded by virtue of his general population status. It is recommended the inmate continue to participate in AA, his religion, and self-help, and that he further explore the causal factors of the crime by talking with a counselor, religious person, sponsor, or mental health professional. It is recommended that all these interventions be part of the inmate's parole plans.

*Dr. R Starrett*

_____          8-31-2007
Richard Starrett, Ph.D.,Ph.D., CA License # PSY-13628          Date Submitted
Contract Forensic Psychologist / Forensic Assessment Division
Board of Parole Hearings
California Department of Corrections and Rehabilitation



CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use, or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act and the Health Insurance Portability and Accountability Act (HIPAA). If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

**INMATE COPY**

# EXHIBIT COVER PAGE:

Exhibit:  5

Description of this exhibit:  Superior Court of California, County of
San Joaquin Order of Denial

Number of pages of this exhibit:  3  pages

JURISDICTION: (Check only one)

_____ Municipal Court

_____ Superior Court

_____ Appellate Court

_____ State Supreme Court

XXXXX United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other: _____

**FILED**
SUPERIOR COURT-STOCKTON

09 JUL 22 PM 2: 55

ROSA JUNQUEIRO. CLERK

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN JOAQUIN

In the Matter of the Petition·of

CARL CHARLES HANCOCK, JR.

For Writ of Habeas Corpus.

CASE NO. SC045624B

ORDER

TO: CARL CHARLES HANCOCK, JR., Petitioner:

Petitioner filed this petition for Writ of Habeas Corpus on June 2, 2009. The court having reviewed the documents and pleadings filed by petitioner, and good cause appearing therefor, IT IS HEREBY ORDERED THAT THE PETITION IS **DENIED** for the reasons that follow:

**REASONS:** Following entry of a no contest plea, petitioner was convicted of first degree murder. On July 29, 1992, he was given an agreed-upon sentence of 25 years-to-life.

After a hearing on October 29, 2007, petitioner was denied parole. He contends that his rights were violated in that the panel continued to rely on the commitment offense as a reason for its denial of a parole date. He also claims that the board unlawfully held against him his refusal to discuss the specific facts of the crime.

As for the second contention, there is no support for this claim in the record.

Regarding the first ground for relief, the Board did clearly outline the facts of the murder, which was indeed cruel and callous, as well as dispassionate and calculated. This was a murder for hire. Defendant had no prior contact with the victim, yet he befriended the victim and then lured him to a location which was preselected for the murder. Once there, petitioner positioned the victim in such a manner that his co-defendant could shoot the victim through the back with a crossbow. The arrow apparently went completely through the victim's body. The victim didn't die immediately, and there is some evidence that he begged the petitioner to help him. Instead, the two perpetrators beat him violently and then put him in the trunk of their rented car. They drove some four hours before stopping to disposed of the body, at which point they realized the victim was still alive. The petitioner and his accomplice then strangled the victim to death with a rope and threw the body into a ravine in Sonoma County. Before disposing of the body, they removed the victim's identification and later threw it off of a bridge into the San Francisco bay.

This was clearly a calculated crime during which the victim suffered greatly. It demonstrates an extremely callous disregard for human suffering.

However, the Board did not simply rely on the commitment offense in denying parole. They also determined that petitioner has programmed in only a limited manner while incarcerated, and that he offered little insight into the murder and little empathy for the victim's family. The Board also found petitioner's parole plans deficient in that he could not readily explain what his duties would be, what his qualifications were for the positions or whether, in the case of one potential position, he would need to be – or be able to be – bonded.

The transcript of the hearing therefore reveals some evidence that petitioner would continue to be a danger to the public if released. Hence, the petition is denied. [See *In re Lawrence* (2008) 44 Cal.4th 1181, 190 P.3d 535, 82 Cal.Rptr.3d 169; *In re Shaputis* (2008) 44 Cal.4th 1241, 190 P.3d 573, 82 Cal.Rptr.3d 213.]

Date: 7/22/05

JUDGE OF THE SUPERIOR COURT
**RICHARD J. GUILIANI**

**FILED**
SUPERIOR COURT-STOCKTON

09 JUL 22 PH 2: 55

ROSA JUNQUEIRO. CLERK

BY _____ DEPUTY

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN JOAQUIN

In the Matter of the Petition of

CARL CHARLES HANCOCK, JR.

Petitioner,

For Writ of Habeas Corpus.

**CASE NO. SC045624B**

CERTIFICATE OF SERVICE BY MAIL

I, the undersigned, declare that I am a deputy of the Clerk of the Superior Court of San Joaquin County, State of California, and not a party to the action; on **JUL 2 2 2009**, I deposited in the United States Post Office at Stockton, California, true and correct copies of the Order regarding the above-entitled petition for writ of habeas corpus, a printed copy of which is hereto attached and made a part hereof, one copy of which being addressed to each of the following named persons at the following named addresses:

CARL CHARLES HANCOCK, JR., #H-43946
California State Prison - Solano
P.O. Box 4000
Vacaville, CA 95696-4000

I further declare that each of said copies so mailed and addressed was enclosed in a separate envelope, sealed, with the postage thereon fully prepaid. I declare under penalty of perjury that the foregoing is true and correct. Executed at Stockton, California on the date above specified.

Deputy Court Clerk

# EXHIBIT COVER PAGE:

Exhibit: 6

Description of this exhibit: Response to Superior Court of California
County of San Joaquin Denial of Petition

Number of pages of this exhibit: 4  pages

JURISDICTION: (Check only one)

_____ Municipal Court

_____ Superior Court

_____ Appellate Court

_____ State Supreme Court

XXXX United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other:_____

1        IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

2                    THIRD APPELLATE DISTRICT

3

4

5

6

7    In re:                              CASE NO.

8         Carl C. Hancock, Jr.          San Joaquin County
                                        Case No. SCO45624B
9
     On Habeas Corpus.
10

11

12

13         RESPONSE TO SUPERIOR COURT OF CALIFORNIA,
           COUNTY OF SAN JOAQUIN, DENIAL OF PETITION
14

15

16

17

18

19

20

21                                    Carl C. Hancock, Jr.
                                      C.S.P Solano
22                                    P.O.Box 4000, 5-144-L
                                      Vacaville, Ca.  95696
23
                                      In pro-per
24

25

26

27

28

                              1

1   Petitioner would like to respond to the Superior Courts
2   denial of his habeas corpus by first stating that the court
3   did'nt answer the merits and our contentions that the petitioner
4   alledged in his writ. That they also erred in there conclusion.

5
6                                        I
7               STATE APPELLATE COURT'S HAVE OVERTURNED MANY PAROLE
                DENIALS BY PAROLE BOARDS AND SUPERIOR COURTS FINDING
8               NO EVIDENCE SUGGESTING THAT THE LIFER'S PAROLE
                CURRENTLY POSES AN UNREASONABLE PUBLIC SAFETY RISK
9               AND FINDING NO NEXUS BETWEEN THEIR FINDINGS AND THE
                PETITIONER'S CURRENT PAROLE RISK
10

11   The Supreme Court along with varioues Appellate Courts have
12   stated: Under "some evidenc" standard of review, a decision by
13   the board or a Superior Court setting forth facts used to find
14   a lifer unsuitable for parole must contain an EXPLICIT
15   "articulation of a rational nexus between those facts and
16   current dangerousness." (In re Lawrence, 44 Cal. 4th at pp. 126-
17   127.)

18   In the case at hand the board and the Court failed to do
19   this.  They did not show an explicit articulation of a rational
20   nexus between those facts for denial and current dangerousness.
21   The board nor the Court directed the petitioner or any reviewing
22   Court to any evidence that is in the record to support there
23   conclusion.

24   The petitioner had challenged the boards conclusion and
25   there evidence in support of there conclusion, but yet the Court
26   did'nt answer the petitioner allegations or concider the
27   petitioner aruguments in support of his petition.
28

                                     2

1    The Court stated:

2 " The transcript of the hearing therefore reveals some evidence
3 that petitioner would continue to be a danger to the public if
4 released. Hence the petition is denied." (see exhibit 5)

5    The Board/Court first stated there denial was because of
6 petitioners commitment offense. (see exhibit 5)

7    In response to this petitioner argued that the board failed
8 to pass the some evidence test as stated In re Lawrence, 44 Cal.
9 4th 1181.(see petition sec. V p.5)

10 THE UNDERLYING CIRCUMSTANCES OF THE COMMITMENT OFFENSE ALONE RARELY
11 WILL PROVIDE A VALID BASIS FOR DENYING PAROLE. also see pet. sec.
12 VI  BOARD'S DENIAL OF PAROLE IS UNSUPPORTED BY EVIDENCE THAT
13 PETITIONER POSES UNREASONABLE RISK TO SOCIETY. pp. 7-8

14    Second reason the Board/Court stated was petitioner offered
15 little insight into the murder. In regards to this denial see
16 pet. sec V pp. 6-7.

17    Third reason the Board/Court stated was petitioner programed
18 in only a limited manner. In regards to this reason for denial
19 see pet. sec. VI pp. 8-10

20    Finally the Board/Court stated petitioners parole plans was
21 deficient. In regards to this reason for denial please see pet.
22 sec. VII  WHERE ONE OR MORE FACTORS ARE USED TO SUPPORT A DENIAL
23 OF PAROLE, THE RELEVANT INQUIRY IS WHETHER THOSE FACTORS, WHEN
24 CONSIDERED IN LIGHT OF THE OTHER FACTORS IN THE RECORD, ARE
25 PREDICTIVE OF CURRENT DANGEROUSNESS OF INMATE pp. 10-12

26    As petitioner has stated the Board/Court did'nt have a explicit
27 "articulation of a rational nexus between those facts (reason for
28 denial) and current dangerousness" In re Lawerence,44 Cal. 4th 1181

3

1      Pursuant to Lawerence, even though the board found petitioner
2   unsuitable due to the circumstances of his commitment offense, it
3   needed to further show how those circumstances related to his
4   current dangerousness in light of the other facts in the record,
5   here the board stated the circumstances of the offense,programmed
6   in only a limited manner, parole plans were deficient and had
7   little insight, even though the psy. report indicated something
8   diffrent about the insight, nevertheless the board did not address
9   how any of these issues were indicative of Mr. Hancock's current
10  dangerousness.  Because the Board's finding do not amount to a
11  determination of current dangerousness the Superior Courts's
12  finding of some evidence to support the findings is unreasonable
13  and a violation of petitioner's right to due process and therefor
14  there decision should be vacated and the petitioner granted a
15  release date and/or found suitable for parole.  There was no
16  reliable evidence before the panel supporting its conclusion that
17  petitioner's release would pose an unreasonable risk to public
18  safety.

19      There was no EXPLICIT "articulation of a rational nexus between
20  those facts (reason for denial) and current dangerousness" as
21  required by Lawerence, 44 Cal. 4th 1181, so therefore the Board/
22  Court order should be vacated.

23                                    Respectfully Submitted

24

25                                    _____

26  Date._____                     Carl C. Hancock, Jr.

27

28

                                  4

# EXHIBIT COVER PAGE:

Exhibit:  7 _____

Description of this exhibit: (Copy) of Cover sheet of petition for
                            Writ of Habeas Corpus filed in The
                            Court of Appeal of the State of California
                            Third Appellate District
                            Case NO. C062770

Number of pages of this exhibit: __1__ pages

JURISDICTION: (Check only one)

_____ Municipal Court

_____ Superior Court

_____ Appellate Court

_____ State Supreme Court

xxxx United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other:_____

Name: _Carl C. Hancock_____

Address: C.S.P Solano_____

_____P.O. BOX 4000, 5-245-I._____

_____Vacaville Ca. 95696_____

CDC or ID Number: H-43946_____

Please endorse and mail back in
S.A.S.E

☐ **COPY**
**FILED**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
AUG 2 5 2009

THIRD APPELLATE DISTRICT COURT OF APPEAL - THIRD DIST.(?)
(Court)                                    DEENA C. FAWCETT

BY_____ Dep....

PETITION FOR WRIT OF HABEAS CORPUS

| | |
|---|---|
| _____CARL C. HANCOCK JR._____ <br> Petitioner <br> vs. <br> _____BOARD OF PRISON HEARING_____ <br> Respondent | No. **C062770** <br><br> CHALLENGING THE BPH DECISION <br> FINDING PETITIONER UNSUITABLE <br> FOR PAROLE |

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the superior court, you only need to file the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and 4 copies of the petition and, if separately bound, 1 copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and 10 copies of the petition and, if separately bound, 2 copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court (as amended effective January 1, 2007). Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page 1 of 6

Form Approved for Optional Use
Judicial Council of California
MC-275 [Rev. January 1, 2009]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 at seq.;
Cal. Rules of Court, rule 8.380
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

## COURT OF APPEAL, THIRD APPELLATE DISTRICT

Criminal C062770

In re CARL C. HANCOCK on Habeas Corpus.

Judge:
Nature of Action: hc      Habeas corpus

### ATTORNEY - LITIGANTS

In propria persona

Petitioner
Carl C. Hancock
H43946
California Medical Facility ·
P.O. Box 2000
Vacaville, CA 95696

Office of the State Attorney General (Bar No. SAGSAC-01)
P.O. Box 944255
Sacramento, CA 94244

Respondent
The People

### DOCKET EVENTS

08/28/2009
Petition for a writ of habeas corpus filed.
(ns).

# EXHIBIT COVER PAGE:

Exhibit: 7B

Description of this exhibit:
Request to the State Attorney General to write an Informal Response to the petitioners writ, from the Court of Appeal

Number of pages of this exhibit: 1 pages

JURISDICTION: (Check only one)

_____ Municipal Court

_____ Superior Court

_____ Appellate Court

_____ State Supreme Court

xxxx United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other:_____

621 CAP TOL MALL Case 2:10-cv-02215-MCE-CKD OFFICE OF THE CLERK Filed 08/19/10 Page 187 of 217 DEENA C. FAWCETT CLERK/ADMINISTRATOR
SACRAMENTO CA 95814-4719
(916) 654-0209
www.courtinfo.ca.gov

COLETTE M. BRUGGMAN
ASSISTANT CLERK/ADMINISTRATOR

# Court of Appeal

THIRD APPELLATE DISTRICT

STATE OF CALIFORNIA

DEPUTIES.

DARLENE A WARNOCK
ANITA L. KENNER
SANDY GREEN
GAYLE KELLY
GRACE M EMERO
ANA I CAVAZOS
SUSAN WELSH
KECIA WORLEY
TORI VOSS
CARRIE R. WHITNEY
SARAH J HARMONING
ANA M GUZMAN
KATHY WOJNAROWSKI

September 3, 2009

Office of the State Attorney General
Attn: Michael Farrell
P.O. Box 944255
Sacramento, CA 94244-2550

Re: In re CARL C. HANCOCK on Habeas Corpus
C062770

Dear Counsel:

A petition for writ of habeas corpus has been filed in the above case. Before acting on this matter, the court requests that the People serve and file with this court written opposition to the petition by September 18, 2009.

Petitioner's response to the opposition, if any, is to be served on the Attorney General and filed with this court within 15 days after the filing of the opposition.

Very truly yours,

DEENA C. FAWCETT
Clerk/Administrator

By: _____
Deputy Clerk

cc: See Mailing List

# EXHIBIT COVER PAGE:

Exhibit: __8__

Description of this exhibit: Informal Response from the Attorney
General's office.
**(Hearing Transcripts exhibit 2)**

Number of pages of this exhibit: __9__ pages

JURISDICTION: (Check only one)

____Municipal Court

____Superior Court

____Appellate Court

____State Supreme Court

xxxx United States District Court

____United States Circuit Court

____United States Supreme Court

____California Department of Corrections, 602 Exhibit.

____Other:_____

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

**In re**

**CARL C. HANCOCK,**

Case No. C062770

Petitioner,

**On Habeas Corpus.**

## INFORMAL RESPONSE

EDMUND G. BROWN JR.
Attorney General of California
JULIE L. GARLAND
Senior Assistant Attorney General
JESSICA N. BLONIEN
Supervising Deputy Attorney General
KRISTA L. POLLARD
Deputy Attorney General
State Bar No. 175603
   1300 I Street, Suite 125
   P.O. Box 944255
   Sacramento, CA 94244-2550
   Telephone: (916) 327-6757
   Fax: (916) 322-8288
   E-mail: Krista.Pollard@doj.ca.gov
*Attorneys for Respondent*

## INTRODUCTION

Petitioner Carl Hancock filed a petition for writ of habeas corpus challenging the Board of Parole Hearings' (Board) 2007 decision finding him unsuitable for parole. The Board's decision must be upheld, however, because the Board conducted an individualized consideration of Hancock's parole suitability and determined that he would pose an unreasonable risk of danger to society if released. In addition, the Court should deny Hancock's claim that the parole hearing violated his plea agreement because the district attorney complied with the plea agreement's terms and Hancock waived that claim at the hearing.

## STATEMENT OF FACTS

On October 29, 2007, the Board held a parole consideration at which they found that Hancock was unsuitable for parole. (Ex. 1, Paroled Hearing Transcript, at pp. 1, 121.) The Board based its decision on the commitment offense, Hancock's limited programming while incarcerated, need for additional insight and empathy, and deficient parole plans. (Ex. 1 at pp. 121-128.)

The Board found that Hancock had limited insight into the murder. During Hancock's hearing, the Board tried to understand the relationship between Hancock's prison programming and whether those programs address "the issue of how did [the crime] happen . . . [a]nd how do we know it's not going to happen again." (Ex. 1 at p. 48) The Board noted that the number of laudatory chronos Hancock acquired is irrelevant, the relevant issue is whether he had changed and no longer posed a threat to public safety if released. (*Id.* at p. 51.)

Hancock and James Mackey plotted to murder Lawrence Carnegie. Hancock lured into standing with his back to an open garage door while . Mackey, was hiding inside the garage waiting. (Ex. 1 at pp. 19-20.) Once

1

Carnegie was in position, Mackey shot Carnegie in the back with a
crossbow. (*Id.* at pp. 19-20.) The pair then placed Carnegie in the trunk of
a car so that they could dispose of his body in another location. (*Id.* at p.
21.)

During the drive, the pair heard a noise coming from the trunk,
stopped the car, and opened the trunk to discover that Carnegie was still
alive. (Ex. 1 at p. 21.) So, the pair used a rope to strangle Carnegie,
dumped his body in a rural area, and disposed of the evidence. (*Id.* at pp.
21-22.)

After he was arrested, Mackey explained that he had been hired by a
wealthy developer to kill Carnegie and had recruited Hancock to help him
with the murder. (Ex. 1 at pp. 22-23.)

During the hearing, the Board wanted Hancock to explain how he had
changed, not only so that he would not have assisted Mackey in shooting
Carnegie, but how he changed from a person who would strangle the
injured Carnegie instead of helping Carnegie. (*Id.* at p. 52.)

In responding, Hancock explained at the time of the murder he was in
a downward spiral and increasingly using drugs. (Ex. 1 at p. 49.) That he
was "influenced by [his] understanding that it was hard for [him] to say no
to somebody that [he] cared for or that [he] loved." (*Ibid.*) He claimed he
would not go back to that mind set because he will not use drugs or use the
excuse that there were "things that's happening in [his] family. You know,
not letting a financial situation press [him] to do anything that would cause
[him] to be financially secure and putting life above money." (*Ibid.*) Drugs
"immobilized [his] sensibilities to be able to justify the crime that [he]
created as far as the murder, as far as the murder for money or anything that
enticed [him] to, you know, follow through on what [he] followed through
on." (*Ibid.*) Hancock also explained that he was currently helping children

2



stay away from drugs, the drugs that made him mentally unstable. (*Id.* at pp. 51-52.)

The Board found that Hancock needed additional substance abuse treatment. After discussing Hancock's substance abuse problem and its relationship to the commitment offense, the Board asked Hancock whether he was attending substance abuse treatment and for how long. (Ex. 1 at pp. 32-37, 49-51, 53.) Hancock told the Board that he has attended substance abuse treatment "off and on for about a year, a year and a half." (*Id.* at p. 53.) When asked whether he derived any benefit from the program, Hancock said that at AA/NA meetings "everybody tells their stories about, you know, how they proceeded through a day. . . And these were just sharing the stories. And I shared my story and that they gave me, and I did. And I'm not the only one that's going through these same kind of problems." (*Id.* at p. 54.) Hancock admitted that while in AA/NA he "never went over the steps. [He] would come from time to time. [He didn't] know if [he] was available or in attendance enough to actually get the steps." (*Id.* at p. 55.) As the Board explained, "the stories are important. They're kind of the introduction to the whole – because that kind of catches you. The real meat of the process is the steps." (*Ibid.*) Its through working the steps with others that leads a person to "a level of understanding that [the Board believes] everyone has to come to, without regard to the excuses that you provide for yourself." (*Id.* at pp. 123-125.)

The Board also found that Hancock lacked empathy. During the hearing, the Board looked for Hancock to express empathy for someone other than himself. (Ex. 1 at pp. 51, 128.) Specifically, the Board asked Hancock to put himself in the shoes of the victim, asking Hancock "[w]hat do you think he felt when his in the trunk of the car? Probably thinking he's going to die." (*Id.* at p. 51.) In response, Hancock did not express any empathy for the victim. (*Id.* at pp. 51-52.) Instead, Hancock said that it's a

3

"process that [he's] processing even as [he] sit[s] here." (Id. at p. 51.) Hancock then explained that he is trying to help children, sharing himself, his situation, and what he felt was his mind set at the time. (Id. at pp. 51-52.) The Board found that, if Hancock were to "look at this transcript, almost every sentence [he] said started with 'I'." *(Ibid.)*

Pursuant to Hancock's plea agreement, and a court order from a prior matter, the district attorney appeared at the hearing. (Ex. 1 at pp. 79-83.) The district attorney stated that to honor the spirit and letter of the agreement, the office would not be commenting on Hancock's suitability at the hearing. *(Id.* at p. 80.) Instead, the office would submit a letter stating their office's non-opposition to Hancock's release on parole. (Id. at pp. 79-83.) Hancock's counsel of record requested that the Board consider the district attorney's letter and stated the letter is largely consistent with the spirit of the agreement. *(Id.* at pp. 81-83.)

## ARGUMENT

### I. THE COURT SHOULD DENY HANCOCK'S HABEAS PETITION BECAUSE SOME EVIDENCE SUPPORTS THE BOARD'S CONCLUSION THAT HIS PAROLE RELEASE WOULD POSE AN UNREASONABLE RISK OF DANGER TO SOCIETY.

When a court reviews a decision by the Board concerning a life-term inmate's suitability for parole release, the proper question is whether some evidence supports a finding that the inmate currently poses a danger to the public. *(In re Lawrence* (2008) 44 Cal.4th 1181, 1212.) Under this standard, a court must affirm the Board's decision if any evidence in the record supports the ultimate conclusion that the inmate would be a current danger to society if released. *(In re Shaputis* (2008) 44 Cal.4th 1241,1258.) In determining parole suitability, the Board may rely on a variety of factors so long as those factors are probative to the issue of whether the inmate remains a danger to the public. *(Lawrence, supra,* at p. 1205.) Further, the

4

Board has authority "to identify and weigh only the factors relevant to predicting 'whether the inmate will be able to live in society without committing additional antisocial acts.'" (*Id.* at pp. 1205-1206 [internal citation omitted].)

Because the circumstances tending to show unsuitability for parole are general guidelines and are not an exclusive list of circumstances demonstrating unsuitability (*In re Reed* (2008) 171 Cal.App.4th 1071, 1084), the Board properly considered Hancock's lack of insight into the circumstances of his commitment offense, lack of empathy, and need for further programming. (*Shaputis, supra*, 44 Cal.4th at p. 1260; see also *In re Morrall* (2002) 102 Cal.App.4th 280, 301 [the regulations are general guidelines listing nonexclusive factors demonstrating unsuitability]; *In re Smith* (2009) 171 Cal.App.4th 1631, 1639 [the Governor may properly rely on a prisoner's lack of insight to show current dangerousness].) When asked by the Board to explain how he had changed, Hancock stated that his participation in the murder was due to drugs and financial pressures. (Ex. 1 at pp. 49, 51-52.) But, Hancock did not explain how his character had changed so that financial pressures, which are a common experience, would not lead to anti-social conduct. (*Id.* at pp. 49, 51-55.) Further, Hancock's participation in a substance abuse treatment is scattered, short term, and did not progress past the introductory exchange of stories. (*Id.* at pp. 53-55.) Hancock did not show the Board that his substance abuse treatment reached the in-depth level where change can occur. (*Id.* at pp. 55, 123-125) Finally, Hancock did not demonstrate the empathy (*Id.* at 51-52, 128) that makes expressions of remorse mean more than empty words.

The central issue in a parole consideration hearing is whether there is a change in the prisoner's character, which can be the result of rehabilitative programs, that renders the prisoner as no longer dangerous. (*Lawrence, supra*, 44 Cal.4th at p. 1228.) Indeed, the California Supreme

5

Court held that unless there is "affirmative evidence of a change in the prisoner's demeanor and mental state," the prisoner may remain a current danger to society. (*Id.* at p. 1219.) The California Supreme Court applied this premise in *Shaputis*. In *Shaputis*, the prisoner expressed remorse for his crime and acknowledged that his conduct was wrong. However, the prisoner "still claim[ed] the shooting was an accident. This claim, considered with evidence of [the prisoner's] history of domestic abuse and recent psychological reports reflecting that his character remains unchanged and that he is unable to gain insight into his antisocial behavior despite years of therapy and rehabilitative programming" supported the conclusion that the prisoner remained dangerous. (*Shaputis, supra*, 44 Cal.4th at p. 1260.) Similarly, because Hancock did not demonstrate that he had empathy, well developed insight into the circumstances of his commitment offense, and sufficient self-help programming, there is some evidence that Hancock's commitment offense remains probative of his current dangerousness. (*Shaputis, supra*, 44 Cal.4th at p. 1260.)

Any doubt regarding whether the Board properly found Hancock presents a current threat should be resolved in favor of the Board's decision. (See *Rosenkrantz, supra*, 29 Cal.4th at p. 665 [holding that judicial review of parole decisions is extremely deferential].) Under the some-evidence standard, "the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [parole authority] . . . ." (*Shaputis, supra*, 44 Cal.4th at p. 1260.) "[T]he court is not entitled to reweigh the circumstances indicating suitability or unsuitability for parole." (*In re Reed* (2009) 171 Cal.App.4th 1071, 1083.) Indeed, it is irrelevant that the Court might conclude, in its own judgment, that given the positive factors supportive of Hancock's release, Hancock does not remain a risk to public safety. (*Shaputis, supra*, 44 Cal.4th at p. 1260.) Because the Board conducted an individualized

6

review of Hancock's parole suitability, and there is some evidence
supporting that decision, this Court must defer to that decision.
Accordingly, the Court should deny Hancock's request for relief.

## II.   THE PAROLE CONSIDERATION HEARING DID NOT VIOLATE HANCOCK'S PLEA AGREEMENT.

Hancock also alleges that the parole hearing violated his plea
agreement because the district attorney's letter was not read into the record.
(Petn. at pp. 12-13.) Under the terms of his plea agreement, Hancock was
entitled to have a letter from the district attorney indicating that the office
agreed that Hancock should be release to parole at the earliest possible
time. (Petn. Ex. 1 at p. 2.) That term of the plea agreement does not
require the Board to read the district attorney's letter into the record. (*Ibid.*)
Because the district attorney provided the letter, which Hancock's counsel
conceded was consistent with the spirit of the plea agreement, and the
Board accepted the letter, (Ex. 1 at pp. 79-83), the parole hearing complied
with the terms of the plea agreement.

Further, to any extent that providing the district attorney's letter to the
Board did not comply with the plea agreement, Hancock has waived that
claim. A party may intentionally waive the right to a known claim.
(*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31.) And a
party's actions can demonstrate that waiver. (*In re Julio N.* (1992) 3
Cal.App.4th 1120, 1123.) Here, the Board, Hancock's counsel, and the
district attorney considered what actions the plea agreement required, and
whether the district's attorney's actions and letter complied with that
agreement. (Ex. 1 at pp. 79-83.) Hancock's counsel also requested that the
Board accept the district attorney's letter and stated the letter is largely
consistent with the spirit of the agreement. (*Id.* at pp. 81-83.) At no time
did Hancock's attorney also state that the plea agreement required the letter
to be read into the record or request that the Board read the letter into the

7

record. (See generally, Ex. 1.) Therefore, Hancock has waived that claim. (*Julio, supra*, 3 Cal.App.4th at p. 1123.)

## CONCLUSION

Because the Board's decision finding Hancock unsuitable for parole was supported by some evidence, the Court should deny that claim. In addition, the Court should deny Hancock's plea agreement claim.

Dated: September 18, 2009      EDMUND G. BROWN JR.
Attorney General of California
JULIE L. GARLAND
Senior Assistant Attorney General
JESSICA N. BLONIEN
Supervising Deputy Attorney General



KRISTA L. POLLARD
Deputy Attorney General
Attorneys for Respondent

SA2009312648
30862043.doc

8

## CERTIFICATE OF COMPLIANCE

I certify that the attached INFORMAL RESPONSE uses a 13 point

Times New Roman font and contains 2,480 words.

Dated: September 18, 2009        EDMUND G. BROWN JR.
Attorney General of California

KRISTA L. POLLARD
Deputy Attorney General
Attorneys for Respondent

9

# EXHIBIT COVER PAGE:

Exhibit: __9__

Description of this exhibit: **Opposition to the Informal Response**

Number of pages of this exhibit: __9__ pages

JURISDICTION: (Check only one)

_____Municipal Court

_____Superior Court

_____Appellate Court

_____State Supreme Court

**XXX**_ United States District Court

_____United States Circuit Court

_____United States Supreme Court

_____California Department of Corrections, 602 Exhibit.

_____Other:_____

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

In re

    Carl C. Hancock,
              Petitioner

On Habeas Corpus

Case No.  C062770

**FILED**

OCT - 8 2009

COURT OF APPEAL - THIRD DISTRICT
DEENA C. FAWCETT
BY _With permission_ Deputy

OPPOSITION TO INFORMAL RESPONSE

Carl C. Hancock, H43946
C.S.P Solano
P.O.Box  4000, 5-245-L
Vacaville CA.  95696

INTRODUCTION

Petitioner is responding to the Attorneys General's Informal Response which was filed on 9/18/09, In The Court of Appeal of the State of California, Third Appellate District. Petitioner received his copy on 9-22-09. The petitioners writ should be granted because the board and the attorney general failed to show an explicit articulation of a rational nexus between the facts used to find unsuitabilty and the current risk/dangerousness to the public safety by granting petitioner parole.

STATEMENT OF FACTS

On or about 10-29-07, the board of prison hearing held a parole consideration hearing at which time they found petitioner was unsuitable for parole. (see Ex. 2 of Petition for writ of habeas corpus, which will be refered to as (pet.) and Ex. 1 of the Informal Response, refered to as (I.F.). Petitioner filed a writ of habeas corpus with the San Joaquin Superior Court. on or about 6-2-09, challenging the BPH decision finding petitioner unsuitable for parole. The writ was denied on 7-22-09. Petitioner then filed a writ of habeas corpus with the Court of Appeal of the State of California, Third Appellate District on 8-28-09. (see Ex. 1) The Appellate Court informed the respondent to file an Informal Response by 9-18-09. (see Ex. 2) On 9-22-09 petitioner received a copy of Respondent Informal Response and is now filing his opposition to the informal response.

The Board and Attorney General stated there denial was based on the petitioners comitment offense. (see pet. Ex. 5; I.R p.1)

1

1    In response to this factor petitioner argued that the board failed
2    to pass the 'some evidence' test as required by In re Lawrence,44
3    Cal. 4th 1181. ( see pet. sec. V p.5 ) The board/ AG stated
4    petitioner offered little insight into the murder. In response to
5    this factor petitioner argued that the record showed that petition-
6    er had insight and they failed to show a nexus between this factor
7    and current dangerousness to the public. (see pet. sec. V pp. 6-7)
8    The board/AG also stated petitioner programend in only a limited
9    manner. In regards to this factor petitioner argued that the
10    record clearly showed petitioner programend in a good/positive
11    manner and the board/AG failed to show a nexus between this
12    factor and current dangerousness to the public.(see pet. sec. VI
13    pp. 8-10) The board/AG finally stated petitioners parole plan was
14    deficient. In response to this factor petitioner argued that
15    the evidence in the record showed that his parole plans were
16    sufficient and realistic also the board/AG failed to show a nexus
17    between this factor and current dangerousness to the public.
18    (see pet. sec. VII p. 10-12)

19    The Board/AG did not direct the petitioner or any reviewing
20    court to any evidence that is on the record to support there
21    conclusion. The Board/AG didn't have an Explicit "articulation
22    of a rational nexus between those facts (reason for denial) and
23    current dangerousness" as required In re Lawerence, 44 Cal. 4th
24    1181. Because there is no evidence on the record to support the
25    decision and they failed to show an explicit articulation of a
26    rational nexus between those facts for denial of parole and
27    current dangerousness to public safety petitioners writ should
28    be granted.    2

1       I.      THE BOARD/ATTORNEY GENERAL FAILED TO SHOW
                      AN EXPLICIT ARTICULATION OF A RATIONAL
2                        NEXUS BETWEEN THOSE FACTS FOR DENIAL OF
                      PAROLE AND CURRENT DANGEROUSNESS TO THE
3                                  PUBLIC

4

5       Petitioner would like to respond to the Attorney General's

6  Informal Response by stating that the Attorney General just

7  simply reinterated the factors that the board used to find

8  petitioner unsuitable for parole without citing an Explict

9  "articulation of a rational nexus between those facts and current

10  dangerousness" as required. ( see In re Lawrence, 44 Cal. 4th at

11  pp. 126-127)

12       The Attorney General stated the Board found that petitioner

13  had limited insight into the murder.  The AG stated the board

14  based this decision on the fact that the petitioner didn't

15  articulate his answer to the board question correctly when he

16  was asked why he didn't help the victim. (see I.R p.2)

17  Petitioner is contending there is no way he could have fully

18  answered this question satisfactorly due to the fact he was

19  convicted of first degree murder, murder-for-hire.  If the

20  petitioner would have help the victim he would not have been

21  convicted for murder and/or he could have become a victim

22  his self due to the fact he was not the main culpert he was

23  recurited to help carcy out this crime.  The petitioner mindset

24  at the time of the crime was to carry out the crime.  Petitioner

25  is not condoning or justifying his mindset petitioner actually

26  took full responcibility for his action.  Petitioner may not have

27  had the ablity to articulate or verbalize how he had changed

28  completly since the time of this crime for the board to realize how

3

1 | remorseful he is or how he is a complety diffrent person from the one
2 | who committed that crime. Petitioner clearly believes that the
3 | record shows along with his demenor that his self help prograns
4 | such as the men's violence preavention, anger managment, POP along
5 | with practicing/particitpating in his religious faith as a servant
6 | student, mentor teachec has help him tremendously in developing
7 | the proper tools to maintain a proper mindset in dealing with all
8 | trials and tribulations life has to offer.

9 | The court should find that the AG factor of lack of insight is
10 | not supported by some evidence of current dangerousness the
11 | AG failed to show how this factor demonstrated that petitioner
12 | " currently poses a threat to public safety"(Lawrence)  There is
13 | no evidence in petitioners record that suggest he would currently
14 | pose a threat to public safety if released.  This is a crucial
15 | defect in light of the psychologist's determination that petitioners
16 | " Insight into the crime involvement and over all situation appears
17 | intact" (see pet. p.6) also stated: " Overall Risk Assesment: the
18 | inmate level of psychopathy is in the low range. The inmates
19 | overall propensity for violence is in the low range when compared
20 | to similar inmates. The inmates general recidivism is rated in
21 | the low range." (see pet. p.6)  Petitioner is contending that to
22 | satisfy due process, " the test is not whether some evidence
23 | supports the Board's finding of factors tending to show unsuit-
24 | ability for parole, but whether some evidence supports the Boards
25 | determination that the prisoner's release would unreasonably
26 | endanger public safety." ( Lawrence 44 Cal. 4th. 1128)  Petitioner
27 | is contending that the Board/AG fails to do this and therfore
28 | petitioners writ should be granted.

4

II.   THE COURT SHOULD INSIST ON A NEXUS BETWEEN
      THE FACTS USED TO FIND PETITIONER'S UN-
      SUITABILITY AND THE RISK TO PUBLIC SAFETY
      POSED BY PETIONER'S PAROLE

The Courts have consistantly stated:

It violates a prisoner's right to due process when the Board or (AG) attaches significance to evidence that forewarns no danger to the public or relies on unsupported conclusion (citing Tripp 150 Cal. App. 4th at p. 313)   As to the AG's alledged substance abuse concern,(see I.R p.3), the record indicates, however that petitioner has remained drug free for over 20 years and the doctors reports indicates that petitioner does not currently have a substance abuse problem. " The diagnostic report from the doctor notes that Mr. Hancock is clean and sober.  That his substance abuse is in remission that he didn't see this as a issue that couldn't be address on parole" (see H.T p.95 )  The AG failed to show how petitioner past substance abuse indicates that he currently poses a threat to public safety and therefore it is insufficient to support the board/AG conclusion.

III.   THE PAROLE CONSIDERATION HEARING DID IN
       FACT VIOLATE PETITIONER'S PLEA AGREEMENT

The Attorney General alledges that the Parole Consideration hearing did not violate the petitioners plea agreement and that the distirct attorney's comments does not have to be consistent with the spirit of the plea agrement and since they didn't object or agreed with part of the DA's statement they waived their claim. (see I.R p.7-8)

OURT PAPER
TATE OF CALIFORNIA
TD. 113 (REV. 8-72)

5 34769

1    The District Attorney in his own words indicated that an
2  attorney for the people words must be consistant with the
3  spirits of the letter other wise it would be a violation of the
4  plea agreement.  The D.A stated  " a habeas petition saying
5  that the district attorney violated an agreement and impropecly
6  spoke at those proceeding."  (see H.T p.79)  The DA was refering
7  to the last hearing which another DA made comments that was not
8  consistant with the plea agreement and therfore petitioner
9  filed an Writ and the writ was granted
10  Sotherfore the Court must conclude does a DA"s comments matter
11  when a plea agreement is made ? and if the DA's comments were
12  in line or in the same spirit of the letter. ( in-regards to
13  this see pet. p. 13)  The only comments that the DA was suppose
14  to place on the record that would be consistant with the spirit
15  of the letter and/or plea agreement was:  " It is our recom-
16  mendation that Mr. Hancock be released on parole upon having
17  served the minmum sentence for first degree murder" (see pet. p.13)
18  Did the DA do this ?  What did he place on the record ? was it
19  in the spirit of the letter?  Petitioner contends that the DA's
20  actions violated the spirit of the letter. (see pet. p. 13-14)
21  Petitioners action nor his attorneys actions waived his claim.
22  Petitioner Attorney stated:  " but we would request that you
23  give the district attorney an opportunity to submit the letter
24  he has prepared for purpose of this hearing, because it goes
25  beyound his brief remarks." (see H.T p.82)  Petitioners attorney
26  also informed the board that the DA's comments was misleading
27  and not part of the plea agreement.  Petitioner attorney stated:
28

1  " Well, one thing I would object to his statement. There was

2  only one charge in this case that was ever filed against Mr. Hancock

3  and I don't think there was any criminality after this case"

4  ( H.T ¶82) Since the record shows that the petitioners attorney

5  wanted the the letter placed in the record by the DA along with

6  objecting to the DA's opening statments and remarks the

7  petitioner didn't waive any rights or claims.( please also

8  read pet. p. 13-14)

9

10                          CONCLUSION

11

12      In sum, the Board may base a denial of parole decision upon

13  the circumstances of the offense, or upon other immutable facts

14  such as an inmates criminal history, but some evidence will support

15  such reliance only if those facts support the ultimate conclusion

16  that an inmate continues to pose an unreasonable risk to public

17  safety. (Regs,§ 2281 subd. (a).)  Accordingly, the relevant

18  inquiry for a reviewing court is not merely whether an inmate

19  crime was especially callaus, or shockingly vicious or lethal, but

20  whether the identified facts are probative to the central issues

21  of current dangerousness when considered in light of the full  .

22  record before the Board. (citing Lawrence)  For any fact the

23  Board involves as a reason to deny parole he must explain why

24  'the evidence substantiates the ultimate conclusion that the

25  prisoner's release currently poses an unreasonable risk of danger

26  to the public." he must explain its nexus to the question of

27  present 'public safety' (pc 3041(b)".

28

                          7

Petitioner is contending that the record fails to show 'some evidence' supporting the boards denial and there was no nexis between the facts used to find unsuitability and the risk to public safety posed by the petitioners parole. Although the commitment offense was callous, the passage of 20 years since the crime should have diminished the value factor as a predictor of current dangerousness, particulary since

1) Petitioner made a plea bargain, he took full responcibility for his actions, he has shown remorse. the District Attorney urge and recommend that petitioner be released after serving his minimum sentence.

2) The psy. report indicated the petitioner was suitable for parole, his insight was intact, he was remorseful, assessed petitioner as a low risk to the public, his substance abuse was in remition and any future rehabilitation could be a condition of his parole, also that currently he had no substance abuse problem

3) Petitioner wasn't the main culprit but was recurited to participate in this criminal activity, there was no history of prior criminal activity, stable prior history along with strong family ties.

4) Petitioner examplary behavior in prison, shows he can get along and work with others, reflects he has rehabilated himself. Because there was no evidence to support the boards decision and there was no nexus between those factors and current dangerousness to public safety, this writ should be granted.

Date:                                    Respectfully Submitted

8

Carl C. Hancock

## VERIFICATION
(C.C.P. §446; §2015.5; 28 U.S.C. §1746)

I, __Carl C. Hancock__ _____ declare under the penalty of perjury that:

I am the __Petitioner__ ____ in the attached matter, I have read the foregoing documents and know the contents thereof, and the same is true of my own personal knowledge, or upon information and belief therein that they are true. That if called to testify as to the contents hereof, I could do so competently as a sworn witness.

Executed this __30th__ day of __September__ ____, __2009__ at the California State Prison-Solano, in the City of Vacaville, County of Solano, State of California.

(Signature)_____

Declarant __Carl C. Hancock__

*****************************************************************************************

## DECLARATION OF SERVICE BY MAIL
(C.C.P.§1013(a); §2015.5; 28 U.S.C. §1746)

I, __Carl C. Hancock__, __H43946__ declare; That I am a resident of the California State Prison-Solano. in the State of California. I am over the age of (18) years of age, I am [ X ] am not [ ] a party to the above entitled action. My address is P.O. Box 4000; cell ( __5-245-L__ ), Vacaville, California 95696-4000.

I served the attached described documentation entitled:

OPPOSITION TO INFORMAL RESPONSE

on the person(s)/entities/parties specified below by placing a true and duplicated copy(s) of the described documentation into a First Class Postage Paid envelope and submitted it to custody officials for inspection, sealing, and depositing in the United State Mail, consistent with the "Mailbox Rule": Houston v. Lack, 487 U.S. 266,108 S.Ct. 2379, 101 L.Ed.2d. 245 (1988) at the California State Prison-Solano, in Vacaville, California 95696-4000, addressed as follows:

Court of Appeal
Third Appellate Dist.
900 N st. 4th. Fl. 400
Sac. Ca. 95814

Attorney General of California
Deputy Attorney General
Krista L. Pollard
1300 I street, suite 125
P.O. Box 944255
Sacramento. CA 94244-2550

There is First Class mail delivery service by the United States Postal Service at the person(s)/entities/parties addresses and/or regular communications by Postal Service delivery at the addresses above. I declare under the penalty of perjury that the foregoing is true and correct according to my knowledge and beliefs, and that I executed the service on:

This __30th__ day of __September__ ____, __2009__ ____

(Signature)_____
Declarant

***CURRENT ADDRESS***
Carl C. Hancock
C.S.P Solano
P.O.Box 4000, 5-245-L
Vacaville CA. 95696

CDC# H43946

# EXHIBIT COVER PAGE:

Exhibit: __10__

Description of this exhibit: **Order from the Court of Appeal of the State of California, Third Appellate District, Denying the petition**

Number of pages of this exhibit: __2__ pages

JURISDICTION: (Check only one)

_____ Municipal Court

_____ Superior Court

_____ Appellate Court

_____ State Supreme Court

**XXX** United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other: _____

## IN THE

# Court of Appeal of the State of California
## IN AND FOR THE
## THIRD APPELLATE DISTRICT

# FILED

OCT 2 2 2009

COURT OF APPEAL - THIRD DISTRICT
DEENA C. FAWCETT, Clerk

BY_____ Deputy

In re CARL C. HANCOCK on Habeas Corpus.

C062770
County
No.

BY THE COURT:

The petition for writ of habeas corpus is denied.

Dated: October 22, 2009

BLEASE, Acting P.J.

--------------------------------

cc: See Mailing List

**VERIFICATION**
(C.C.P. §446; §2015.5; 28 U.S.C. §1746)

I, *Carl C. Hancock* _____ declare under the penalty of perjury that:

I am the *Petitioner* _____ in the attached matter, I have read the foregoing documents and know the contents thereof, and the same is true of my own personal knowledge, or upon information and belief therein that they are true. That if called to testify as to the contents hereof, I could do so competently as a sworn witness.

Executed this *8th* day of *Nov* _____, *2009* at the California State Prison-Solano, in the City of Vacaville, County of Solano, State of California.

(Signature) _____
            Declarant

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**DECLARATION OF SERVICE BY MAIL**
(C.C.P.§1013(a); §2015.5; 28 U.S.C. §1746)

I, *Carl C. Hancock* _____ declare; That I am a resident of the California State Prison-Solano. in the State of California. I am over the age of (18) years of age, I am [X] am not [ ] a party to the above entitled action. My address is P.O. Box 4000; cell (____), Vacaville, California 95696-4000.
I served the attached described documentation entitled:
*Exhibits to my Petition for Writ of Habeas Corpus*

on the person(s)/entities/parties specified below by placing a true and duplicated copy(s) of the described documentation into a First Class Postage Paid envelope and submitted it to custody officials for inspection, sealing, and depositing in the United State Mail, consistent with the "Mailbox Rule": <u>Houston v. Lack, 487 U.S. 266,108 S.Ct. 2379, 101 L.Ed.2d. 245 (1988)</u> at the California State Prison-Solano, in Vacaville, California 95696-4000, addressed as follows:

*California Supreme Court*
*350 Mc Allister st.*
*San Francisco CA. 94102*

There is First Class mail delivery service by the United States Postal Service at the person(s)/entities/parties addresses and/or regular communications by Postal Service delivery at the addresses above. I declare under the penalty of perjury that the foregoing is true and correct according to my knowledge and beliefs, and that I executed the service on:

This *8th* day of *Nov* _____, *2009*

(Signature) _____
            Declarant

# EXHIBIT COVER PAGE:

Exhibit: __11__

Description of this exhibit: **Petitioner's Copy of his filed/endorsed petition for writ of habeas corpus filed in the CA. Suprme Court CASE NO. S177839**

Number of pages of this exhibit: __1__ pages

JURISDICTION: (Check only one)

_____ Municipal Court

_____ Superior Court

_____ Appellate Court

_____ State Supreme Court

__X__ United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other:_____

Name: _Carl C. Hancock_

Address: _C.S.P Solano_

_P.O.Box  4000,  5-245-L_

_Vacaville CA.  95696_

CDC or ID Number: _H-43946_

Petitioner's

☐ **COPY**

**SUPREME COURT**
**FILED**

IN THE SUPREME COURT

NOV 1 0 2009

OF THE STATE OF CALIFORNIA
(Court)

Frederick K. Ohlrich Clerk

Deputy

| | |
|---|---|
| _Carl C. Hancock Jr._<br><br>Petitioner<br><br>vs.<br><br>_Board of Prison Hearing_<br><br>Respondent | PETITION FOR WRIT OF HABEAS CORPUS<br><br>No. **S177839**<br><br>CHALLENGING THE BPH DECISION<br>FINDING PETITIONER UNSUITABLE<br>FOR PAROLE |

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the superior court, you only need to file the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and 4 copies of the petition and, if separately bound, 1 copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and 10 copies of the petition and, if separately bound, 2 copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court (as amended effective January 1, 2007). Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved for Optional Use
Judicial Council of California
MC-275 [Rev. January 1, 2009]

**PETITION FOR WRIT OF HABEAS CORPUS**

Page ·
Penal Code, § 1473 et seq.,
Cal. Rules of Court, rule 8.380
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

# EXHIBIT COVER PAGE:

Exhibit:  **12**

Description of this exhibit: **Denial order from The Supreme Court Of CA.
Case No. S177839;  The petition for writ of habeas corpus**

Number of pages of this exhibit:  **1**  pages

JURISDICTION:  (Check only one)

_____ Municipal Court

_____ Superior Court

_____ Appellate Court

_____ State Supreme Court

**XX** _____ United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other:_____



**S177839**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re CARL C. HANCOCK, JR., on Habeas Corpus.

The petition for writ of habeas corpus is denied.

**GEORGE**
_____
*Chief Justice*

## DECLARATION AND PROOF OF SERVICE BY MAIL

I, **Carl C. Hancock Jr.**, declare under the penalty of perjury that I am over the age of 18 years, (      ) and not a party, or (**XX** ) am a party to this action, and reside in Solano County, at P.O. Box 4000, Cell # **5-245-I.** ) Vacaville, California. 95696-4000.

That on __AUG__, __13__, 20**10**. I submitted to custody officials for inspection, sealing and depositing in the United States Mail, consistent with the "Mailbox Rule"; Houston v. Lack, 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988) at the California State Prison-Solano, Vacaville, California. 95696-4000 a copy of the attached hereof: **EXHIBITS 1 thru 12**

in a fully prepaid envelope, addressed to: **United States District Court for the Eastern District 501 I street, suite 4-200 Sacramento CA. 95814**

I declare under the penalty of perjury that the foregoing is true and correct. This declaration was executed on this __AUG__, __13__, 20**10**, at CSP-Solano, Vacaville, California. 95696-4000.

**Carl C. Hancock Jr.**
DECLARANT